Filed and Recorded Sep-14-2011 10:12am
2011-0116430
Real Estate Transfer Tax $0.00

Jay C. Stephenson

Jay C. Stephenson
Clerk of Superior Court Cobb Cty. Ga.



After recording return to:
Calloway Title & Escrow, LLC
David W. Dudley 2·2623S
4170 Ashford Dunwoody Rd. Ste. 285
Atlanta, Georgia 30319

---

Space Above This Line for Recorder's Use

---

**After recording, please return to:**

Haynes and Boone, LLP
30 Rockefeller Plaza
26th Floor
New York, NY 10112
Attention: Lawrence Mittman, Esq.

**Cross-Reference:**

Deed Book 14545, Page 2743;
Deed Book 14545, Page 2776;
Deed Book 14878 Page 4191-4197
Deed Book 14878 Page 4198 and 4204
Deed Book 14878 Page 4205-4211
Cobb County, Georgia Records

## STATE OF TEXAS

## COUNTY OF DALLAS

### <u>LIMITED WARRANTY DEED IN LIEU OF FORECLOSURE</u>

**THIS INDENTURE** is made this 25th day of August, 2011, by and between R-ROOF VI, LLC, a Delaware limited liability company having an address of 5847 San Felipe, Suite 4650, Houston, Texas 77057, herein called "Grantor", and FMW RRI NC LLC, a Delaware limited liability company having an address of 5847 San Felipe, Suite 4650, Houston, Texas 77057, herein called "Grantee". The words "Grantor" and "Grantee" include the neuter, masculine and feminine genders, and the singular and the plural.

### <u>W I T N E S S E T H</u>:

**FOR AND IN CONSIDERATION** of the sum of Ten Dollars ($10.00) in hand paid to Grantor by Grantee at and before the execution, sealing and delivery hereof, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does grant, bargain, sell, alien, convey and confirm unto Grantee, and the heirs, successors, legal representatives and assigns of Grantee, all that tract or parcel of land lying and being in Cobb County, Georgia, being more particularly described on <u>Exhibit "A"</u>, attached hereto and incorporated herein by reference (herein called the "Property").

Deed in Lieu Pool 3, #26, Smyrna, GA

1

RRI_GW_0000001

Deed Book **14878** Pg **4213**

**TO HAVE AND TO HOLD** the Property, together with any and all of the rights, members and appurtenances thereof to the same being, belonging or in anywise appertaining to the only proper use, benefit and behoof of Grantee forever, in fee simple; and

**GRANTOR WARRANTS** and shall forever defend the right and title to the Property unto Grantee, and the heirs, successor, legal representatives and assigns of Grantee, against the claims of all persons whomsoever, claiming by, through or under Grantor, but not otherwise; *provided, however*, that the warranties of title made by Grantor herein shall not extend to any claims arising under any matter set forth on Exhibit "B", attached hereto and incorporated herein by reference.

This conveyance is made in lieu of the foreclosure by Grantee of that certain Deed to Secure Debt, Assignment of Leases and Rents and Security Agreement made as of August 16, 2007, but effective as of September 6, 2007, executed by Grantor to Mortgage Electronic Registration Systems, Inc. a Delaware corporation, and recorded in Deed Book 14545, Page 2743 of the Cobb County, Georgia records (the "Records") and that certain Assignment of Leases and Rents dated as of August 30, 2007, but effective as of September 6, 2007, executed by Grantor to Mortgage Electronic Registration Systems, Inc. and recorded October 11, 2007 in Deed Book 14545, Page 2776 of the Records, and Financing Statement for Grantor as Debtor and Mortgage Electronic Registration Systems, Inc. as Secured Party and filed October 11, 2007 in Deed Book 14545, Page 2789 of the Records, as each such document has been assigned by: (1) "Assignment of (1) Deed to Secure Debt, Assignment of Leases and Rents and Security Agreement and (2) Assignment of Leases and Rents" from Mortgage Electronic Registration Systems, Inc., to U.S. Bank National Association, not individually but solely as trustee for the Maiden Lane Commercial Mortgage Backed Securities Trust 2008-1, dated on or about the date hereof, and recorded in the Records in connection herewith, (2) "Assignment of (1) Deed to Secure Debt, Assignment of Leases and Rents and Security Agreement and (2) Assignment of Leases and Rents" from U.S. Bank National Association, not individually but solely as trustee for the Maiden Lane Commercial Mortgage Backed Securities Trust 2008-1, to BP SPE LLC on or about the date hereof and recorded in the Records in connection herewith, and (3) "Assignment of (1) Deed to Secure Debt, Assignment of Leases and Rents and Security Agreement and (2) Assignment of Leases and Rents" from BP SPE LLC to Grantee dated on or about the date hereof and recorded in the Records in connection herewith.

Grantor further declares and warrants that (a) this Limited Warranty Deed in Lieu of Foreclosure is a present, complete and absolute conveyance and grant of title and includes and unconditionally conveys all equitable and redemptive rights of Grantor; (b) this conveyance is freely and fairly made; and (c) this Limited Warranty Deed in Lieu of Foreclosure is not a mortgage, deed to secure debt or security device of any kind, and is made subject to the Security Deed described herein. Grantor acknowledges and agrees to having transferred the Property to the Grantee for a fair and adequate consideration.

There shall be no merger of the estate conveyed hereby with the estate, lien or security title created by the Security Deed by reason of the fact that the same person or entity or a related or affiliated person or entity may own or hold (a) the estate, lien or security title conveyed and created by the Security Deed, and (b) the equity of redemption in the Premises hereby conveyed;

Deed in Lieu Pool 3, #26, Smyrna, GA                    2

and no such merger shall occur until Grantee shall execute a written statement or instrument effecting such merger and shall duly record same.

[Remainder of page intentionally left blank; Signature page(s) follow.]

Deed in Lieu Pool 3, #26, Smyrna, GA                           3

RRI_GW_0000003

**IN WITNESS WHEREOF**, Grantor has executed and sealed this indenture, and delivered this indenture to Grantee, all the day and year first above written.

**GRANTOR**:

R-ROOF VI, LLC,
a Delaware limited liability company

Signed, sealed and delivered in the presence of:

By:_____
Name:  Mohamed Thowfeek
Title:   President

_____
Unofficial Witness

_____
Unofficial Witness

STATE OF TEXAS           §
                         §
COUNTY OF DALLAS         §

    This instrument was acknowledged by me on the _____ 19 day of August, 2011, by Mohamed Thowfeek, President of R-Roof VI, LLC, a Delaware limited liability company, on behalf of said limited liability company.

JUDY A. GIPSON
Notary Public, State of Texas
My Commission Expires
April 09, 2015
(PERSONALIZED SEAL)

_____
Notary Public Signature

My Commission Expires:

_____
Printed Name of Notary

_____

Signature Page

Deed Book 14878 Pg 4216

## EXHIBIT A

ALL THAT TRACT or parcel of land lying and being in Land Lots 805 and 851 of the 17th District, Second Section, Cobb County, Georgia, and being more particularly described as follows:

Commence at a point located at the intersection of the northwestern right-of-way of Circle 75 Parkway (a 60 foot right-of-way) and the southern right-of-way of Windy Hill Road (a 130 foot right-of-way); thence running along the southern right-of-way of Windy Hill Road and following the curvature thereof 630.51 feet to a point located at the intersection of the southern right-of-way of Windy Hill Road and the eastern right-of-way of an unnamed road; thence South 00°13'43" East along the eastern right-of-way of said unnamed private road, 205.51 feet to a point, thence South 22°42'38" West, 91.65 feet to a rebar marking the POINT OF BEGINNING; said point lying on the Westerly right-of-way of Corporate Plaza (50-foot right-of-way); thence South 02°30'53" West along said Westerly right-of-way, a distance of 434.66 feet to an iron pipe; thence running South 51°07'55" West, 284.33 feet to a rebar; thence North 38°56'04" West, 331.74 feet to a rebar; thence North 51°41'38" East, 572.09 feet to a rebar and the POINT OF BEGINNING.

TOGETHER WITH those easement rights arising under that certain Agreement by and between Rich's, Inc., Earl Stevenson, Jr., John S. Miller, Francis Scott Key, John Ernest Bailey and Charles C. Panter, Dated January 26, 1973, filed for record January 29, 1973 at 12:30 p.m., recorded in Deed Book 1387, Page 521, Records of Cobb County, Georgia.

ALSO TOGETHER WITH those easement rights arising under that certain Easement by and between Corporate Plaza Northwest, a Joint Venture composed of JKR Realty Associates, Ltd., a Georgia limited Partnership, Gary A. Beller and Red Roof Atlanta I Co., an Ohio limited partnership, dated September 16, 1982, filed for record September 17, 1982 at 10:26 a.m., recorded in Deed Book 2589, Page 386, aforesaid Records.

ALSO TOGETHER WITH those easement rights arising under that certain Sign Easement Agreement by and between Corporate Plaza Northwest, a Joint Venture composed of JKR Realty Associates, Ltd., a Georgia limited partnership, Gary A. Beller and Red Roof Atlanta I Co., an Ohio limited partnership, dated September 16, 1982, filed for record September 17, 1982 at 10:26 a.m., recorded in Deed Book 2589, Page 394, aforesaid Records.

1

RRI_GW_0000005

Deed Book 14878 Pg 4217

Pool 3, Property #26
Smyrna, Georgia
Site #7088

## EXHIBIT B

## PERMITTED EXCEPTIONS

The following matters, to the extent and only to the extent the same are valid and subsisting against the subject property as of the date of this instrument:

1.  All taxes for the year 2011 and subsequent years.

2.  Any and all unpaid water bills associated with subject property.

3.  Right-of-Way Easement from Rich's, Inc. to Georgia Power Company, dated September 2, 1970, filed for record November 6, 1970 at 3:30 p.m., recorded in Deed Book 1187, Page 546, aforesaid Records.

4.  Terms, conditions and obligations as contained in that certain Easement by and between Corporate Plaza Northwest, a Joint Venture composed of JKR Realty Associates, Ltd., a Georgia limited partnership, Gary A. Beller and Red Roof Atlanta I Co., an Ohio limited partnership, dated September 16, 1982, filed for record September 17, 1982 at 10:26 a.m., recorded in Deed Book 2589, Page 386, Records of Cobb County, Georgia, as shown on survey prepared by Ronnie J. Joiner, P.L.S. No. 2488 dated June 24, 2011, as last revised (the "Survey").  **(Affects appurtenant easement area only)**

5.  Terms, conditions and obligations as contained in that certain Sign Easement Agreement by and between Corporate Plaza Northwest, a Joint Venture composed of JKR Realty Associates, Ltd., a Georgia limited partnership, Gary A. Beller and Red Roof Atlanta I Co., an Ohio limited partnership, dated September 16, 1982, filed for record September 17, 1982 at 10:26 a.m., recorded in Deed Book 2589, Page 394, Records of Cobb County, Georgia, as shown on the Survey. **(Affects appurtenant easement area only)**

6.  Declaration of Restrictions by and between Corporate Plaza Northwest, a Joint Venture composed of JKR Realty Associates, Ltd., a Georgia limited partnership, Gary A. Beller and Red Roof Atlanta I Co., an Ohio limited partnership, dated September 16, 1982, filed for record September 17, 1982 at 10:26 a.m., recorded in Deed Book 2589, Page 405, Records of Cobb County, Georgia.

7.  Easement from Red Roof Atlanta 1 Co. to Georgia Power Company, dated November 4, 1982, filed for record June 29, 1983 at 11:47 a.m., recorded in Deed Book 2802, Page 169, Records of Cobb County, Georgia.

8.  Other matters, if any, shown on the Survey.

9.  Deed to Secure Debt, Assignment of Lease and Rents and Security Agreement from R-Roof VI, LLC, a Delaware limited liability company to Mortgage Electronic Registration Systems, Inc., a Delaware corporation, as nominee of Bear Stearns Commercial Mortgage, Inc., a New

RRI_GW_0000006

Deed Book 14878 Pg 4218
Jay C. Stephenson
Clerk of Superior Court Cobb Cty, Ga.

Pool 3, Property #26
Smyrna, Georgia
Site #7088

York corporation, dated effective as of September 6, 2007, filed for record October 11, 2007 at 3:51 p.m., recorded in Deed Book 14545, Page 2743, Records of Cobb County, Georgia, as referenced in the instrument to which this exhibit is attached.

10. Assignment of Leases and Rents from R-Roof VI, LLC, a Delaware limited liability company to Mortgage Electronic Registration Systems, Inc., a Delaware corporation, as nominee of Bear Stearns Commercial Mortgage, Inc., a New York corporation, dated effective as of September 6, 2007, filed for record October 11, 2007 at 3:51 p.m., recorded in Deed Book 14545, Page 2776, Records of Cobb County, Georgia, as referenced in the instrument to which this exhibit is attached.

11. U.C.C. Financing Statement showing R-Roof VI, LLC as Debtor and Mortgage Electronic Registration Systems, Inc., as nominee of Bear Stearns Commercial Mortgage, Inc. as Secured Party, filed for record October 11, 2007 at 3:51 p.m., recorded in Deed Book 14545, Page 2789, Records of Cobb County, Georgia.

RRI_GW_0000007



**FRANCHISE AGREEMENT**
[Intercompany]

HOU:2728313.1

**CONFIDENTIAL**

**RRI_GW_0000008**

**RED ROOF INN**

**FRANCHISE AGREEMENT**
**[Intercompany]**

**TABLE OF CONTENTS**

1. GRANT ..................................................................................................................................... 1

2. TERM ...................................................................................................................................... 2

3. DUTIES OF FRANCHISOR .................................................................................................... 3

4. FEES ...................................................................................................................................... 3

5. DUTIES OF FRANCHISEE .................................................................................................... 5

6. PROPRIETARY MARKS ........................................................................................................ 9

7. CONFIDENTIAL MANUALS ................................................................................................. 11

8. CONFIDENTIAL INFORMATION ......................................................................................... 11

9. ACCOUNTING AND RECORDS .......................................................................................... 12

10. MARKETING AND RESERVATION CONTRIBUTION ....................................................... 13

11. INSURANCE ...................................................................................................................... 15

12. TRANSFER OF INTEREST ............................................................................................... 16

13. DEFAULT AND TERMINATION ........................................................................................ 20

14. OBLIGATIONS UPON TERMINATION .............................................................................. 24

15. COVENANTS ..................................................................................................................... 25

16. TAXES, PERMITS AND INDEBTEDNESS ........................................................................ 26

17. INDEPENDENT CONTRACTOR AND INDEMNIFICATION .............................................. 26

18. APPROVALS AND WAIVERS ........................................................................................... 28

19. NOTICES ........................................................................................................................... 28

HOU:2728313.1

20. ENTIRE AGREEMENT ........................................................................................29

21. SEVERABILITY AND CONSTRUCTION .............................................................29

22. APPLICABLE LAW ............................................................................................30

23. ACKNOWLEDGMENTS ......................................................................................31

<u>ATTACHMENT</u>

ATTACHMENT 1 – GUARANTEE, INDEMNIFICATION AND
                  ACKNOWLEDGMENT

<u>SCHEDULE</u>

SCHEDULE 1 - DEFINITIONS

<u>EXHIBITS</u>

EXHIBIT A -  SELECTED TERMS
EXHIBIT B -  FIDELIO PROPERTY MANAGEMENT SOFTWARE LICENSE AGREEMENT
EXHIBIT C -  INSURANCE REQUIREMENTS
EXHIBIT D -  OWNERSHIP SCHEDULE


<u>ADDENDA</u>

RED ROOF INN & SUITES ADDENDUM
RENOVATION ADDENDUM
NEW CONSTRUCTION ADDENDUM

HOU:2728313.1

RRI_GW_0000010

**RED ROOF INN**
**FRANCHISE AGREEMENT**

THIS RED ROOF INN FRANCHISE AGREEMENT (the "Franchise Agreement") is made and entered into this _____ day of _____, 2007 by and between Red Roof Franchising LLC, a Delaware limited liability company ("Franchisor") and R-Roof VI, LLC ("Franchisee"), a Delaware limited liability company.   Capitalized terms shall have the meanings as defined in Schedule A.

**RECITALS:**

Franchisor has the exclusive right to license the use of a System for the establishment and operation of inns which are designed to compete directly with other brands in the economy segment of the lodging market and which operate under the trade name and service mark "Red Roof Inn" and other designated Proprietary Marks (the "Proprietary Marks").

Franchisee is the owner of the fee or long-term leasehold interest in the property at an Approved Location identified on Exhibit A (the "Approved Location"). Franchisee desires to obtain a franchise to operate a Red Roof Inn at the Approved Location.

Franchisee understands and acknowledges the importance of operating in conformity with Franchisor's Standards and specifications in order to enhance public acceptance of, and demand for, all Red Roof Inns.

In entering into this Franchise Agreement, Franchisor is relying upon the business skill, financial capacity and character of Franchisee and its Owners, and the guarantee of Franchisee's obligations under this Franchise Agreement by those of its Principal Owners who have executed the Guarantee, Indemnification and Acknowledgment to this Franchise Agreement.

Franchisee has conducted an independent investigation into the feasibility and advisability of establishing a Red Roof Inn at the Approved Location, and has had the opportunity to consult with legal, accounting and other advisors of the Franchisee's own choosing in making a decision to enter into this Franchise Agreement and establish a Red Roof Inn at the Approved Location.

NOW, THEREFORE, in consideration of the mutual undertakings and commitments set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **GRANT**

1.1.    As of the Opening Date, Franchisor grants Franchisee the right, and Franchisee undertakes the obligation, to operate the Inn as a Red Roof Inn under the System and the Proprietary Marks granted to Franchisee by Franchisor under this Franchise Agreement at the Approved Location. Franchisee shall not operate the Inn from or at any other address or location.

1.2.    If Franchisee is in full compliance with its obligations and is in Good Standing under this Franchise Agreement, and Franchisee and its Affiliates are in full compliance with all other agreements, including any other Franchise Agreements with Franchisor and in compliance with agreements with Franchisor's approved or designated suppliers, then from the Effective Date of this Franchise Agreement and continuing throughout the term of this Franchise Agreement, unless otherwise agreed by the parties, and except for any Red Roof Inns in existence on the date of this Franchise Agreement, as identified in Exhibit A hereto, (including any replacement for such locations) Franchisor shall not establish or operate, or grant any other person or entity the right to establish or operate, a Red Roof Inn at any location within the Protected Territory.

1

HOU:2728313.1

1.3.     Notwithstanding Section 1.2, Franchisee acknowledges and agrees that Franchisor or its Affiliates may establish or operate, or grant any person or entity the right to establish or operate, Red Roof Inns at any location outside the Protected Territory, including locations adjacent, adjoining or proximate to the Protected Territory, which may compete directly with the operation of the Inn. Franchisee further acknowledges and agrees that, except as specifically provided in Section 1.2, Franchisor and its Affiliates have and retain the right to engage in any business activities, under any name, at any location, without granting Franchisee any right therein, including, without limitation, the right to establish or operate, and to grant others the right to establish or operate, inns, motels, hotels and other lodging facilities (including, without limitation, extended stay, limited service, full service, resort, economy, and ultra luxury facilities) under marks and names similar to or different from the Proprietary Marks at any location, including locations within, adjacent, adjoining or proximate to the Protected Territory.

1.4.     Franchisee acknowledges that Franchisor and its Affiliates have and may have business interests other than the operation of the network of Red Roof Inns and that they, in their sole discretion, may identify, define, and act upon such interests in the manner they deem appropriate.  Franchisee further acknowledges that business decisions made by Franchisor and its Affiliates may impact Franchisee and agrees that Franchisor and its Affiliates have no express obligation or implied duty to protect Franchisee from the consequences of such business decisions and expressly waives any right to assert any claim against Franchisor or its Affiliates based on the existence, actual or arguable, of any such obligation or duty.

## 2.     TERM

2.1.     The initial term of this Franchise Agreement shall be for a period of twenty (20) years and commence on the Effective Date and shall expire on the Expiration Date, unless sooner terminated in accordance with the provisions hereof.

2.2.     If Franchisee desires to renew this franchise for one additional period of ten (10) years, Franchisee shall submit a renewal application to Franchisor not less than twelve (12) months nor more than eighteen (18) months before the end of the initial term.  Upon receipt of Franchisee's renewal application, Franchisor shall have the right, in its reasonable discretion, to preliminarily approve or disapprove Franchisee's application.  Franchisor shall notify Franchisee of its preliminary decision, in writing, not less than nine (9) months before the end of the initial term.  Notwithstanding Franchisor's preliminary approval, Franchisee's right and Franchisor's obligation to renew this franchise is expressly subject to Franchisee's continuing compliance with the following terms and conditions:

2.2.1.    Upon the expiration of the initial term, Franchisee shall not then be in default of any provision of this Franchise Agreement, including any amendments or replacements hereof, or any other agreement, including any other Franchise Agreement, between Franchisee and Franchisor or in default of any agreement with Franchisor's approved or designated suppliers, and Franchisee shall have substantially complied with all the terms and conditions of such agreements during their respective terms;

2.2.2.    Upon the expiration of the initial term, Franchisee shall have satisfied all monetary obligations owed by Franchisee to Franchisor and to all approved or designated suppliers to the Inn and shall have met these obligations on a timely basis throughout the term of this Franchise Agreement;

2.2.3.    Not less than six (6) months before the end of the initial term, as a condition to renewal, Franchisee shall, among other things, cause the Inn Manager and any other employees designated by Franchisor to comply with Franchisor's then-current training requirements and shall upgrade the Inn, at Franchisee's expense, to conform to Franchisor's then-current Standards and specifications, including, without limitation, such structural changes, remodeling, redecoration, and modifications to existing improvements as may be required by Franchisor. All such training requirements and upgrades shall have been completed, to Franchisor's sole satisfaction, upon the expiration of the initial term; and

2

HOU:2728313.1

2.2.4.   As a condition to renewal, Franchisee and Franchisee's Owners shall execute a general release of in favor any and all claims Franchisee, the Owners or its Affiliates may have, have had, or may have in the future against Franchisor and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, past or present, in their corporate and individual capacities, including, without limitation, claims arising under this Franchise Agreement or under federal, state or local laws, rules, regulations or orders which arose or accrued before the date of the renewal.

2.2.5   As a condition of renewal, Franchisee shall sign Franchisor's then-current franchise agreement for the ten (10) year renewal term. If the renewal is approved by Franchisor,  such renewal franchise agreement shall supersede in all respects this Franchise Agreement and the terms thereof may differ from the terms of this Franchise Agreement including, without limitation, higher Royalty and Marketing and Reservation Contributions.  Also, as a condition to renewal, Franchisee shall sign then-current ancillary agreements (such as, but not limited to, Software Agreements) that other franchisees execute in connection with opening new franchise locations.

2.2.6.   As a condition to renewal, Franchisee shall pay a renewal fee in an amount equal to fifty percent (50%) of Franchisor's then-current initial franchise fee.

**3.**     **DUTIES OF FRANCHISOR**

Franchisor shall, or shall cause its designees, employees or agents to:

3.1.     Make training programs available to Franchisee on the terms and conditions set forth in Section 5.3 and may provide continuing training, consultation and advisory assistance to Franchisee in the management, operation and marketing of the Inn in the manner, at such times, and upon such other terms and conditions (including, but not limited to, fees payable for such assistance) as Franchisor deems advisable.

3.2.     Provide Franchisee, on loan, one (1) set of the Manuals, as more fully described in Section 7 and Schedule 1 of this Franchise Agreement, or make such manuals available in electronic form, accessible by Franchisee.

3.3.     Provide for a Reservation System, which may be operated by a third party supplier of Franchisor's choosing.

3.4.     Publish a periodic Directory periodically.

3.5.     In Franchisor's reasonable discretion, as it deems advisable, enter upon the premises of the Inn at any time to conduct inspections or evaluations of Franchisee's services and facilities for the purpose of evaluating compliance with the Standards.  Franchisee shall be required to provide lodging for Franchisor's personnel evaluating Franchisee's property at Franchisee's sole cost and expense.

Franchisee acknowledges and agrees that any duty or obligation imposed on Franchisor by this Franchise Agreement may be performed, at Franchisor's discretion, by any designee, employee, contractor or agent of Franchisor, which may include Affiliates, as Franchisor may direct.

3

HOU:2728313.1

CONFIDENTIAL

RRI_GW_0000013

4.      **FEES**

4.1.      As part of the consideration for the franchise granted herein, Franchisee shall pay to Franchisor an initial franchise fee in the amount of Thirty Thousand Dollars ($30,000), as follows:  (i) Three Thousand Dollars ($3,000) with the submission of the Application, and (ii) the balance, on the Effective Date of this Franchise Agreement.  Except as stated below, the Application fee is fully earned and is non-refundable in consideration of administrative and other expenses Franchisor incurs in reviewing Franchisee's Application.  If Franchisor approves Franchisee's Application, Franchisor will credit Franchisee's Application fee toward the initial franchise fee.  If Franchisor rejects Franchisee's Application, Franchisor will refund Franchisee's Application fee if Franchisor or its designee has not visited Franchisee's proposed site or the area surrounding Franchisee's proposed site, or provided architectural or technical assistance to Franchisee.  The initial franchise fee is fully earned and non-refundable in consideration of the administrative and other expenses incurred by Franchisor in entering into this Franchise Agreement and for Franchisor's lost or deferred opportunity to franchise others within the Protected Territory.

4.2.      As further consideration for the franchise granted by this Franchise Agreement, Franchisee shall pay to Franchisor, within twenty (20) days after the end of each calendar month, commencing with the calendar month in which the Opening Date occurs and continuing for the term of this Franchise Agreement, a monthly Royalty Fee;

4.2.1      Commencing with the calendar month in which the Opening Date occurs and continuing through the calendar month in which the Expiration Date occurs, a monthly Royalty Fee in an amount equal to four and one-half percent (4.5%) of the Inn's Gross Room Revenues.

4.2.2      If the Inn achieves superior results for any full 12 month period, as determined by and in the sole discretion of Franchisor, using a guest satisfaction tracking system conducted or commissioned by Franchisor for the purpose of determining the satisfaction of guests at Red Roof Inns, or any other such program that Franchisor might use in its sole discretion to measure guest satisfaction, and if Franchisee is in Good Standing as a Red Roof Inn Franchisee and is not in default under this Franchise Agreement, or any other agreement between Franchisor and Franchisee, then Franchisor will rebate to Franchisee an amount equal to one-ninth of the Royalty Fee paid by Franchisee with respect to such 12 month period pursuant to Section 4.2.1.  Thus, if the Franchisee has paid four and one-half percent (4.5%) of the Inn's Gross Room Revenues under Section 4.2.1, one-half percent (0.5%) of the Inn's Gross Room Revenues for such 12 month period will be rebated to the Franchisee. Such rebate, if any, will be paid to Franchisee within 90 days following the end of the twelve (12) month period to which the rebate relates.

4.3.      In addition to the fees described in Sections 4.1 and 4.2, Franchisee shall pay to Franchisor, within twenty (20) days after the end of each calendar month, commencing with the calendar month in which the Opening Date occurs and continuing for the term of this Franchise Agreement, a monthly Marketing and Reservation Contribution in an amount equal to four percent (4%) of the Inn's Gross Room Revenues for the preceding calendar month.

4.4.      Franchisee must participate in any guest loyalty programs that Franchisor may initiate (the "Preferred Members Program").  Such programs may provide members of the general public with express check-in, guaranteed late check-in and the opportunity for guests to earn free room nights at Red Roof Inns.  The Preferred Members Program may include other features.  The Franchisor may make changes to features of the Preferred Members Program at any time or from time to time.  Franchisee shall pay to the Franchisor five percent (5%) of Gross Room Revenues that are generated by the Preferred Members Program. For this purpose insurance proceeds will not be taken into account in computing Gross Room Revenues.

4.5.      Franchisee must reimburse Franchisor or its designees or agents for the amounts of any travel agency commissions, airline reservation system fees, fees associated with the use of other electronic booking systems by guests and other related fees that Franchisor pays to third parties on

4

HOU:2728313.1

Franchisee's behalf in connection with reservations for rooms at the Inn ("Booking Fees and Commissions"). Franchisee must reimburse Franchisor or its designees or agents for the amounts of the Booking Fees and Commissions monthly on or before the twentieth (20th) day of the month after Franchisee receives an invoice for the Booking Fees and Commissions. Additionally, Franchisee shall comply with Franchisor's Manual regarding the Booking Fees and Commissions and any modifications that Franchisor in its sole discretion make to the Manual. Franchisee acknowledges that the Booking Fees and Commissions may, in the future, be directly invoiced to Franchisee by one or more third-party billing clearinghouses. Franchisee may be required to pay such clearinghouses an additional administrative or related fee for their services. Franchisee agrees to participate fully in such billing clearinghouses and agrees to pay the amounts of invoices that Franchisee receives from these clearinghouses on a timely basis, including the administrative or related fees imposed by the clearinghouses.

4.6.    The monthly payments required by this Section 4 shall be submitted to Franchisor together with all monthly reports required under this Franchise Agreement; provided, that Franchisor may direct that all monthly payments required under this Section 4 be made to a bank account designated by Franchisor by wire transfer, by automated clearinghouse (ACH) transfer, or by other means which Franchisor may specify from time to time, in accordance with procedures set forth in the Manuals.

4.7.    If any payment due to Franchisor or its designees or agents by Franchisee is not received on or before its due date, the payment shall be deemed overdue. Without limiting the foregoing, any monthly payment not actually received by Franchisor or its designees or agents on or before the twentieth (20th) day of the month shall be deemed overdue. With respect to any overdue payment, Franchisee shall pay to Franchisor designees or agents, as the case may be, in addition to the amount overdue, a fifty dollar ($50) Late Fee plus interest on such overdue amount from the day it was due until paid at the rate of one and one half percent (1.5%) per month or the maximum rate permitted by law, whichever is less. Entitlement to such Late Fee and interest shall be in addition to any other remedies Franchisor or its designees or agents may have. Further, Franchisor reserves the right to impose a returned check fee, payable upon demand, if Franchisee's check for any payments due under this Franchise Agreement fails to clear.

4.8.    All sums payable by Franchisee to Franchisor or its designees or agents under this Franchise Agreement shall be paid as Franchisor may from time to time specify in writing.

## 5.    <u>DUTIES OF FRANCHISEE</u>

5.1.    Franchisee shall construct, convert, equip and furnish the Inn in accordance with the provisions of this Franchise Agreement and, as applicable, the New Construction Addendum ("Construction Addendum") or the Renovation Addendum ("Renovation Addendum") attached to this Franchise Agreement. Except for Franchisee's own uses related to its operation of the Inn, Franchisee shall not reproduce, use, or permit the use of, any of Franchisor's design concepts, drawings, or specifications, without Franchisor's prior written consent.

5.2.    Franchisee acknowledges that every detail of the System is important to Franchisor and other franchisees operating under the System in order to develop and maintain the Standards and public image of the System, to protect Franchisor's reputation and goodwill, and to increase the demand for the lodging services offered by Red Roof Inns. Franchisee agrees to comply with the Standards and not to deviate therefrom. In addition, Franchisee agrees as follows:

5.2.1.    Franchisee shall offer only such goods and services as are from time to time specifically approved by Franchisor in writing for the System. Any goods or services offered by Franchisee, other than lodging services, shall not be represented as goods or services authorized or sanctioned by Franchisor;

5.2.2.    Franchisee shall operate the Inn twenty-four (24) hours a day, every day, except as otherwise approved in writing by Franchisor, and in strict conformity with the Standards; and

5

CONFIDENTIAL

5.2.3.    Franchisee shall not operate the Inn, or any other operation to which Franchisor has consented pursuant to Section 5.5, in any manner which Franchisor reasonably believes adversely reflects on Franchisor, the System, the Proprietary Marks, the associated goodwill, or Franchisor's rights therein.  Franchisee shall not, directly or indirectly, operate any business, at the Approved Location or otherwise, which violates this Section 5.2.3.

5.3.    Before the Opening Date, and at all times during the term of this Franchise Agreement, Franchisee shall designate a Manager who must devote his or her full time, best efforts to managing the Inn, who may, but need not, be an Owner of Franchisee and who shall have authority over the day-to-day operations of the Inn.    Before the Opening Date, Franchisee's initial Manager must attend and successfully complete to Franchisor's satisfaction, Franchisor's Manager's Training program, unless otherwise approved by Franchisor in writing.  All replacement or substitute Managers hired subsequent to the initial Manager, must attend and successfully complete to Franchisor's satisfaction, Franchisor's Manager Training program within a reasonable period of time (not to exceed two (2) months) after commencing their duties as Manager.

5.3.1.    Before opening, but no later than six (6) months following the Effective Date of this Franchise Agreement, Franchisee or its designee must attend and successfully complete to Franchisor's satisfaction an Owner's Orientation program.

5.3.2.    In addition to its Manager's Training program and Owner's Orientation program, Franchisor may require Franchisee and its employees to attend other training courses, programs, conferences and seminars.

5.3.3.    All meetings, training (online or in person), conferences (including annual conferences) and seminars shall be provided at such locations as Franchisor may designate. Franchisee shall be responsible for all expenses incurred by its participants and the costs of transportation, meals, lodging and wages or salary and benefits.  Franchisor reserves the right to limit the availability of, and to charge attendance, tuition or other fees for, any such meetings, training program, conference, or seminar.

5.3.4. Franchisor shall conduct at the Inn (i) a 1-3 day initial training program for Franchisee's employees, at Franchisee's expense, to prepare them to operate, administer, and manage the Inn in compliance with Franchisor's Standards and procedures and (ii) Computer System training. Franchisee shall reimburse Franchisor s for the cost of the trainers' travel, out-of-pocket expenses, meals and lodging, as well as the cost of shipping computer training equipment to the Inn.

5.4.    The Inn shall consist of the number of guest rooms specified in Exhibit A.  Franchisee shall not increase or decrease the number of guest rooms in the Inn without the prior written consent of Franchisor.  Franchisor may impose reasonable conditions on its consent to an increase or decrease in the number of guest rooms, including, without limitation, the following:

5.4.1.    Franchisee shall demonstrate to Franchisor's reasonable satisfaction that the Inn, as altered, will continue to meet the then-current Standards; and

5.4.2.    In the case of a proposed decrease in the number of guest rooms, Franchisee shall demonstrate to Franchisor's reasonable satisfaction that the number of guest rooms remaining after the decrease are sufficient to serve the Protected Territory.

5.5.    Franchisee shall use the Approved Location solely for the operation of the Inn, and shall not permit the use of the Approved Location for any other purpose or activity at any time without Franchisor's prior written consent.

5.6.    Franchisee shall purchase and install at the Inn, at Franchisee's expense, all fixtures, furnishings, equipment, decor items (including signs, posters and other property identification items) and supplies that meet Franchisor's specifications. In no event shall Franchisee, without Franchisor's prior

6

HOU:2728313.1

written consent, install or permit to be installed in, on or about the Inn, any fixtures, furnishings, equipment, signs or other items not meeting such specifications or the Standards set forth in the Manual.

5.7.    Franchisee shall maintain the Inn in a condition consistent with the Standards and shall make such additions, alterations, repairs and replacements as may be required for that purpose (but no others without Franchisor's prior written consent), including, without limitation, periodic repainting and replacement of signs, equipment, furnishings and furniture in accordance with the Standards.

5.8.    At Franchisor's request, Franchisee shall make Short-Term Renovations to the Inn. Additionally, at Franchisor's request, which shall not be made more often than once every five (5) years during the term of this Franchise Agreement, Franchisee shall make Long-Term Renovations to the Inn to conform the Inn to the then-current Standards for facilities then entering the System.  All Short-Term Renovations and Long-Term Renovations shall be at Franchisee's sole expense.

5.9.    Franchisee shall take such steps as are necessary to ensure that its employees preserve good guest relations, render competent, prompt, courteous and knowledgeable service, and meet the Standards.  Franchisee shall be solely responsible for all employment decisions and functions at and for the Inn, including, without limitation, those related to hiring, firing, training, wage and hour requirements, payment and provision of wages, salaries and fringe benefits, record-keeping, supervision and discipline. Franchisee further acknowledges and agrees that Franchisee shall be solely responsible for the acts and omissions of its employees.  Franchisee shall specify on all employment applications used at the Inn that Franchisee is the sole employer of the Inn's employees and that there exists no employment relationship between Franchisor and any such employee.

5.10.    Franchisee shall at all times use only such fixtures, furnishings, equipment, signs, materials, services and supplies, as conform to the Standards. Further, upon notice from Franchisor, Franchisee shall purchase any or all such items solely from suppliers who demonstrate to Franchisor's continuing reasonable satisfaction the ability to meet the Standards, who possess adequate quality controls and the capacity to supply Franchisee's needs promptly and reliably, and who have been approved by Franchisor in the Manuals or otherwise in writing.  Franchisor reserves the right to approve or designate a single supplier of certain items in order to promote compliance with the Standards.

5.10.1.  If Franchisee desires to purchase any items from an unapproved supplier, then Franchisee shall submit to Franchisor a written request to approve the proposed supplier, together with such evidence of the supplier's qualifications as Franchisor may reasonably require.  Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered for evaluation and testing to Franchisor or to an independent testing facility designated by Franchisor.  A charge, not to exceed the reasonable cost of the evaluation and testing, shall be paid by Franchisee whether or not the supplier is approved. After completion of such evaluation and testing (if required by Franchisor), Franchisor shall notify Franchisee in writing of its approval or disapproval of the proposed supplier.  Approval shall not be unreasonably withheld.  Franchisee shall not purchase any products or services from the proposed supplier until Franchisor's written approval of the proposed supplier is received.

5.10.2.  Franchisor may from time to time revoke its approval of particular products or suppliers if Franchisor determines, in its sole discretion, that such products or suppliers no longer meet the Standards.  Upon receipt of a written notice of revocation, Franchisee shall immediately cease to offer or sell any disapproved products and shall cease to purchase from any disapproved supplier.

5.10.3.  Except as otherwise specifically approved by Franchisor in writing, Franchisee agrees that it will use products purchased from approved suppliers solely for the purpose of operating the Inn and not for any other purpose, including, without limitation, for resale.

5.11.    Franchisee shall comply with all federal, state and local laws, rules, regulations, and ordinances, including but not limited to public accommodation laws, and shall timely obtain any and all permits, certificates and licenses necessary for the full and proper development and operation of the Inn,

7

HOU:2728313.1

CONFIDENTIAL

including, without limitation, licenses to do business, trade, fictitious or assumed name registrations, building permits, sales tax permits, health and sanitation permits and ratings, and fire clearances. Franchisee shall be solely responsible for and Franchisor shall have no responsibility for architecture or engineering, for code, zoning, or other requirements of the laws, rules, regulations or ordinances of any state, local municipality, urban community, or provincial or federal governmental body, including any errors, omissions, or discrepancies of any nature in any drawings or specifications obtained by Franchisee, including those provided by Franchisor.  Without limiting the foregoing, Franchisee shall be solely responsible for compliance with any requirements of the Americans with Disabilities Act, Payment Card Industry Data Security Standards, and current state and federal privacy and data security legislation, and shall provide such proof as Franchisor may require.

5.12.    Franchisee shall prominently display in and upon the premises of the Inn such signs as are required by Franchisor in the Manuals or as otherwise directed or approved by Franchisor from time to time in writing, including, without limitation, signs bearing the Proprietary Marks.  All such signs shall be of a nature, and shall be in the form, color, number, location, size and content as specified by Franchisor in the Manuals or otherwise in writing. Franchisee shall comply with the Standards concerning the types of services and products that may be promoted or advertised at the Inn, including those Standards relating to the display of promotional materials.  Franchisor reserves the right at any time to require, and Franchisee agrees to conform to, any change in or presentation of the Proprietary Marks.

5.13.    Franchisee shall promptly report to Franchisor all incidents involving safety, security, public relations or serious injury to persons or property that occur at, or involve, the Inn and shall consult with Franchisor before speaking to or corresponding with the media about any such incident. Franchisee shall otherwise comply with those portions of the Safety, Security and Public Relations provisions designated as mandatory in the Manuals. Notwithstanding the foregoing, Franchisee acknowledges and agrees that it is Franchisee's sole responsibility to maintain the safety and security of its employees, guests and others who may be on the Inn premises.

5.14.    Franchisor and its agents shall have the right to enter upon the premises of the Inn at any time for the purpose of conducting inspections or evaluations, and Franchisee shall provide Franchisor's representatives with lodging, without charge, during such evaluations. Upon the written request of Franchisor or its agent, Franchisee shall take such steps as may be necessary to correct any deficiencies detected during an evaluation, within the time specified by Franchisor.  If Franchisee fails an evaluation, Franchisee shall provide lodging, without charge, for, and shall reimburse Franchisor for the travel expenses of Franchisor's representatives incurred in subsequent evaluations to determine whether all deficiencies have been corrected.

5.15.    Franchisee acknowledges and agrees that offering the public a single, efficient, reservation referral service is essential to the goodwill, reputation and success of the System. Franchisee agrees to participate during the term of this Franchise Agreement in any Reservation System maintained or designated by Franchisor for the System and to comply with all terms and conditions of participation. Franchisee shall purchase, install and maintain at the Inn all equipment necessary for participation in the Reservation System, including any required reservation terminal and related equipment and any future enhancements, additions, substitutions or other modifications specified by Franchisor in the Manuals or otherwise in writing.  Franchisee shall be responsible for telephone line charges or other charges to connect Franchisee's equipment to the Reservation System, for the cost of supplies used in the operation of the equipment, and for all other related expenses.  Without limiting the foregoing, Franchisee shall comply with the provisions of Section 5.18 below.

5.16.    Franchisee shall list the Inn in each edition of the Directory and shall timely furnish to Franchisor in writing such information as Franchisor may request for that purpose, including the Inn's then-current room rate.  Failure to timely respond to Franchisor's request for Directory information may result in Franchisee's Inn not being listed in the Directory and, in such event, Franchisee agrees that Franchisor shall not be liable for any such omission.  Franchisee shall not quote, advertise or charge any guest a rate higher than Franchisee's rate published in the then-current Directory, nor engage in any other rate practices which tend to mislead the public in any way.

8

HOU:2728313.1

CONFIDENTIAL                                                                                    RRI_GW_0000018

5.17.    Franchisee shall participate in and comply with the terms of all marketing, reservation service, advertising and operating programs and policies required by Franchisor for the System (including, without limitation, any Internet advertising and marketing conducted and prescribed by Franchisor), in the manner directed by Franchisor in the Manuals or otherwise in writing. Such programs and policies may include, without limitation, a "Kids Stay Free" policy, Preferred Member Programs, Corporate Programs, any successor billing and/or controlled spending card program, voucher program, guest satisfaction program, pay-per-view program, pet friendly policy and all other programs designated by Franchisor, and that do not violate the law of the state in which the Inn is located. Franchisor may also establish and coordinate advertising, marketing and sales programs, guest satisfaction programs and other activities among System inns, on a local or regional basis and Franchisee shall participate in and comply with such programs and activities on the same basis as other participating Red Roof Inns in the same region as the Inn.

5.18.    Franchisee shall purchase or license, install, utilize and maintain at the Inn, at its sole cost, all Software, hardware, communication lines and equipment, and other equipment and any upgrades or improvements thereto designated by Franchisor for use by Red Roof Inns, including, but not limited to, the Computer System and any other guest check-in, reservation, property management, revenue and other statistical reporting systems. The foregoing obligation shall include any enhancements, additions, substitutions or other modifications to such Software and hardware and equipment that may be required from time to time. Franchisee shall be responsible for all costs incurred in fulfilling its obligations hereunder, including, without limitation, data circuit charges, charges for connecting Franchisee's equipment to Franchisor's office, the cost of supplies used in the operation of the equipment, maintenance and support services, and for other related expenses.  In furtherance of its obligation hereunder, Franchisee shall, (i) upon execution of this Franchise Agreement, execute and deliver to Franchisor the Software Agreement in the form of Exhibit B relating to the proprietary Software, and shall fully comply with all of its obligations under such Software Agreement throughout its term; and (ii) not later than ninety (90) days before the scheduled Opening Date, Franchisee shall make application through Franchisor for a data circuit, as specified by Franchisor, between the Computer System and Franchisor's Reservation System.  Franchisee shall install the data circuit not later than thirty (30) days before the Opening Date.     Franchisee may not open before the approved installation of the data circuit. Notwithstanding the foregoing, Franchisee shall not purchase, install, utilize or maintain any computer software, hardware or other telecommunications line that has not been previously approved in writing by Franchisor.

5.19.    Franchisee shall comply with Franchisor's policies and procedures set forth in the Manuals concerning guest relations and guest complaints, including those relating to alleged discrimination in guest accommodations. If Franchisee fails to resolve a guest complaint in accordance with Franchisor's policies, Franchisee shall be required to (a) reimburse Franchisor for any expenses incurred by Franchisor to resolve the guest complaint and (b) pay Franchisor a guest relations intervention fee if Franchisor communicate with the guest or otherwise intervenes or takes action to resolve the complaint.  The guest relations intervention fee shall be as set forth in the Manuals, which fee may be  modified by Franchisor from time to time as provided in the Manuals.

5.20.    If at any time during the term of this Franchise Agreement the Inn is damaged by fire or other casualty and the cost to repair such damage is reasonably estimated to be not more than fifty percent (50%) of the fair market value of the Inn, Franchisee shall expeditiously repair the damage.  If the reasonable estimated cost to repair the damage exceeds such amount, Franchisee shall immediately notify Franchisor and shall elect, by written notice to Franchisor delivered within sixty (60) days following the date of the casualty, to repair or rebuild the Inn in accordance with the Standards or to terminate this Franchise Agreement.  Any such notice of termination shall be effective sixty (60) days after receipt of the notice by Franchisor.  If Franchisee elects to repair the damage, Franchisee shall commence reconstruction within six (6) months after the date of the casualty, shall expeditiously continue with such reconstruction on an uninterrupted basis and, subject to Franchisor's inspection and final approval, shall reopen the Inn for continuous business operations as soon as practicable, but in any event within eighteen (18) months after closing of the Inn, giving Franchisor four (4) weeks' advance notice of the date

9

HOU:2728313.1

of reopening. Franchisor shall have the right to terminate this Franchise Agreement by written notice to Franchisee if Franchisee fails to reconstruct the Inn and recommence operations in accordance with the time periods specified in this Section and the Standards.

## 6. **PROPRIETARY MARKS**

6.1.    Franchisee shall use the Proprietary Marks only on and after the Opening Date, unless otherwise approved in writing by Franchisor.

6.1.1.    Unless otherwise approved by Franchisor in writing, Franchisee shall use only the Proprietary Marks designated by Franchisor and shall use them only in the manner authorized by Franchisor. Any unauthorized use thereof shall constitute an infringement of the rights of Franchisor and its Affiliates owning rights in the Proprietary Marks.

6.1.2.    Franchisee shall use the Proprietary Marks only for the operation of the Inn at the Approved Location.

6.1.3.    Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on behalf of Franchisor or its Affiliates.

6.1.4.    Franchisee shall not use the Proprietary Marks as part of its corporate or other legal name nor shall Franchisee use the Proprietary Marks as part of its domain name except as permitted by and subject to Franchisee's strict compliance with Franchisor's Internet Style Guide and Manuals, as amended from time to time.

6.1.5.    Franchisee shall file and maintain the requisite trade, fictitious or assumed name registrations, and shall execute any documents, in each case as deemed necessary by Franchisor to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

6.1.6.    Franchisee shall identify itself as the owner of the Inn, and a franchisee of the Red Roof Inn System, in conjunction with any use of the Proprietary Marks, including, but not limited to, on stationery, invoices, order forms, receipts, business cards, and contracts, and at such conspicuous locations on the Inn premises as Franchisor may direct in writing.

6.2.    Franchisee acknowledges that Proprietary Marks are valid and identify the System and Red Roof Inns operating thereunder. During the term of this Franchise Agreement and after its expiration, Franchisee shall not directly or indirectly contest the validity of the Proprietary Marks, Franchisor's (or Franchisor's Affiliates') ownership, exclusive right to license others to use the Proprietary Marks or the ownership of the Proprietary Marks by Franchisor or its Affiliate.

6.2.1.    Franchisee's use of the Proprietary Marks pursuant to this Franchise Agreement does not give Franchisee any ownership or other interest in or to the Proprietary Marks.

6.2.2.    Any and all goodwill arising from Franchisee's use of the Proprietary Marks in the operation of its Inn under the System shall inure exclusively to the benefit of Franchisor, and upon expiration or termination of this Franchise Agreement, no monetary amount shall be attributed to any goodwill associated with Franchisee's use of the System or the Proprietary Marks.

6.3.    Franchisor reserves the right, in its sole discretion, to substitute different trademarks or service marks for the Proprietary Marks for use in identifying the System and the facilities operating under the System. Franchisee agrees to comply promptly in connection with any such substitution, at Franchisee's expense.

6.4.    Franchisee shall promptly notify Franchisor of any unauthorized use of the Proprietary Marks or marks confusingly similar to the Proprietary Marks and any challenge to (i) the validity of the Proprietary Marks, (ii) the ownership of or exclusive right to use and license the Proprietary Marks by

10

HOU:2728313.1

Franchisor or its Affiliate, (iii) Franchisor's right to use and to license others to use the Proprietary Marks, or (iv) Franchisee's right to use the Proprietary Marks. Franchisee acknowledges that Franchisor and its Affiliate have the sole right to initiate, direct and control any administrative proceeding or litigation involving the Proprietary Marks, including any settlement thereof. Franchisor and its Affiliate have the right, but not the obligation, to take action against uses by others that may constitute infringement of the Proprietary Marks.

6.5.     Franchisor shall defend Franchisee against any third-party claim, suit or demand which alleges that Franchisee's use of the Proprietary Marks infringes the rights of such third party, provided that Franchisee has used the Proprietary Marks in accordance with this Franchise Agreement, the Standards, the Manuals and other instructions issued by Franchisor from time to time. If Franchisor, in its sole discretion, determines that Franchisee has used the Proprietary Marks in accordance with the foregoing requirements, the cost of Franchisee's defense, including the cost of any judgment or settlement, shall be borne by Franchisor, and Franchisor shall be entitled to use its counsel of choice. If Franchisor, in its sole discretion, determines that Franchisee has not used the Proprietary Marks in accordance with such requirements, the cost of Franchisee's defense, including the cost of any judgment or settlement, shall be borne by Franchisee.

6.6.     In the event of any litigation or administrative proceeding relating to the Proprietary Marks, Franchisee shall execute any and all documents and do all acts that may, in the opinion of Franchisor, be necessary or appropriate to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action. Except to the extent that such litigation is the result of Franchisee's use of the Proprietary Marks in a manner inconsistent with the terms of this Franchise Agreement, Franchisor agrees to reimburse Franchisee for its out-of-pocket costs for such acts.

## 7.     CONFIDENTIAL MANUALS

7.1.     Franchisee and its Owners shall at all times treat the Manuals and the information contained therein as confidential and shall use all reasonable efforts to maintain the confidentiality thereof, in accordance with Section 8.1 of this Franchise Agreement.

7.2.     The Manuals shall remain at all times the sole property of Franchisor and any hard copies shall be kept in a secure place on the Inn premises. Franchisee shall keep access to electronic copies of the Manuals secure. Franchisor may from time to time revise the contents of the Manuals, and Franchisee agrees to comply promptly with each new or changed Standard.

7.3.     Franchisee shall ensure that any hard copy of the Manuals in Franchisee's possession is kept up-to-date.  In the event of any dispute as to the content of the Manuals, the terms of the master copies of the Manuals maintained by Franchisor at Franchisor's home office shall control.

## 8.     CONFIDENTIAL INFORMATION

8.1.     Franchisee and its Owners specifically acknowledge that, pursuant to this Franchise Agreement, they will receive valuable Confidential Information. Franchisee and its Owners shall not, during the term of this Franchise Agreement or thereafter, misuse, communicate, divulge, or disclose to any third party, or use for the benefit of any other person any Confidential Information, knowledge or know-how concerning Franchisor, the System, or the operation of the Inn, which may be communicated to Franchisee or its Owners, or of which Franchisee or its Owners may be apprised, by virtue of Franchisee's operation under the terms of this Franchise Agreement.  Further, after the termination or expiration of this Franchise Agreement, Franchisee and its Owners shall not use the Confidential Information for its or their own benefit and shall surrender all Confidential Information to Franchisor. Neither Franchisee nor its Owners shall at any time, without Franchisor's prior written consent, copy, duplicate, record or otherwise reproduce any Confidential Information, in whole or in part. Franchisee shall divulge such Confidential Information only to such of its employees, contractors, architects, lenders, investors, agents or others who must have access to the Confidential Information in connection with the

11

performance of this Franchise Agreement or the operation of the Inn pursuant hereto and who have executed covenants satisfactory to Franchisor to maintain the confidentiality thereof, copies of which shall be submitted to Franchisor at Franchisor's request.

8.2.    Franchisee and its Owners agree that the existence of any claims they may have against Franchisor or Franchisor's Affiliates, whether or not arising from this Franchise Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section 8.  Franchisee and its Owners further acknowledge that any violation of the terms of this Section 8 would result in irreparable injury to Franchisor or its Affiliates for which no adequate remedy at law may be available, and Franchisee and its Owners accordingly consent to the issuance of an injunction prohibiting any conduct by them in violation of the terms of this Section 8. Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees and court costs) incurred by Franchisor or its Affiliates in connection with the enforcement of this Section 8, including all costs and expenses for obtaining specific performance, or an injunction against any violation, of the requirements of Section 8.

8.3.    At Franchisor's request, Franchisee shall obtain covenants similar in substance to those in this Section 8, in a form acceptable to Franchisor, from any of its Owners and from such of Franchisee's officers as Franchisor may require.

8.4.    The covenants in this Section 8 shall survive the termination, expiration or Transfer of this Franchise Agreement.

8.5     Franchisor acknowledges that during the term of this Franchise Agreement it may obtain confidential or proprietary information belonging to or concerning Franchisee and/or the operation of the Inn, through reports provided by Franchisee, inspections or evaluations of the Inn, software, or other means. Franchisor shall use all reasonable measures to protect Franchisee's confidential or proprietary information, provided that Franchisor shall have the right to use all such Confidential Information in evaluating and administering the System and the operation of individual Red Roof Inns, including Franchisee's Inn, and may disclose such Confidential Information to third parties, including in reports of hotel/motel industry data and franchise earnings claims, provided that unless otherwise required by law, individual franchise or Inn results will be reported without specifically identifying Franchisee or the Inn.

9.      **ACCOUNTING AND RECORDS**

9.1.    Franchisee shall maintain and preserve, for at least five (5) years from the date of their preparation, complete and accurate books, records, and accounts showing the results of operation of the Inn, in the form and manner prescribed by Franchisor from time to time in the Manuals or otherwise in writing.

9.2.    Franchisee shall, at Franchisee's expense, install and maintain such equipment (including Computer System and Software), make such arrangements and follow such procedures as Franchisor may require in the Manuals or otherwise in writing, to permit Franchisor to access each night during the term of this Franchise Agreement, from Franchisee's Computer System, information on the occupancy, average daily room rate, rooms sold, Gross Room Revenue, and such other data and information attributable to the Inn as Franchisor may require (the "Reports").  To the extent the Reports for any calendar month or partial calendar month are not furnished to Franchisor by Franchisee's Computer System, as provided herein, Franchisee shall submit such Reports to Franchisor, together with all required monthly payments, within twenty (20) days following the end of each calendar month, as required by Section 4 of this Franchise Agreement.

9.3.    Franchisee shall upon Franchisor's request and at Franchisee's expense, submit to Franchisor within ninety (90) days following the end of each fiscal year (in the form prescribed by Franchisor): (a) an annual income statement for such fiscal year, and (b) a balance sheet as of the end of such fiscal year.  If such statement is audited, a copy of the audited statement, together with the auditor's report, shall be furnished.  Each statement shall be signed by an authorized representative of Franchisee attesting that it is true and correct.

12

HOU:2728313.1

RRI_GW_0000022

9.4.     Franchisee shall submit to Franchisor, for review and/or auditing, such other forms, periodic and other reports, records, information, and data as Franchisor may reasonably designate, in the form and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manuals or otherwise in writing.  All such reports and information received by Franchisor pursuant to this Franchise Agreement shall be the property of Franchisor, and Franchisor shall have the right to use such information in its reasonable discretion, subject to the limitations set forth in Section 8.5 of this Franchise Agreement, for the benefit of the entire System.

9.5.     Franchisor or its designated agents shall have the right at any time to examine and copy, at Franchisor's expense, all books, records and tax returns of Franchisee related to the Inn and, at Franchisor's option, to have an independent audit made. Such records shall be made available to Franchisor or its agents at the Approved Location as soon as practical but not more than three (3) days after Franchisee receives written notice of the request. If all books, records and tax returns of Franchisee related to the Inn are not made available to Franchisor at a scheduled audit, the audit will be  deemed failed. If an inspection or audit reveals that Franchisee has failed to pay Franchisor or its designees or agents any sums payable under this Franchise Agreement, then Franchisee shall immediately pay Franchisor or its designees or agents the amount of such deficiency, any late fees, and interest from the date such amount was due until paid, as provided in Section 4.7.  If an inspection discloses an underpayment to Franchisor of two percent (2%) or more of the total amount that should have been paid to Franchisor, Franchisee shall, in addition to payment of such deficiency, with late fees and interest, reimburse Franchisor for any and all costs and expenses incurred in connection with the inspection or audit (including, without limitation, reasonable accounting and attorneys' fees).    If Franchisee fails an audit (whether because of a failure to made records available as required above or because the inspection reveals that Franchisee has failed to pay all amounts payable), Franchisor may re-inspect the books and Franchisee shall bear the re-inspection costs.  The foregoing remedies shall be in addition to any other remedies Franchisor may have.

## 10.     MARKETING AND RESERVATION CONTRIBUTION

10.1.    Franchisee shall pay to Franchisor the Marketing and Reservation Contribution specified in Section 4.3. Franchisor may utilize or cause to be utilized such funds in Franchisor's sole discretion to develop, operate, support and/or administer a Reservation System, and/or to develop, operate, support and/or administer marketing programs for the System.  Local and regional marketing programs and related activities may be conducted by Franchisee, at Franchisee's expense and subject to Franchisor's approval; provided, that in no event shall Franchisee advertise, promote, post or list information relating to the Inn on the Internet (through the creation or use of a website or otherwise), except in accordance with Section 10.5 below or as permitted and subject to Franchisee's strict compliance with the guidelines set forth in the Internet Style Guide and Manuals, as amended from time to time.  If Franchisee elects to create a website for the Inn pursuant to this Section 10.1, Franchisee will be responsible for all costs and expenses associated with the development and maintenance of such website.  A reasonable fee may be charged by Franchisor for advertising materials provided to Franchisee.

10.1.1. The Marketing and Reservation Contribution shall be spent as Franchisor, in Franchisor's sole discretion, determines to be necessary or appropriate for the development and operation of the System, which may include marketing, advertising, reservation confirmations, the development of new guests, repeat visits by guests, and systems designed for such purposes, including any and all costs associated with developing, preparing and administering reservation services, such as the Computer System and Software, phone lines and phone operations.

10.1.2.  Marketing and Reservation m shall be used for any programs as Franchisor, in Franchisor's sole discretion, determines to be appropriate to promote the System, including but not limited to developing, preparing, producing, directing, administering, conducting, maintaining and disseminating advertising, marketing, telemarketing, promotional and public relations materials, programs and campaigns, publishing the Directory, creating and maintaining Internet advertising and marketing for the System (through a Red Roof Inn website or otherwise), conducting market research and the

13

HOU:2728313.1

CONFIDENTIAL

reasonable administration costs and overhead Franchisor or its Affiliates incur in directing and administering the Reservation System and the Marketing Program (including, without limitation, the cost of collecting and accounting for assessments of each franchisee's Marketing and Reservation Contribution).

10.1.3. Marketing and Reservation Contributions of Franchisee, plus any interest or other income in respect thereof, may be held or maintained in one or more accounts in financial institutions, any of which may include funds other than Red Roof Inns Marketing and Reservation Contributions. Marketing and Reservation Contributions shall not be used to defray any of Franchisor's general operating expenses, except the reasonable administration costs and overhead incurred in directing and administering the Reservation System and the Marketing Program, including the costs described in Sections 10.1.1 and 10.1.2 above.

10.1.4. Franchisee agrees and acknowledges that the Reservation System and Marketing Program are intended to maximize general public recognition, acceptance and use of the System and of Franchisor's brands, and that Franchisor in administering the Marketing and Reservation Contribution is not required to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's Marketing and Reservation Contribution or to ensure that any particular franchisee benefits directly or pro rata from expenditures of the Marketing and Reservation Contribution.

10.1.5. Franchisee shall pay the Marketing and Reservation Contribution in the manner specified by Franchisor in accordance with Section 4 hereof or by any other means as Franchisor may designate.

10.1.6. An unaudited annual report of the income and expenditures of the Reservation System and the Marketing Funds shall be made available to Franchisee upon request.

10.1.7 In addition to the Marketing and Reservation Contribution, Franchisee shall pay the following:  (i) all of Franchisee's expenditures for local billboard advertising and other Inn-specific advertising and promotions, (ii) certain special promotion support materials, such as the in-room acrylic holders for promotional materials, point-of-sale or other such materials used to promote the Red Roof Inn System from time to time, and (iii) the annual listing of Franchisee's Inn in the Yellow Pages directory(ies) for Franchisee's market area placed through TMP Worldwide (or other designated supplier) in the form that Franchisor prescribes in the Operations Manual or otherwise.

In addition to the foregoing, the Franchisee shall participate in and pay for any designated advertising or quality assurance programs designated or conducted by Franchisor, provided that such expenditures for the designated advertising or quality assurance programs (including payments to Franchisor) shall not exceed two thousand five hundred dollars ($2,500.00) on the part of the Franchisee in a calendar year.  Franchisor may increase such required expenditures, but not more than once every three years.

10.2.    Franchisor or its Affiliates may enter into arrangements with third parties for the development or provision of services and/or personnel to support the Reservation System and the Marketing Program, and may use any facilities, programs, services or personnel of Franchisor's parent, subsidiaries, divisions or Affiliates.

10.3.    Franchisor shall have the right, in its sole discretion, to designate geographic areas ("Cooperative Areas") for purposes of establishing local or regional advertising cooperatives ("Cooperatives") and to require Franchisee to join a Cooperative and contribute monies to the Cooperative as set forth below.  Red Roof Inn locations owned or operated by Franchisor, or any entity controlled by Franchisor, operating within Cooperative Areas will become members of the respective Cooperative and will contribute to the Cooperative at the same rate as franchisees.  Contributions to the Cooperative shall be in addition to, and not in lieu of, the Marketing and Reservation Contribution required under Section 4.5.  Franchisee and other members of the Cooperative shall contribute monthly to the Cooperative an amount determined by the membership.  Said amount may not be greater than one

14

HOU:2728313.1

RRI_GW_0000024

percent (1%) of the Gross Room Revenues of each inn operated by the members of the Cooperative. Monthly contributions shall be made to the Cooperative on the twentieth (20th) day of each month, beginning in the first month in which the Cooperative commences operation. Each required monthly contribution shall be based on Gross Room Revenues and shall be submitted together with such statements or reports as may be required by Franchisor, or by the Cooperative with Franchisor's prior written approval. If a Cooperative has been established for the Cooperative Area in which the Inn is located at the time the Inn opens for business, Franchisee shall immediately become a member of the Cooperative. If a Cooperative is established for the Cooperative Area in which the Inn is located during the term of this Franchise Agreement, Franchisee shall become a member no later than thirty (30) days after written notification by Franchisor that the Cooperative has commenced operation. In no event shall Franchisee be required to be a member of more than one Cooperative for each Red Roof Inn operated by Franchisee under franchise agreements with Franchisor. The following provisions shall apply to the Cooperatives:

10.3.1. Each Cooperative shall be organized and governed in a form and manner, and shall commence operations on a date, approved in advance by Franchisor in writing. The bylaws and any other governing documents of the Cooperative shall provide that the Cooperative will comply with Section 10.4, regarding the use by the Cooperative, and the approval by Franchisor, of advertising and promotional materials. No changes in the bylaws or other governing documents of a Cooperative shall be made without Franchisor's prior written consent.

10.3.2. Each Cooperative shall be organized for the exclusive purpose of administering advertising programs and developing, subject to Franchisor's approval, standardized advertising materials for use by the members in local advertising.

10.3.3. No advertising or promotional plans or materials may be used by a Cooperative or furnished to its members without Franchisor's prior approval pursuant to Section 10.4 below.

10.4. Recognizing the value of advertising and the importance of the standardized advertising programs to the furtherance of the goodwill and public image of the System, Franchisee agrees that all advertising by Franchisee shall be conducted in a dignified manner and shall conform to such Standards and requirements as Franchisor may specify in the Manuals or otherwise in writing. At least fifteen (15) business days before the date on which Franchisee intends to print or record the materials, Franchisee shall submit to Franchisor for review and approval samples of all proposed advertising and promotional materials for the Inn. Franchisor reserves the right to disapprove such materials upon written notice to Franchisee. If Franchisor does not notify Franchisee in writing of its disapproval of the materials within ten (10) business days following the date such materials are received by Franchisor, Franchisor shall be deemed to have approved the materials. Franchisor may from time to time revoke its approval of any advertising and promotional materials that were previously approved, upon thirty (30) days' prior written notice. Franchisee shall immediately discontinue use of any such materials upon receipt of written notice that Franchisor's approval has been revoked.

10.5. In the event Franchisor maintains a website on the Internet that provides information about Franchisor and its franchise systems, including the System and the accommodations and services that Red Roof Inns provide, and over which Franchisor has sole discretion and control (including design, contents and continuation). Franchisor may use Marketing and Reservation Contributions to pay or reimburse the costs associated with the development, maintenance and update of the website.

10.5.1. Franchisor may (but is not required to) include at the website an interior page containing information about Franchisee's Inn. If Franchisor includes such information on the website, Franchisor may require Franchisee to prepare all or a portion of the page, at Franchisee's expense, using a template that Franchisor provides. All such information will be subject to Franchisor's approval before posting.

10.5.2. Franchisor also may (but is not required to) develop an Intranet through which Franchisor and its franchisees can communicate by e-mail or similar electronic means. If Franchisor

15

HOU:2728313.1

develops such an Intranet, Franchisee agrees to use the facilities of the Intranet in strict compliance with the Standards, protocols and restrictions that Franchisor includes in the Manual (including, without limitation, Standards, protocols and restrictions relating to the encryption of Confidential Information and prohibitions against the transmission of libelous, derogatory or defamatory statements).

## 11.    **INSURANCE**

11.1.    Before the commencement of any activities under this Franchise Agreement, Franchisee shall procure, and shall maintain in full force and effect at all times during the term of this Franchise Agreement, at Franchisee's sole expense, an insurance policy or policies of the types, and in the amounts, specified in Exhibit C, protecting Franchisee, Franchisor, and their respective past and present officers, directors, partners, agents, employees and successors, against any demand, claim, loss, liability or expense arising out of or occurring upon or in connection with the establishment and operation of the Inn.

11.2.    Franchisor may from time to time during the term of this Franchise Agreement, at its sole option, require that the minimum limits and types of insurance coverage described on Exhibit C be reasonably increased or changed in any manner (including, without limitation, amounts and types of coverage) as determined solely by Franchisor.  Franchisee shall comply with such requirements, at Franchisee's sole cost and expense, and shall deliver evidence of such compliance to Franchisor within thirty (30) days of its receipt of written demand by or on behalf of Franchisor for any such increase or change in said insurance.

11.3.    Franchisee's obligation to obtain and maintain the policy or policies described in Exhibit C, in the amounts specified in Exhibit C or in the Manuals, shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions in Section 17.4 of this Franchise Agreement. Nothing contained herein shall be deemed to be a representation by Franchisor that the required insurance coverages will insure Franchisee in part or in whole against any or all insurable risk arising from or in connection with the establishment or operation of the Inn.

11.4.    Upon the execution of this Franchise Agreement, on each policy renewal date thereafter, and each time a change is made in any insurance or insurance carrier, Franchisee shall submit evidence of satisfactory insurance, as specified in Exhibit C.

11.5.    Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Franchise Agreement, as such requirements may be revised from time to time by Franchisor in the Manuals or otherwise in writing, Franchisor shall have the right and authority (but not the obligation) to procure such insurance and to charge the cost thereof to Franchisee, which charge, together with a reasonable fee for Franchisor's efforts expenses in so acting (not to exceed $2,500), shall be payable by Franchisee immediately upon notice.  The foregoing remedies shall be in addition to any other remedies Franchisor or its Affiliates may have.

11.6.    Notwithstanding anything to the contrary stated herein, Franchisor shall under no circumstances be liable for any premiums or costs of insurance and/or indemnification or defense incurred by Franchisee to fulfill any of the insurance requirements stated herein.

## 12.    **TRANSFER OF INTEREST**

12.1.    Franchisee represents that the Owners named in Exhibit D to this Franchise Agreement have the legal and/or beneficial interests set forth in the Ownership Schedule. Franchisor shall have the right to approve any additional Owners, and each Owner shall be required personally to guarantee the Franchise Agreement. Upon Franchisor's request, Franchisee shall from time to time furnish Franchisor with a current list of all Owners and their mailing addresses.

HOU:2728313.1

**CONFIDENTIAL**                                                                                              **RRI_GW_0000026**

12.2.    Without limiting any of the provisions of this Section 12, throughout the term of this Franchise Agreement, Franchisee's governing documents shall provide that no Transfer of any interest in Franchisee may be made except in accordance with this Section 12, and any certificate issued by Franchisee evidencing such interests shall bear a conspicuous printed legend to that effect.   Upon Franchisor's request, Franchisee shall furnish to Franchisor copies of its governing documents and any other documents Franchisor may reasonably request.   No change affecting the power to direct and Control the affairs of Franchisee shall be made in Franchisee's governing documents, nor shall Franchisee or the Owners enter into any shareholders' agreement, management agreement, voting trust or other arrangement affecting the power to direct and Control the affairs of Franchisee, without Franchisor's prior written consent.

12.3.    Franchisee may not assign or delegate any right or obligation of Franchisee under this Franchise Agreement, nor may Franchisee or any Owner sell, assign, Transfer, convey, exchange, give away, lease, sublease, pledge, mortgage or otherwise encumber any direct or indirect interest in Franchisee, this Franchise Agreement, the Inn, or substantially all of the assets of the Inn, whether by merger or otherwise, whether or not such sale, assignment, transfer, conveyance, merger, gift, or disposition constitutes a transfer or assignment under applicable law.   Any such Transfer shall follow the procedure and be on the conditions as provided in Sections 12.4, 12.5, 12.6 and 12.7 below.   Any Transfer or attempted Transfer in violation of this Section shall be a material event of default of this Franchise Agreement.

12.3.1. Notwithstanding the provisions of Section 12.3, Franchisee, or the Owners of Franchisee collectively, shall have the right during the term of this Franchise Agreement to Transfer up to a total of 20% of ownership in Franchisee (in the aggregate for the entire term considering all Transfers collectively, whether effected in one or a series of transactions), without prior written consent of Franchisor or payment of a fee, upon written notice to Franchisor, execution by any new Owner of a Guarantee in a form acceptable to Franchisor, and revision of an Exhibit D-Ownership Schedule.   Any transferee under this provision shall meet the criteria in Section 12.5.3.   Such a transfer will not relieve a prior Owner of its Indemnification obligations or any other financial or other obligations under the Agreement that have accrued before the change in ownership or which by their terms survive the Transfer.   For such obligations accruing after the change in ownership, the prior Owner shall continue to be obligated unless the new Owner accepts responsibility for those obligations.

12.3.2. Notwithstanding the provisions of Section 12.3, during the first six (6) months of the initial term of the Franchise Agreement, Franchisee or all the Owners of Franchisee shall be permitted to make one Transfer to a transferee entity owned by the Owners in the same proportions as set forth in this Franchise Agreement, without payment of a transfer fee, by assigning this Franchise Agreement to the transferee in a form acceptable to Franchisor; the execution of such Guarantees by Owners as may be required by Franchisor; and transferee providing Franchisor any corporate or other organizational documents Franchisor may require.   In addition, at any time during the term of this Franchise Agreement, an Owner that owns a majority interest in Franchisee may acquire the interest of one or more minority owners upon submission of Transferor's Notice, payment of $2,500 as a transfer application fee, and execution of such Guarantees or assumptions of liability as Franchisor may require.   Not withstanding the provisions of Section 12.6, no further transfer fee shall be required for this type of transfer.   Transfers under this Section 12.3.2 shall not require execution of a new Franchise Agreement.

12.3.3. Notwithstanding anything in this section 12, the Franchisee shall at all times during the term of this Franchise Agreement own or control the Inn.

12.4.    Except as set forth in Section 12.3.1 and 12.3.2 above, Franchisee must give Franchisor at least sixty (60) days prior written notice of any proposed Transfer.   Franchisor may withhold its consent to a proposed Transfer on any reasonable grounds.   With its written notice of a proposed Transfer ("Transferor's Notice"), Franchisee, transferor, and transferee shall provide, in writing, all information which Franchisor believes would be appropriate for consideration by Franchisor in connection with its review of the proposed Transfer.   Transferor's Notice must be accompanied by a non-refundable transfer application fee in the amount of Two Thousand Five Hundred Dollars ($2,500).   This transfer application

17

CONFIDENTIAL

fee is in addition to the transfer fee, if required, set out in Section 12.5.6 and payment of the transfer application fee shall not obligate Franchisor to approve the proposed Transfer.  Upon Franchisor's request, Franchisee shall provide such additional information and documentation relating to the proposed Transfer as Franchisor may reasonably require.

12.5.   Franchisor may, in its sole discretion, require any or all of the following as conditions of its approval of a proposed Transfer:

12.5.1.  That all of Franchisee's accrued monetary obligations to Franchisor, its Affiliates and its approved or designated suppliers shall have been satisfied;

12.5.2.  That Franchisee is not in default of any provision of this Franchise Agreement or any other agreement between Franchisee and Franchisor or its approved suppliers;

12.5.3.  That the transferee demonstrates to Franchisor's satisfaction that the transferee and, if applicable, its owners possess good moral character, business reputation and credit rating and, in a Transfer of controlling interest in Franchisee, have the aptitude and ability to operate the Inn in accordance with the Standards required by Franchisor (as may be evidenced by prior related business experience or otherwise); have adequate financial resources and capital to operate the Inn; and, in the case of a transferee which is already a franchisee under the System, be in Good Standing and have a record of guest service and Standards compliance each of which is satisfactory to Franchisor;

12.5.4.  That, in a Transfer of controlling interest in Franchisee or a controlling interest in the Inn (other than as set forth in Section 12.3.2), the Franchisee or transferee, respectively, executes, for a term ending on the Expiration Date of this Franchise Agreement, the then-current form of Red Roof Inn franchise agreement (which may include, without limitation, changes to the Royalty Fee and Marketing and Reservation Contribution to conform to the amounts then being paid by new franchisees as of the date of the Transfer, provided, however, the transferee shall not be required to pay any initial franchise fee) and such other ancillary agreements as Franchisor may require, all of which shall supersede this Franchise Agreement in all respects;

12.5.5.  That in the event of an assignment of this Franchise Agreement to a transferee, if permitted by Franchisor, including an assignment pursuant to Section 12.3.2., Franchisee and the assignee enter into a contemporaneous written agreement, in a form satisfactory to Franchisor, transferring the Inn and all of the assets of the Inn to the assignee;

12.5.6.  That, except as otherwise provided in this Section 12, in addition to the application fee provided for in Section 12.4, the Franchisee pay Franchisor a transfer fee of Twelve Thousand Five Hundred Dollars ($12,500) upon closing of the Transfer.  If, however, Franchisee does not timely submit information and other items described in this Section 12, or Franchisee's proposed Transfer requires Franchisor to engage outside parties in order for it reasonably to evaluate the proposed Transfer,  Franchisor may require Franchisee to reimburse Franchisor for its reasonable out-of-pocket costs and expenses associated with the Transfer, including, without limitation, legal and accounting fees. If transferee achieves and maintains quality scores that average equal to or better than System Standard for the twelve (12) months immediately following the effective date of Transfer and the transferee is otherwise in Good Standing, transferee shall be eligible for an incentive credit in the amount of Five Thousand Dollars ($5,000), applied to transferee's account within thirty (30) days after the end of the first full twelve (12) months of operation following the effective date of the Transfer;

12.5.7.  That if the transferee is a corporation, partnership or limited liability company, such Principal Owners of the transferee as Franchisor may request, shall execute a guarantee of the transferee's performance of its obligations under the Franchise Agreement;

12.5.8.  That the transferor (and, if the transferor is the Franchisee, all Owners) execute a general release, in a form satisfactory to Franchisor, that waives, releases and discharges all claims that Franchisee, Owners, their affiliates and the respective officers, directors, employees and agents of each

18

HOU:2728313.1

of them have, have had or may ever have, against Franchisor, its affiliates and their respective officers, directors, shareholders, employees or agents, past or present, in their corporate or individual capacities arising or accruing up to the date of Transfer;

12.5.9.   That the transferor remain liable for all of its obligations to Franchisor which arose before the effective date of the Transfer and execute any and all instruments reasonably requested by Franchisor to evidence such liability;

12.5.10.   That the transferee's manager and owners, at the transferee's expense, complete any training programs then in effect before the Transfer; and

12.5.11.   That the transferee shall, at the transferee's expense and upon the reasonable request of Franchisor, agree to upgrade the Inn to conform to the then-current Standards and specifications for Inns operating under the System, and to complete the upgrading and other requirements within a reasonable time specified by Franchisor.

12.6.   In the event of the death or medically certified incapacity of an individual Franchisee who is a sole proprietor or any Owner of a Franchisee that is a corporation or other legal entity, an executor, administrator, trustee or personal representative shall give Franchisor written notice of the death or incapacity within thirty (30) days after the death or determination of incapacity.   The executor, administrator, trustee or personal representative of a Franchisee who is a sole proprietor shall be permitted to continue to operate the Inn and perform the conditions of the Franchise Agreement until the earlier of twelve (12) months or the date on which heirship or transfer by devise is determined by a court of competent jurisdiction, as long as the Inn is operated in compliance with Red Roof Inn Standards and with this Franchise Agreement.   Any failure to operate in compliance with Red Roof Inn Standards and this Franchise Agreement will constitute a default in the Franchise Agreement.   Within twelve (12) months after the death or incapacity of a Franchisee who is a sole proprietor or of any Owner of a Franchisee that is a corporation or other legal entity, if there has been no transfer by heirship or by devise determined by the court, then the executor, administrator, trustee, or personal representative of such individual Franchisee or Owner shall transfer the individual's interest to a third party approved by Franchisor, subject to Sections 12.3, 12.4, 12.5, and 12.7.   In the case of a Transfer by devise or inheritance, if the heirs or beneficiaries of an individual Franchisee or Owner are unable to meet the conditions in Section 12.5.3, then the executor, administrator, trustee, or personal representative of the individual Franchisee or Owner shall transfer the interest to another party approved by Franchisor within the time period set forth above, and such disposition also shall be subject to all the terms and conditions for transfers contained in this Franchise Agreement.   A Transfer by devise or inheritance to heirs or beneficiaries who do meet the conditions in Section 12.5.3 shall not be subject to a transfer fee, but shall be subject to the other provisions of Sections 12.3, 12.4 and 12.5 and their subparts.   Any failure to comply with the provisions of this Section 12.6, within the time periods set forth herein, shall constitute a default for which Franchisor may terminate this Franchise Agreement.

12.7.   If Franchisee wishes to Transfer all or part of its interest in this Franchise Agreement or in the Inn, or if Franchisee or any Owner wishes to Transfer any Direct or Indirect ownership interest in Franchisee, pursuant to a *bona fide* offer received from a third party, the proposed transferor shall comply with the provisions of Section 12.4 and shall include with the Transfer Notice the terms of such offer, and shall provide such additional information and documentation relating to the offer as Franchisor may require.   Franchisor shall have the right and option, exercisable within thirty (30) days after its receipt of Transferor's Notice and copies of all documentation requested by Franchisor, to send written notice to the transferor that Franchisor intends to purchase the transferor's interest on the same terms and conditions offered by the third party ("Franchisor's Notice").   If Franchisor elects to purchase the transferor's interest, the transfer application fee will be refunded and closing on such purchase must occur within the later of ninety (90) days from the date of Franchisor's Notice, ninety (90) days after the date Franchisor receives and obtains all necessary permits and approvals, or such other date as the parties may agree upon in writing.   If Franchisor elects not to purchase, then the transfer to a third party is subject to the provisions of Sections 12.3, 12.4 and 12.5.   Any subsequent material change in the terms of any offer before closing shall constitute a new offer subject to the same right of first refusal by

19

CONFIDENTIAL

Franchisor as in the case of an initial offer.  In the event an offer from a third party provides for payment of consideration other than cash or involves certain intangible benefits, Franchisor may elect to purchase transferor's interest for the reasonable cash equivalent.  If the parties cannot agree within a reasonable time on the reasonable cash equivalent of the non-cash portion of the offer, then such amount shall be determined by two (2) appraisers, with each party selecting one (1) appraiser, and the average of their determinations shall be the exercise price. After determination of the exercise price by the appraisers, Franchisor may elect to exercise its right of first refusal at that price or not.  In the event of an appraisal, each party shall bear its own legal and other costs and shall bear the appraisal fees equally.  If Franchisor exercises its right of first refusal, it shall have the right to set off against any payment due the transferor (i) all fees for any independent appraiser due from the transferor, and (ii) all amounts due Franchisor, its Affiliates and its approved or designated suppliers from Franchisee, Franchisee's Owners, and any of Franchisee's Affiliates. Franchisor's failure to exercise the option afforded by this Section 12.7 shall not constitute a waiver of any other provision of this Franchise Agreement, including all of the requirements of Sections 12.3, 12.4 and 12.5, with respect to a proposed Transfer.  Failure to comply with the provisions of this Section 12.7 before the Transfer of an interest in Franchisee, the Inn, or this Franchise Agreement shall constitute a material event of default under this Franchise Agreement.  Upon a request for a Transfer pursuant to this Section 12.7, including its subparts, Franchisor may assign its purchase rights under this Section 12.7 to a third party of the Franchisor's choosing.

12.7.1   If Franchisor does not deliver the Franchisor's Notice or if Franchisor elects not to purchase transferor's interest, as provided above, Franchisor's Right of First Refusal terminates for a period of one year from the date the Transferor's Notice is delivered to Franchisor, as long as the property is sold at a price equal to or greater than the price offered to Franchisor.

12.8.   Franchisor may transfer or assign this Franchise Agreement or any part of its rights or obligations under this Franchise Agreement to any person or legal entity, provided that the transferee is an entity to which Franchisor transfers all or substantially all of the franchise agreements for Red Roof Inns and the transferee or assignee accepts the transfer or assignment.  Franchisee agrees that Franchisor shall have no liability after the effective date of such transfer or assignment for the performance of any obligations under this Franchise Agreement.

12.9.   In addition to the other requirements of this Section 12, securities in Franchisee may be offered to the public only in compliance with this Section 12.9.  All materials required by federal or state law to be filed in connection with the offer or sale of any interest in Franchisee shall be submitted to Franchisor for review before filing with any governmental agency and any materials to be used in any offering of interests exempt from filing shall be submitted to Franchisor for review before their use. Franchisor's review of any offering materials shall be limited solely to the subject of the relationship between Franchisee and Franchisor.  No Franchisee offering shall imply, by use of the Proprietary Marks or otherwise, that Franchisor is participating as an underwriter, issuer or offeror of Franchisee's or Franchisor's securities.  Franchisee and other participants in the offering must fully indemnify Franchisor in connection with the offering.  For each proposed offering, Franchisee shall pay to Franchisor a non-refundable offering fee of Ten Thousand Dollars ($10,000) or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering, including, without limitation, legal and accounting fees.

12.10.   Franchisor's consent to a Transfer shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver or release of Franchisor's right to demand exact compliance with any of the terms of this Franchise Agreement by the transferee.

12.11   At Franchisor's request, Franchisee shall obtain covenants similar in substance to those in this Section 12, in a form specified by Franchisor, from any of its Owners agreeing not to engage in a Transfer except in accordance with the terms and conditions of this Franchise Agreement; provided, that this provision shall not apply to Owners that are required to comply with the reporting requirements under Section 13 or Section 15 of the Securities Exchange Act of 1934.

20

HOU:2728313.1

RRI_GW_0000030

13.    **DEFAULT AND TERMINATION**

13.1.    Franchisee may terminate this Franchise Agreement after the fifth anniversary of the opening of the Inn (or, if a renovation, the completion of the renovation of the Inn) by providing sixty (60) days written notice of termination to Franchisor and paying a termination fee equal to three (3) times the sum of the amounts the Franchisee has paid and was required to pay to Franchisor with respect to the twelve (12) full calendar month period ending as of the calendar month immediately preceding such notice in Royalties, Marketing Fees, Booking Fees and Commission Fees, and Preferred Member Program Fees. Termination will not be effective unless and until such period has elapsed and payment has been made, and until such termination Franchisee shall strictly comply with all of its obligations hereunder. Upon termination of this Agreement, Franchisee shall comply with all post-termination covenants contained in this Agreement.

13.2.    Franchisee shall be deemed to be in default under this Franchise Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if Franchisee becomes insolvent or makes a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by Franchisee or such a petition is filed against, and consented to by, Franchisee; if Franchisee is adjudicated as bankrupt; if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any state or federal law is instituted by or against Franchisee; if Franchisee is dissolved; if execution is levied against the Inn or any part or asset of the Inn, or suit to foreclose any lien or mortgage against the Inn or any part or asset of the Inn is instituted against Franchisee and not dismissed within ninety (90) days; or if the Inn or any part or asset of the Inn is sold after levy.

13.3.    Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate this Franchise Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon receipt of notice by Franchisee, upon the occurrence of any of the following:

13.3.1.    If Franchisee ceases to do business at the Approved Location, or ceases to operate the Inn under the Proprietary Marks and System, or loses the right to possession of the Inn, or otherwise forfeits the right to operate the Inn at the Approved Location; provided, that if the cessation of business or loss of possession results from a fire or other casualty, then the provisions of Section 5.20 of this Franchise Agreement shall apply;

13.3.2.    If the construction, renovation, maintenance or operation of the Inn, in the sole opinion of Franchisor, presents a threat or danger to public health or safety and an immediate shutdown of the Inn is either required by competent authority or reasonably determined by Franchisor to be essential to avoid substantial liability or loss of goodwill;

13.3.3.    If Franchisee, any Owner or any entity controlled by any Owner is convicted of a felony or any other crime or offense, or if Franchisee, any Owner or any entity controlled by any Owner acts, or operates the Inn or any other business, in any manner that is reasonably likely, in the sole opinion of Franchisor, to adversely affect the System, the Proprietary Marks, the goodwill associated therewith or Franchisor's or its Affiliate's interests therein;

13.3.4.    If Franchisee or any Owner Transfers or purports to Transfer any rights or obligations in violation of Section 12 of this Franchise Agreement;

13.3.5.    If Franchisee or any Owner fails to comply with the covenants in Sections 7 and 8, if Franchisee fails to exercise reasonable care to prevent disclosure of Franchisor's Confidential Information, or of Franchisee uses the software outside the scope of the Software License or otherwise breaches the Software License;

HOU:2728313.1

CONFIDENTIAL                                                    RRI_GW_0000031

13.3.6. If Franchisee or any Owner makes any material false statements or omissions, negligently or otherwise, in connection with Franchisee's Application for the franchise, the execution of this Franchise Agreement, or in connection with any information submitted to Franchisor;

13.3.7. If Franchisee or any Owner misuses or participates in any unauthorized use of the Proprietary Marks or otherwise adversely impacts the goodwill associated therewith or Franchisor's or its Affiliate's rights therein, including, without limitation, any use of the Proprietary Marks before receiving written authorization to open the Inn as a Red Roof Inn, except as otherwise expressly permitted under the Renovation Addendum or Construction Addendum;

13.3.8. If Franchisee commits a default under Section 13.4 more than three times in any consecutive twelve (12) month period, whether the same or different defaults, and whether or not such defaults are cured after notice; or,

13.3.9. If Franchisee fails to strictly comply with the terms of the Renovation Addendum or New Construction Addendum to this Franchise Agreement, as applicable, on or before the dates set forth therein, including, without limitation, if Franchisee opens the Inn before receiving Franchisor's written approval to do so pursuant to Section 5.6 of the Renovation Addendum or Construction Addendum.

13.4.    Except as provided in Sections 13.2 and 13.3 of this Franchise Agreement, Franchisee shall have thirty (30) days from its receipt of a written notice of default within which to remedy any default under this Franchise Agreement. Such defaults shall include, without limitation, the occurrence of any of the following:

13.4.1. If Franchisee fails, refuses or neglects to pay any monies owing to Franchisor or its suppliers when due, or to submit the financial information or other Reports required by Franchisor under this Franchise Agreement;

13.4.2. If, in connection with the establishment or operation of the Inn, Franchisee, by act or omission, allows a continuing violation of any law, ordinance, rule or regulation of a governmental agency, in the absence of a good faith dispute over its application or legality and without having promptly resorted to an appropriate administrative or judicial forum for relief therefrom;

13.4.3. If Franchisee fails to comply with the requirements concerning the upgrading of the Inn set forth in Section 5.8 hereof;

13.4.4. If Franchisee lists the Inn on the Internet in violation of Sections 10.1 and 10.5 of this Franchise Agreement;

13.4.5. If Franchisee fails any quality measurement of the Inn, or otherwise fails to maintain Franchisor's Standards or comply with Franchisor's procedures as set forth in the Manuals or otherwise in writing; or

13.4.6. If after receipt of written demand from Franchisor, Franchisee fails to timely comply with its obligations in violation of Sections 17.4., 17.4.1. or 17.4.2 of this Franchise Agreement.

13.5.    In the event Franchisee commits any default of this Franchise Agreement (including, without limitation, any failure to comply with the Standards and procedures specified in the Manuals or otherwise in writing), and if Franchisee fails to cure any such default which may be cured as permitted hereunder, Franchisor may, in its sole discretion, in lieu of, or as a preliminary action before, terminating this Franchise Agreement as provided in Sections 13.3 or 13.4, cease accepting reservations from guests for lodging at Franchisee's Inn through the Reservation System (provided, that Franchisor shall preserve, and Franchisee shall honor, all reservations received before the date reservations cease to be accepted), and/or refuse to provide any operational or procurement support, and/or refuse to list the Inn in the Directory, until the default is cured. During any period in which some or all of the services listed above

22

HOU:2728313.1

                                                                                                 RRI_GW_0000032

are suspended, Franchisee shall nevertheless comply with all of its obligations under this Franchise Agreement, including the obligation to pay Royalty Fees and the Marketing and Reservation Contribution.

## 14.    OBLIGATIONS UPON TERMINATION

Upon termination or expiration of this Franchise Agreement:

14.1.    Franchisee shall immediately cease to operate the Inn under the System and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former Red Roof Inn franchisee.

14.2.    Franchisee shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, the name "Red Roof Inn," any other Proprietary Marks or identifying characteristics of the System, and any and all Confidential Information, methods, procedures and techniques associated with the System including, but not limited to, the Software.    Franchisee shall remove and discontinue using for any purpose, any and all signs, fixtures, furniture, furnishings, equipment, software, advertising, materials, stationery, supplies, forms or other articles, which display the Proprietary Marks.    Nothing herein contained shall allow Franchisee to sell or Transfer any of the foregoing without obliterating any Proprietary Marks or distinctive features of the System, unless transferred to Franchisor, its designee, or another franchised Red Roof Inn. Any signs bearing the Proprietary Marks which Franchisee is unable to remove within one (1) day following expiration or termination of this Franchise Agreement shall be completely covered by Franchisee until the time of their removal, which shall be within ten (10) days following the expiration or termination of this Franchise Agreement. Franchisee agrees that all signs that are not timely removed pursuant to this section may be removed by Franchisor, and all legal and other costs related to such removal shall be borne by Franchisee.

14.3.    Franchisee shall, at its expense, immediately make such modifications or alterations as may be necessary to distinguish the Inn so clearly from its former appearance and from other Red Roof Inns as to prevent any possibility of confusion therewith by the public, and shall do all things necessary to prevent the operation of any business at the Approved Location (by Franchisee or others) in derogation of this Section 14.3 including, without limitation, removal of all distinctive physical and structural features identifying Red Roof Inns or the System, removal of all distinctive signs and emblems, and removal or alteration of any design or decor features that Franchisor, in its sole discretion, determines to be indicative of a Red Roof Inn,  including, without limitation, the removal of the Red Roof Inn hoods and the exterior and interior color schemes.

14.3.1.    Without limiting the foregoing, (a) the following distinctive features or devices associated with the System shall be painted colors other than the then-current colors used by Red Roof Inns:  Sign Cans for all signs, Sign Poles for all signs, Doors, and Railings; and (b) the following distinctive features or devices associated with the System shall be completely removed from the Approved Location:  Logo Sign Faces, Non-Logo Signs in Red Roof Inn colors and font, Red Roof Inn Posters, Red Roof Inn Drapes, Red Roof Inn Bedspreads, Phone Face Plates, Signage on the back of guest doors, Pool Signage and Red Roof Inn Theft Disclaimer Signage.

14.3.2.    Until all modifications and alterations required by this Section 14.3 are completed, Franchisee shall (i) maintain a conspicuous sign at the registration desk in a form specified by Franchisor stating that the Inn is no longer associated with the System, and (ii) advise all guests or prospective guests who telephone the Inn that it is no longer associated with the System.

14.3.3.    If Franchisee fails to initiate immediately and timely complete the alterations described herein, as and when required by this Section 14.3, Franchisee acknowledges and agrees that Franchisor or its designated agents may enter the premises of the Inn and adjacent areas at any time and make such alterations, at Franchisee's sole risk and expense, without responsibility for any actual or consequential damages to the property of Franchisee or others, and without liability for trespass or other

23

CONFIDENTIAL

tort or criminal act.  Franchisee expressly acknowledges that its failure to make such alterations timely and completely will cause irreparable injury to Franchisor.

14.4.    Franchisee shall take such action as may be necessary to cancel any trade, fictitious or assumed name or equivalent registration which contains the mark "Red Roof Inn" or any other Proprietary Marks, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five (5) days after termination or expiration of this Franchise Agreement.

14.5.    In the event Franchisee continues to operate or subsequently begins to operate any other business, Franchisee agrees not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with the operation of such other business or the promotion thereof. Franchisee further agrees not to utilize any design or decor features, designation of origin, description or representation (including, but not limited to, reference to Franchisor, the System, or the Proprietary Marks) which, in Franchisor's sole discretion, suggests or represents a present or former association or connection with Franchisor, the System, or the Proprietary Marks.

14.6.    Franchisee shall timely pay all sums owing to Franchisor, its Affiliates and its approved or designated suppliers, including all amounts required under Section 14.7 below. Franchisor shall have the right, within sixty (60) days following the termination or expiration of this Franchise Agreement, to inspect the Inn premises and offices, and conduct a review and/or an audit of Franchisee's books and records for the purpose, among other things, of assuring Franchisee's compliance with the provisions of this Section 14. Such books and records shall be made available to Franchisor at the Approved Location upon five (5) days written notice to Franchisee.

14.7.    Franchisee shall pay upon demand to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor in connection with Franchisee's default and/or the early termination or expiration of this Franchise Agreement including, without limitation, those incurred to enforce and/ or obtain injunctive or other relief in connection with this Section 14.

14.8.    Franchisee shall immediately return to Franchisor all Manuals and other Confidential Information, and all other records, files, instructions, correspondence and other materials provided by Franchisor related to the operation of the Inn, and all copies thereof (all of which are acknowledged to be Franchisor's property), and shall retain no copy or record of any of the foregoing, with the exception of Franchisee's copy of this Franchise Agreement, any correspondence between the parties, and any other documents which Franchisee reasonably needs for compliance with any provision of law.

14.9.    Franchisor shall have the option, (which may be assigned) to be exercised within thirty (30) days after the termination or expiration of this Franchise Agreement, to purchase from Franchisee any or all of the furnishings, signs, fixtures, supplies or inventory of Franchisee bearing the Proprietary Marks at their then-current fair market value.  If the parties are unable to agree on fair market value within ten (10) days after the termination or expiration of this Franchise Agreement, then such amount shall be determined by two (2) licensed appraisers, with each party selecting one (1) appraiser, and the average of their determinations shall be the appraised value.  The two (2) appraisers shall determine fair market value within ten (10) days after their appointment.  If the amount determined by the appraisers is not acceptable to Franchisor, then Franchisor shall have the option to withdraw its offer.  Each party shall bear its own legal and other costs and shall bear the appraisal costs equally.  If Franchisor elects to exercise any option herein provided, it shall have the right to set off all amounts due from Franchisee, if any, against any payment due hereunder to Franchisor, its Affiliates and its approved or designated suppliers .

## 15.    <u>COVENANTS</u>

15.1.    Franchisee covenants that, during the term of this Franchise Agreement, except as otherwise approved in writing by Franchisor, Franchisee shall employ at the Inn a Manager who has successfully completed Franchisor's Manager's Training Program before the Opening Date, or a replacement or substitute Manager, who has successfully completed Franchisor's Manager's Training

24

CONFIDENTIAL                                                          RRI_GW_0000034

within two (2) months of assuming the duties of Manager, and who shall devote full time and best efforts to the management and operation of the Inn.

15.2.    In recognition of the valuable specialized training and Confidential Information received by them pursuant to this Franchise Agreement, Franchisee and its Owners covenant that during the term of this Franchise Agreement, except as otherwise approved in writing by Franchisor, Franchisee and its Owners shall not, directly or indirectly, for itself or themselves, or through, on behalf of, or in conjunction with any other person or legal entity, divert or attempt to divert any present or prospective business or customer of any Inn operating under the System to any competitor,  by direct or indirect inducement or otherwise.

15.3.    Franchisee and its Owners agree that the existence of any claims they may have against Franchisor, whether or not arising from this Franchise Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section 15.

15.4.    At Franchisor's request, Franchisee shall obtain covenants similar in substance to those in this Section 15, in a form acceptable to Franchisor, from any of its Owners and from such of Franchisee's officers as Franchisor may require.

## 16.    TAXES, PERMITS AND INDEBTEDNESS

16.1.    Franchisee shall promptly pay when due all taxes levied or assessed by any federal, state or local tax authority, and any and all other indebtedness incurred by Franchisee in connection with the operations of the Inn.  Franchisee shall pay to Franchisor an amount equal to any sales tax, gross receipts tax, or similar tax imposed on Franchisor or its Affiliates with respect to any payments to Franchisor or its Affiliates required under this Franchise Agreement.

16.2.    In the event of any *bona fide* dispute as to liability for taxes assessed or other indebtedness, Franchisee may contest the validity of the amount of the tax or indebtedness in accordance with the procedures of the taxing authority or applicable law, provided that such action does not result in any liability to or assessment of, any fine, penalty, or fee against, Franchisor; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the Inn, any part thereof, or any of its assets.

16.3.    Copies of all inspection reports, warnings, certificates, letters and ratings issued by any governmental authority, agency or instrumentality during the term of this Franchise Agreement in connection with the operation of the Inn, which indicate Franchisee's failure to meet or maintain the Standards or less than full compliance with any applicable law, rule, regulation, or ordinance, shall be forwarded to Franchisor by Franchisee within five (5) days after Franchisee's receipt thereof.

16.4.    Franchisee shall notify Franchisor in writing within five (5) days after the commencement of any action, suit, or proceeding, and thereafter upon the issuance of any order, writ, injunction, award or decree, of any court, agency or other governmental authority or instrumentality relating to the Inn.

## 17.    INDEPENDENT CONTRACTOR AND INDEMNIFICATION

17.1.    The parties hereto understand and agree that, in connection with its performance under this Franchise Agreement, Franchisee, its agents, employees and successors, shall act as independent contractors, and nothing herein shall at any time be construed to create the relationship of employer and employee, partnership, principal and agent, or joint venture between Franchisor and Franchisee.  In addition, Franchisee shall have no right or authority to enter into any contract, commitment, or agreement, or to speak on behalf of, or incur any debt or obligation in the name or on behalf of, Franchisor or its Affiliates unless expressly authorized to do so in writing by Franchisor.  Franchisee shall exercise full and complete control over, and have full responsibility for, its contracts, daily operations, labor relations, employment practices and policies, including but not limited to recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of its employees.

25

HOU:2728313.1

17.2.    During the term of this Franchise Agreement, Franchisee shall at all times hold itself out to the public as an independent contractor who independently owns and operates the Inn pursuant to a franchise agreement from Franchisor.

17.3.    Franchisee assumes full responsibility and liability for and agrees to release Franchisor and its Affiliates and their officers, directors, agents, representatives and employees, past and present, from and against any injury to any person including, but not limited to, Franchisee and its employees or agents, or damage to property caused by, resulting from, or arising out of any act or omission on the part of Franchisee, or its employees or agents, in connection with Franchisee's establishment or operation of the Inn or Franchisee's performance under this Franchise Agreement, including, but not limited to, fraudulent or dishonest acts of Franchisee or its employees or agents, personal injury, slander, libel, defamation, false arrest, detention or imprisonment, malicious prosecution, wrongful entry or eviction, invasion of privacy, or disclosure of any customers personally identifiable or credit card information.

17.4.    Franchisee shall defend, protect, indemnify and hold Franchisor, its Affiliates, their successors and assigns, and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them past or present (the "Indemnitees"), harmless from and against any and all payments of money (including, without limitation, all liabilities, losses, damages, claims, suits, demands, fines, settlement amounts, costs, expenses, attorneys' fees, investigative fees and court costs) for damages to property or persons including death (and in addition including, without limitation, the injury or death of any of Franchisee's employees or agents or damage to any of their property) which may arise out of or in connection with any act or omission, whether actual or alleged, negligent or otherwise, of Franchisee, its employees or agents, in connection with Franchisee's ownership, construction, renovation, establishment or operation of the Inn, the performance of Franchisee, its employees or agents, under this Franchise Agreement, or the default by Franchisee or its Owners of any representation or warranty herein.   Such indemnity shall survive the termination or expiration of this Franchise Agreement.

**17.4.1.    Franchisee's obligations to defend, protect, indemnify and hold harmless the Indemnitees as provided in Sections 17.4., 17.4.1. and 17.4.2. shall include but not be limited to, circumstances in which the damages to property or persons including death (and in addition including, without limitation, the injury or death of any of Franchisee's employees or agents or damage to any of their property) arise in whole or in part as a result of the negligent acts or omissions of the Indemnitees; provided, however, that nothing contained herein shall require Franchisee to defend or indemnify an Indemnitee for damages to property or persons including death (and in addition including, without limitation, the injury or death of any of Franchisee's employees or agents or damage to any of their property) to the extent the same are caused by the intentional act or willful misconduct of such Indemnitee.   Franchisee shall have ten (10) business days from its receipt of a written demand from Franchisor for indemnification under this Section 17 to comply with its obligations hereunder.**

17.4.2.    Franchisor shall have the right, through counsel of its own choosing and at Franchisee's sole cost and expense, to direct, manage and control its defense of any matter to the extent that it could directly or indirectly affect Franchisor or its Affiliates.  In addition to the foregoing, Franchisee also will reimburse Franchisor or its Affiliates for all expenses reasonably incurred by Franchisor or its Affiliates to protect themselves from, or to remedy, defaults by Franchisee under this Franchise Agreement.

**17.5.    Franchisee, its employees and agents, hereby waive, and release the Indemnitees from and against, any and all claims, demands, causes of actions for injury to property or person (including death) arising out of or in connection with Franchisee's operation of the Inn or its performance under this Franchise Agreement, regardless of when in the future sustained, and whether or not caused or contributed to by the negligence of Indemnitees. The foregoing sentence shall not apply with respect to an Indemnitee to the extent that such injury (or death) is caused by the international or willful misconduct of such Indemnitee.**

26

HOU:2728313.1

**17.6.    Franchisor and its Affiliates shall in no event be liable by reason of any act or omission of Franchisee in its construction, renovation, establishment or operation of the Inn or its performance under this Franchise Agreement or for any claim or judgment arising therefrom against Franchisee or Franchisor or its Affiliates.  Franchisee agrees that all of the obligations of Franchisor under this Franchise Agreement are to Franchisee, and no other party is entitled to rely on, enforce or obtain relief for default of, such obligations, directly or indirectly, by subrogation or otherwise. Franchisee agrees and understands that Franchisor and its Affiliates shall not, nor shall they have the obligation to, indemnify or hold Franchisee harmless from and against any action or claim by any third party based upon Franchisor's or its Affiliates' exercise of any of its rights in accordance with the terms of this Franchise Agreement.**

## 18.    <u>APPROVALS AND WAIVERS</u>

18.1.    Whenever this Franchise Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request therefor to Franchisor, and such approval or consent shall not be valid unless given in writing and signed by an authorized officer of Franchisor.  Franchisor may, in its sole discretion, withhold its approval or consent to any such request unless otherwise provided for herein.

18.2.    Franchisor's review and approval of any of Franchisee's Renovation or Construction Plans or specifications for the Inn, or its approval of the site of the Inn, shall not be construed as any express or implied guaranty, warranty, or promise that the Inn will achieve any particular level of sales, revenue or occupancy rate.  Franchisor's review and approval of Franchisee's initial or future plans for upgrades or renovations of the Inn are not, and should not be considered as, any assurance or guaranty that the Renovation or Construction Plans satisfy all federal, state and/or local quality and/or zoning requirements, including, without limitation, compliance with the Americans with Disabilities Act.  Such approval is not a guaranty that the Renovation or Construction Plans are in compliance with the law, and Franchisee shall remain, at all times, responsible for compliance with all laws, including, without limitation, the Americans with Disabilities Act.

18.3.    Except for the obligations of Franchisor specifically set forth in this Franchise Agreement, Franchisor makes no warranties or guaranties upon which Franchisee may rely.  Franchisor assumes no liability or obligation to Franchisee by providing any waiver, approval, consent or suggestion to Franchisee in connection with this Franchise Agreement, or by reason of any delay or denial of any request therefor.

18.4.    Franchisor will not be deemed to waive or impair any right, power or option this Franchise Agreement reserves (including, without limitation, Franchisor's right to demand exact compliance with every term, condition and covenant of this Agreement) because of any custom or practice at variance with this Franchise Agreement's terms; Franchisor's waiver of or failure to exercise any right, power or option, whether of the same, similar or different nature, with other Red Roof Inn franchisees; or the existence of franchise agreements for other Red Roof Inn locations which contain provisions different from those contained in this Franchise Agreement.  Franchisor's waiver of any particular default of Franchisee shall not affect or impair Franchisor's rights with respect to any subsequent default of the same, similar or different nature; nor shall any delay, forbearance or omission of Franchisor to exercise any power or right arising out of any breach or default by Franchisee affect or impair Franchisor's rights with respect to such default, or Franchisor's right to declare any subsequent breach or default and to terminate this Franchise Agreement before the expiration of its term.  Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding default by Franchisee of any terms, covenants or conditions of this Franchise Agreement

18.5.    In the event that either party hereto shall be delayed, hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection (all referred to herein as "Force Majeure"), then performance of such act shall be excused for the period of

HOU:2728313.1

CONFIDENTIAL

the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.   Force Majeure shall not include Franchisee's lack of adequate financing. Notwithstanding the foregoing, in no event shall the time periods established for commencement or completion of construction or renovation be excused, and/or extended in the aggregate for longer than (one) 1 year due to one or more events of Force Majeure.

## 19.   NOTICES

All notices pursuant to this Franchise Agreement shall be in writing and shall be personally delivered; sent by facsimile (if confirmed by regular mail within three (3) days); mailed by registered or certified mail, return receipt requested; or dispatched by overnight delivery to the respective parties at the following addresses, unless and until a different address has been designated by written notice to the other party:

| | |
|---|---|
| Notices to Franchisor: | Joseph Wheeling<br>Red Roof Franchising LLC<br>San Felipe Plaza<br>5847 San Felipe, Suite 4650<br>Houston, Texas 77057<br>Facsimile Number (713) 782-9600 |
| With a copy to: | Robert Wallace<br>Red Roof Franchising LLC<br>121 East Nationwide Boulevard<br>Columbus, Ohio 43215<br>Facsimile Number (614) 224-9724 |
| Notices to Franchisee: | R-Roof VI, LLC<br>San Felipe Plaza<br>5847 San Felipe, Suite 4650<br>Houston, Texas 77057<br>Facsimile No.: (713) 782-9600 |

Notice shall be deemed to have been received as follows: by personal delivery – at the time of delivery; by facsimile (if confirmed by regular mail as set forth above) - at time of faxing; by overnight delivery service - on the next business day following the date on which the notice was given to the overnight delivery service; and by registered or certified mail, return receipt requested - three (3) days after the date of mailing.

## 20.   ENTIRE AGREEMENT

This Franchise Agreement together with the Schedules, Exhibits and Addenda attached hereto are intended by Franchisor and Franchisee to be the final and binding expression of their agreement, contain all of the material terms agreed to, are a complete and exclusive statement of the terms thereof and supercede all prior oral or written agreements, negotiations and representations. No representation, understanding or agreement, oral or written, have been made or relied upon in the making of this Franchise Agreement other than as specifically set forth herein.   Unless otherwise provided in this Franchise Agreement, this Franchise Agreement, the Schedules, Exhibits and Addenda attached hereto may only be amended, modified, or supplemented by a writing signed by both Franchisor and Franchisee. Oral modification of this Franchise Agreement is not permitted, and Franchisee hereby waives any right to claim an oral modification of this Franchise Agreement

## 21.   SEVERABILITY AND CONSTRUCTION

21.1.   The parties agree that if any provision of this Franchise Agreement may be construed in two ways, one of which would render the provision illegal or otherwise voidable or unenforceable, and the

28

HOU:2728313.1

   RRI_GW_0000038

other of which would render the provision valid and enforceable, such provision shall have the meaning which renders it valid and enforceable. The language of all provisions of this Franchise Agreement shall be construed according to its fair meaning, but in no event shall it be presumed that such language is to be construed against the draftor. It is the intent of the parties that the provisions of this Franchise Agreement be enforced to the fullest extent and should any court or other public agency determine that any provision herein is not enforceable as written in this Franchise Agreement, the provision shall be amended so that it is enforceable to the fullest extent permissible under the laws and public policies of the jurisdiction in which the enforcement is sought. The provisions of this Franchise Agreement are severable, and this Franchise Agreement shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained in the Franchise Agreement, and partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable; provided, that if any court or other public agency determines that one or more provision is invalid, illegal or unenforceable, and such determination would, in the reasonable opinion of Franchisor, frustrate the purpose of this Franchise Agreement as determined by Franchisor, then Franchisor may terminate this Franchise Agreement.

21.2.   Except as expressly provided to the contrary herein, nothing in this Franchise Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisee, Franchisor or Franchisor's Affiliates and their officers, directors and employees, past or present, and such of Franchisee's and Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, permitted by Section 12 hereof), any rights or remedies under or by reason of this Franchise Agreement.

21.3.   Franchisee agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Franchise Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which Franchisee is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

## 22.   **APPLICABLE LAW**

22.1.   This Franchise Agreement takes effect upon its acceptance and execution by Franchisor in Harris County, Texas, and the entry into, performance and interpretation of this Franchise Agreement shall be governed, construed and interpreted by the laws of the State of Texas, without regard to, and without giving effect to, the application of Texas conflict-of-law rules; except that if Texas law would invalidate or make unenforceable any provision of this Franchise Agreement, then that provision will be governed by the law of any relevant state whose law would uphold or enforce the provision.

22.1.1.   Franchisee and Owners acknowledge that the negotiation, execution, and acceptance of this Franchise Agreement by the parties occurred in Harris County, Texas, and further acknowledge that the performance of certain of Franchisee's obligations arising under this Franchise Agreement will occur in Harris County, Texas, including but not limited to, the payment of monies due and the satisfaction of certain training requirements.

22.1.2.   Nothing in this Section 22.1 is intended by the parties to subject this Franchise Agreement to any franchise or similar law, rule or regulation of the State of Texas or of any other state to which it would not otherwise be subject.

22.2.   Franchisor has established a policy for Franchisee to air and resolve grievances, issues and disputes internally. If the parties are unable to resolve such disputes through this policy, the parties agree to submit any claim, controversy or dispute arising out of or relating to this Franchise Agreement (including the Attachments, Exhibits, Schedules and Addenda hereto) or the relationship created by this Franchise Agreement (with the exception of those disputes concerning failure to commence construction, failure to commence operations, insurance, insurance requirements, monetary obligations, indemnification, quality inspection ratings, the Inn has ceased operations, unauthorized use of

HOU:2728313.1

CONFIDENTIAL                                                                   RRI_GW_0000039

trademarks, failure to de-identify) to non-binding mediation before bringing such claim, controversy or dispute in a court or before any other tribunal. The parties shall select a mediator within thirty (30) days of request of mediation by either party. The mediation shall be conducted through either an individual mediator or a mediator appointed by a mediation services organization or body approved by Franchisor and experienced in the mediation of lodging service business disputes or franchise disputes, and shall be conducted at a location selected by Franchisor that is proximate to the Inn. The costs and expenses of any such mediation, including compensation and expenses of the mediator (and except for the attorneys fees incurred by either party), shall be borne by both parties equally. If the parties are unable to resolve the claim, controversy or dispute within ninety (90) days after either party requests mediation, then either party may bring a legal proceeding under Section 22.3 below to resolve such claim, controversy or dispute unless such time period is extended by written agreement of the parties. Notwithstanding the foregoing, Franchisor may bring an action for injunctive or other extraordinary relief (including, without limitation, specific performance), or involving the possession or disposition of, or other relief relating to, real property in a court having jurisdiction and in accordance with Section 22.7 below, without first submitting such action to mediation.

22.3.   With respect to any claims, controversies or disputes which are not finally resolved through mediation or as otherwise provided above, all claim, controversies or actions under the Franchise Agreement shall be filed in a court of competent jurisdiction in Harris County, Texas.

22.4.   No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Franchise Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy provided herein or permitted by law or equity, but each shall be cumulative of every other right or remedy.

**22.5.   To the extent permitted by law, Franchisor and Franchisee and its Owners irrevocably waive trial by jury in any action, proceeding or counterclaim, whether at law or in equity, brought by either of them against the other. Any and all claims and actions arising out of or relating to this Franchise Agreement, the relationship of Franchisee and Franchisor, or Franchisee's operation of the Inn, brought by either party hereto against the other, whether in mediation or a legal action, shall be commenced within three (3) years from the occurrence of the facts giving rise to such claim or action, notwithstanding any applicable statute of limitations, or such claim or action shall be barred.**

**22.6.   Except for any indemnification obligations in Section 17.4, Franchisor and Franchisee and its Owners hereby waive to the fullest extent permitted by law any right to or claim of any punitive or exemplary damages against the other, provided, that this provision shall not serve as a waiver of rights to damages set forth in Section 13.6 or other claims by either party for lost future profits.**

22.7.   Nothing herein contained shall bar or limit in any way Franchisor's right to obtain injunctive relief against threatened conduct that will cause it loss or damage (including, without limitation, damage to the goodwill of the System and the Proprietary Marks), under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.

22.8.   In connection with any suit or proceeding, brought by Franchisor or Franchisee to enforce any of their respective rights under this Franchise Agreement, the prevailing party in such suit or proceeding shall be entitled to recover its reasonable attorney's fees and court costs incurred therein.

22.9.   Franchisee, its Owners and Franchisor acknowledge that various provisions of this Franchise Agreement specify certain matters that are within the sole discretion or judgment of Franchisor. If the exercise of Franchisor's sole discretion or judgment as to any such matter is subsequently challenged, the parties to this Franchise Agreement (as well as Owners of Franchisee) agree that if a trier of fact finds that Franchisor relied on a business reason in the exercise of its sole judgment or discretion, then Franchisor's exercise of its discretion or judgment is to be viewed as a reasonable and proper exercise of such sole discretion or judgment, without regard to whether other reasons for its decision may

HOU:2728313.1

CONFIDENTIAL

RRI_GW_0000040

exist and without regard to whether the trier of fact would independently accord the same weight to such business reason.

## 23. <u>ACKNOWLEDGMENTS</u>

23.1.    Franchisee acknowledges that it has independently investigated the business franchised hereunder, including current and potential market conditions, competitive factors and risks, and recognizes that the business venture contemplated by this Franchise Agreement involves business risks and that its success will be largely dependent upon the ability of Franchisee as an independent business owner. Franchisor expressly disclaims the making of, and Franchisee acknowledges that Franchisee has not received or relied on, any representation, warranty or guaranty, express or implied, whatsoever, including, but not limited to, the potential volume, profits or success of the business venture contemplated by this Franchise Agreement, or that otherwise contradicts the information in Franchisor's Uniform Franchise Offering Circular.

23.2.    Franchisee acknowledges that the System may be supplemented, improved and otherwise modified from time to time by, and in the sole discretion of, Franchisor, and Franchisee agrees to comply with all reasonable requirements of Franchisor in that regard.

23.3.    Franchisee acknowledges that Franchisee received a completed copy of this Franchise Agreement, the exhibits and addenda hereto, and the agreements relating thereto, if any, at least five (5) business days before to the date on which this Franchise Agreement was executed.  Franchisee further acknowledges that Franchisee has received the Uniform Franchise Offering Circular required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" at the earlier of (i) at least ten (10) business days before the date on which this Franchise Agreement was executed; or (ii) at the "first personal" meeting with Franchisor's representatives.

23.4.    Franchisee acknowledges that it has read and understood this Franchise Agreement, the Attachments, Exhibits, Schedules and Addenda hereto, and the agreements relating thereto, if any, and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors of Franchisee's own choosing about the potential benefits and risks of entering into this Franchise Agreement.

[Signature pages follow]

31

HOU:2728313.1

IN WITNESS WHEREOF, each of the parties hereto has caused this Franchise Agreement to be executed by its duly authorized representative as of the date first above written.

**Red Roof Franchising LLC**
a Delaware limited liability company

By: _____

Name: MICHAEL KLINGHER

Title: AUTHORIZED REPRESENTATIVE

[Additional signature pages follow]

RRI_GW_0000042

**FRANCHISEE**

**R-Roof VI, LLC**

By:

Name: DAVID WEINSTEIN

Title: AUTHORIZED REPRESENTATIVE

RRI_GW_0000043

**ATTACHMENT 1 TO RED ROOF INN FRANCHISE AGREEMENT**

**GUARANTEE, INDEMNIFICATION AND ACKNOWLEDGMENT**

N/A

Attachment 1 - 1

RRI_GW_0000044

## SCHEDULE 1 TO RED ROOF INN FRANCHISE AGREEMENT

## DEFINITIONS

"Affiliate" means, with respect to any person or entity, any other persons Controlling, Controlled by or under common Control with such person or entity.

"Approved Location" means the street address of the Inn, as identified in Exhibit A to the Franchise Agreement.

"Computer System" means all hardware and software, the Software and peripheral equipment that Franchisor or its Affiliates license or sell to Franchisee for the Fidelio Property Management System, which will run the Software.

"Confidential Information" means the proprietary property management Software, the Manuals (including all supplements and revisions thereto), any other manuals issued for use in connection with the establishment and operation of Red Roof Inns, and any and all other materials, information, procedures, techniques or data which Franchisor provides (including, without limitation, the site selection, operational, sales, promotional, and marketing methods and techniques of the System), except information which Franchisee can demonstrate came to Franchisee's attention by proper means before disclosure thereof by Franchisor, or which, at or after the time of such disclosure, had become or later becomes a part of the public domain, through proper publication or communication by others and which does not violate this Franchise Agreement or any agreement Franchisor may have with a third party.

"Construction Plans" means the proposed renderings and specifications for the construction of the Inn, which must be submitted to Franchisor on or before the date specified in Schedule A to the Construction Addendum to the Franchise Agreement.  The Construction Plans shall include, without limitation, architectural, mechanical, electrical, structural, civil engineering, and landscaping drawings, in such detail and containing such information (such as door locking systems and other safety features) as Franchisor may request.

"Control," "Controlled" or "Controlling Interest" means the direct or indirect power to direct the management and policies of a person or entity, including those relating to the payment of financial obligations, whether through the ownership of voting securities or interests, by contract, or otherwise, each as reasonably determined by Franchisor.

"Directory" means directory published from time to time by or at the direction of Franchisor or its agent. "Direct Owners" are the immediate Owners of the Franchisee and those people who are listed as Direct Owners in Exhibit D to the Franchise Agreement.

"Effective Date" means the date that the Franchise Agreement is executed by Franchisor.

"Expiration Date" means the date on which the Franchise Agreement expires, as set forth on Exhibit A.

"Franchisee" includes the entity identified in the preamble to this Franchise Agreement and Franchisee's Owners.

"Franchisor's Software" means any proprietary software (including the accompanying documentation and all future enhancements, upgrades, additions, substitutions and other modifications) developed or licensed, or which may be developed or licensed in the future, by Franchisor or one of its affiliates for use by Red Roof Inns as part of the Red Roof Inn System.

"Good Standing" means Franchisor has authorized Franchisee to open and operate the Inn as a Red Roof Inn, and that the Inn, during the last twelve (12) consecutive months, has: achieved passing quality

Schedule 1 - 1

assurance scores in all evaluations; the number of guest complaints at the Inn has been and is then within then-current System averages; and Franchisee has satisfied all obligations under this Franchise Agreement on a timely basis and is in full compliance with its obligations hereunder. Franchisee is not in default under this Franchise Agreement.

"Gross Room Revenues" means the gross receipts whether collected or uncollected, attributable to or payable for the rental of guest rooms at the Inn, including, without limitation, the gross revenues used in calculation of business interruption, rent loss, or similar insurance with respect to the Inn (provided that insurance proceeds shall be included in Gross Room Revenues only to the extent actually received or due). Gross Room Revenues shall not include gratuities to employees or service charges levied in lieu of such gratuities, which, in either case, are payable to employees, or federal, state and local taxes or fees collected by Franchisee for transmittal to the appropriate taxing authorities. Gross Room Revenues shall not be reduced by credit card commissions, bad debts (or reserves for bad debts) or refunds to lodgers.

"Indirect Owners" are Owners of the Direct Owners of the Franchisee and those people who are listed as Indirect Owners in Exhibit D to the Franchise Agreement.

"Inn" means Franchisee's inn located or to be located on the property at the Approved Location. The Inn identified in the Franchise Agreement includes the freehold or long-term leasehold title to the Inn facility located at the Approved Location, together with all improvements, including, without limitation, the building, and all furniture, fixtures, equipment (including computer and telephone systems), and inventories.

"Internet" is a global computer-based communications network.

"Intranet" is a restricted global computer-based communications network.

"Long-Term Renovations" are those upgrades, refurbishments and renovations which constitute capital improvements and include, without limitation, such items as interior/exterior structural changes, shower and tub combinations, vanities, roofs and parking lots.

"Manager" is the individual meeting the requirements of Section 5.3 of the Franchise Agreement.

"Manuals" are the confidential operations manuals, which may include more than one volume and periodic supplements, and all other manuals and guides containing the Standards, specifications, policies, and procedures for the establishment and operation of franchised inns operating under the System, whether in hard copy or electronic form.

"Marketing Program" means a marketing program developed for Red Roof Inns as described in Section 10 of the Franchise Agreement.

"Marketing and Reservation Contribution" means the monthly contribution of Franchisee as described in Section 4.3 of the Franchise Agreement.

"Opening Date" means (i) the date on which Franchisee has completed the renovation or construction of the Inn in strict accordance with Section 5.1 of the Franchise Agreement (and, as applicable, the Construction or the Renovation Addendum to the Franchise Agreement) and the Franchisor authorizes in writing the opening of the Inn as a Red Roof Inn, or (ii) the date on which Franchisee has completed, to Franchisor's satisfaction, in its sole discretion, the renovation or construction of the Inn in accordance with Section 5.1 (and, as applicable, the Construction or Renovation Addendum) and Franchisor conditionally authorizes in writing the opening of the Inn as a Red Roof Inn.

Schedule 1 - 2

RRI_GW_0000046

"Owners" include any person or entity which directly, or indirectly through an ownership interest in a Direct Owner, owns any legal or beneficial interest in Franchisee. Franchisee's Owners are listed in Exhibit D to the Franchise Agreement.

"Ownership Schedule" means Exhibit D to the Franchise Agreement.

"Principal Owners" include those Owners designated as Principal Owners on Exhibit D to the Franchise Agreement. Each Principal Owner shall sign the Guarantee of the Franchisee's obligations under the Franchise Agreement in the form of the Guarantee, Indemnification and Acknowledgment attached to the Franchise Agreement.

"Proprietary Marks" are all trade names, trademarks, service marks, logos, emblems, symbols and indicia of origin that are now designated and may hereafter be designated in writing by Franchisor for use in connection with Red Roof Inn locations, including the trade name and service mark "Red Roof Inn" as further described in Item 13 of Franchisor's Uniform Franchise Offering Circular. The Proprietary Marks may be modified by Franchisor from time to time, in its sole discretion.

"Protected Territory" means the geographic area described in Exhibit A to the Franchise Agreement.

"Red Roof Inn & Suites" means a high quality lodging facility in the economy segment with no less than 10% of the room count consisting of rooms with enhanced amenities. These may include more spacious rooms, refrigerators, coffee makers, second telephone, exercise room, or meeting rooms.

"Red Roof Inn" means a high quality lodging facility offering amenities to business and leisure guests at room rates associated with the economy chain lodging segment which operates under the System and the Proprietary Marks.

"Renovation Plans" means the proposed renderings and specifications for the renovation of the Inn, which must be submitted to Franchisor on or before the date specified in Schedule A of the Renovation Addendum to the Franchise Agreement. The Renovation Plans shall include, without limitation, architectural, mechanical, electrical, structural, civil engineering, and landscaping drawings, in such detail and containing such information (such as door locking systems and other safety features) as Franchisor may request.

"Reservation System" means the proprietary reservation system or any replacement system (including, without limitation, all equipment and software) designated by Franchisor for use by Red Roof Inns, as such Reservation System may be modified by Franchisor from time to time.

"Royalty Fee" means the monthly fee paid by Franchisee pursuant to Section 4.3 of the Franchise Agreement.

"Short-Term Renovations" means upgrades, refurbishments and renovations, which include such items as damaged or deteriorated carpet, drapes, bedspreads, paint and casegoods.

"Software" means the Fidelio Property Management System Software or other software provided or specified by Franchisor for use in the System, including but not limited to, Franchisor's Software and third party software.

"Standards" means the standards, specifications, policies and procedures of the Red Roof Inn System as specified from time to time by Franchisor in the Manuals, or otherwise in writing.

"System" is the collection of procedures, policies, Standards, specifications, controls and other distinguishing elements which Franchisor have developed or acquired in connection with the establishment and operation of Red Roof Inn locations. The distinguishing characteristics of the System

Schedule 1 - 3

include, without limitation, Standards and specifications for the establishment and operation of a Red Roof Inn location; prototypical architectural plans, designs, layouts and distinctive color schemes for Red Roof Inns; Software; the Reservation System; a Marketing Program; a Directory; management and personnel training programs; operational Standards, policies, procedures and techniques as prescribed in the Manuals; and a quality assurance program, all of which may be changed, improved or further developed from time to time.  The Franchisor has and retains all ownership rights in and to the System and Franchisee has only the right to use the System under the terms and conditions of the Franchise Agreement.

"Transfer" means Franchisee's assignment or delegation of any right or obligation of Franchisee under this Franchise Agreement, or the sale, assignment, transfer, conveyance, exchange, gift, lease, sublease, pledge, mortgage or other encumbrance, by Franchisee or any Owner of Franchisee or any direct or indirect interest in Franchisee, this Franchise Agreement, the Inn, or substantially all of the assets of the Inn.

Schedule 1 - 4

RRI_GW_0000048

**EXHIBIT A TO**
**RED ROOF INN FRANCHISE AGREEMENT**

[attached]

Exhibit A – Solo Page

RRI_GW_0000049

**EXHIBIT A TO**
**RED ROOF INN FRANCHISE AGREEMENT**

1.     Initial Franchise Fee:
    The initial Franchise Fee is $0.

2.     This Franchise Agreement will expire on:  <u>See Amendment Number 1 to Franchise Agreement</u>

3.     Approved Location:
    The Approved Location for the Inn is: <u>See Amendment Number 1 to Franchise Agreement</u>

4.     To be operated as:    ☐   Red Roof Inn
                               ☐   Red Roof Inn & Suites (See Addendum)
                               <u>See Amendment Number 1 to Franchise Agreement</u>

5.     Protected Territory:
    The Protected Territory is: <u>See Amendment Number 1 to Franchise Agreement</u>

6.     The following Red Roof Inn locations are in existence within the Protected Territory on the date hereof:
    <u>See Amendment Number 1 to Franchise Agreement</u>

7.     Guest Rooms:
    The Inn shall have the number of guest rooms set forth in Amendment Number 1 to Franchise Agreement.

8.     The Opening Date shall be the Effective Date.

9.     The Owners are:  N/A

HOU:2731058.1

## Amendment Number 1 to Franchise Agreement

Reference is hereby made to that certain Franchise Agreement (the "Franchise Agreement") by and between Red Roof Franchising LLC, a Delaware limited liability company ("Franchisor") and R-Roof VI, LLC ("Franchisee"), dated September 6, 2007, which is the Effective Date under the Franchise Agreement. Franchisor and Franchisee desire to enter into this Amendment Number 1 to memorialize their additional understandings regarding the subject matter of the Franchise Agreement. Capitalized terms used herein without definition shall have the respective meanings ascribed to them in the Franchise Agreement. Except as amended hereby, the Franchise Agreement remains in full force and effect.

Franchisor and Franchisee hereby agree as follows:

1.      Notwithstanding anything to the contrary in the Franchise Agreement, Franchisor and Franchisee each acknowledges that Franchisee will operate multiple Inns at Approved Locations, which such Approved Locations are listed on Exhibit A attached hereto, and that the Franchise Agreement shall govern the rights and obligations of Franchisor and Franchisee with respect to each and all such Inns as if the Franchise Agreement separately applied to each Inn at each separate Approved Location. Exhibit A hereto sets forth the Approved Locations. The expiration date of the Franchise Agreement will be the 6th day of September, 2027; the Inns will be operated as "Red Roof Inns" or "Red Roof Inn & Suites," as the case may be, as they are designated and operated on the Effective Date. The number of Guest Rooms in each Inn as of the date hereof is set forth on Exhibit B hereto.

2.      The Protected Territory for each Inn shall be as follows: (a) as to any Approved Location located within the top 30 Metropolitan Statistical Areas (as defined by the U.S. Census Bureau) as of the Effective Date, the Protected Territory shall be a one-half (1/2) mile diameter surrounding the Inn (within the Inn at the center); and (b) as to any Approved Location located outside of the top 30 Metropolitan Statistical Areas as of the Effective Date, the Protected Territory shall be a one (1) mile diameter surrounding the Inn (within the Inn at the center). For the purposes of Section 6 of Exhibit A to the Franchise Agreements the Approved Locations have those other Red Roof Inns, if any, located within their respective Protective Territories as are in existence on the Effective Date.

3.      Without limiting the generality of the foregoing, Franchisee shall operate each Inn individually. Without limiting the foregoing, the obligations of Franchisee shall be with respect to each Inn and the provisions of the Franchise Agreement shall be interpreted to apply in each instance as to each Inn. Therefore, and again without limiting the foregoing, the following provisions of the Franchise Agreement shall apply to each and every Inn separately:

(a)      the provisions of Section 1 relating to Franchisor's grant of the right, and Franchisee's undertaking of the obligation, to operate each Inn as a Red Roof Inn under the System and the Proprietary Marks at the Approved Location associated with such Inn;

(b)      the provisions of Section 2 relating to the term of the Franchise Agreement and renewals thereof; provided, however, that while all Inns at the Approved Locations

HOU:2728315.3

      RRI_GW_0000051

listed on Exhibit A are subject to the Franchise Agreement, Franchisee may renew the Franchise Agreement as to all Inns covered thereby in a single renewal application;

      (c)    the provisions of Section 4 relating to the payments of various fees to Franchisor; *provided, however,* that Franchisee may aggregate the fees owed by all of the Inns into one payment to the Franchisor;

      (d)    the provisions of Section 5 describing the duties owed by Franchisee to Franchisor during the term of the Franchise Agreement with respect to each Inn and its operation;

      (e)    the provisions of Section 6 describing Franchisee's obligations with respect to the Proprietary Marks;

      (f)    the provisions of Section 7 and 8 describing Franchisee's and its Owners' obligations of confidentiality relating the Manuals and other Confidential Information;

      (g)    the provisions of Section 9 describing Franchisee's obligations in keeping and maintaining accounting and other books and records relating to the operation of each Inn;

      (h)    the provisions of Section 10;

      (i)    the provisions of Section 11 and Exhibit C describing Franchisee's obligations with respect to maintaining insurance against loss for each Inn and each Approved Location;

      (k)    the provisions of Section 12 describing the restrictions on transfer by Owners of the ownership interests in Franchisee;

      (l)    the provisions of Section 15 relating to certain covenants made by Franchisee with respect to its operation of each Inn;

      (m)    the provisions of Section 16 describing the obligations of Franchisee with respect to the payment of taxes, the incurrence and payment of indebtedness and the maintenance of permits, all as it relates to the operation of each Inn;

      (n)    the provisions of Attachment 1 relating to the guaranty and indemnification obligations of guarantors of the Franchisee with respect to the operation of each Inn;

      (o)    the provisions of Exhibit B describing Franchisee's obligations with respect to the Fidelio Property Management Software;

      (p)    if applicable, the provisions of the Red Roof Inn & Suites Addendum relating to the operation of an Inn as a "Red Roof Inn & Suites";

2

HOU:2728315.3

(q)     if applicable, the provisions of the Renovation Addendum (including Exhibit A thereto) describing the obligations of Franchisee with respect to a renovation of an Inn; and

(r)     if applicable, the provisions of the New Construction Addendum describing the obligations of the Franchisee with respect to the construction of an Inn.

4.     However, a default with under the provisions of Section 13 and 14 with respect to one Inn shall be treated as a default as to all Inns and give rise to the termination rights of Franchisee and Franchisor.

5.     This Amendment is governed by the internal laws of the State of Texas without regard to its conflicts of law principles.

6.     This Amendment shall be subject to the provisions of that certain Collateral Assignment Of Franchise Agreements And Subordination Of Franchise Agreements made as of the 6th day of September, 2007, by and among Franchisor, Franchisee, and the Lender named therein, to the provisions of the Side Letter referred to therein, to the provisions that certain Subordination Of Franchise Agreements made as of the 6th day of September, 2007, by and among Franchisor, Franchisee, and the Lender named therein, and to the provisions of the Side Letter referred to therein.

7.     This Amendment may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Amendment and all of which, when taken together, will be deemed to constitute one and the same agreement.

FRANCHISEE

R-Roof VI, LLC

By: _____
Name: _____
Title: _____
          **David Weinstein**
          Secretary and Treasurer

FRANCHISOR

Red Roof Franchising LLC

By: _____
Name: _____
Title: _____
          **David Weinstein**
          Secretary and Treasurer

3

HOU:2728315.3

# EXHIBIT A

## LIST OF HOTELS

**R-Roof VI, LLC**

**80 Properties (Bear)**

| Property ID | Property Name | City | State |
|---|---|---|---|
| 7117 | Mobile South | Mobile | AL |
| 7261 | Phoenix West | Phoenix | AZ |
| 7228 | San Francisco Airport | Burlingame | CA |
| 7076 | Jacksonville Orange Park | Jacksonville | FL |
| 7251 | Jacksonville Southpoint | Jacksonville | FL |
| 7083 | Pensacola University Mall | Pensacola | FL |
| 7120 | Tallahassee | Tallahassee | FL |
| 7144 | Tampa Busch | Tampa | FL |
| 7227 | West Palm Beach | West Palm Beach | FL |
| 7166 | Atlanta Indian Trail | Norcross | GA |
| 7088 | Atlanta North | Smyrna | GA |
| 7114 | Atlanta South | Morrow | GA |
| 7260 | Macon | Macon | GA |
| 7078 | Chicago Lansing | Lansing | IL |
| 7057 | Peoria | Peoria | IL |
| 7040 | Springfield | Springfield | IL |
| 7008 | Fort Wayne | Fort Wayne | IN |
| 7074 | Indianapolis Speedway | Indianapolis | IN |
| 7062 | LaFayette | LaFayette | IN |

HOU:2732434.1

CONFIDENTIAL                                                                 RRI_GW_0000054

| Property ID | Property Name | City | State |
|---|---|---|---|
| 7015 | Merrillville | Merrillville | IN |
| *[7289* | *South Deerfield* | *South Deerfield* | *MA]* |
| 7043 | Benton Harbor St. Joseph | Benton Harbor | MI |
| 7011 | Grand Rapids | Grand Rapids | MI |
| 7012 | Detroit Roseville | Roseville | MI |
| 7133 | Detroit Southfield | Southfield | MI |
| 7004 | Flint | Flint | MI |
| 7003 | Kalamazoo East | Kalamazoo | MI |
| 7025 | Kalamazoo West University | Kalamazoo | MI |
| 7029 | Lansing East University | Lansing | MI |
| 7020 | Lansing West | Lansing | MI |
| 7116 | Columbia | Columbia | MO |
| 7032 | Kansas City Independence | Independence | MO |
| 7051 | Kansas City North | Kansas City | MO |
| 7143 | St. Louis St. Charles | St. Charles | MO |
| 7126 | St. Louis Westport | St. Louis | MO |
| 7065 | Minneapolis Burnsville | Burnsville | MN |
| 7202 | Minneapolis Plymouth | Plymouth | MN |
| 7063 | St. Paul Woodbury | Woodbury | MN |
| 7131 | Jackson Fairgrounds | Jackson | MS |
| 7128 | Jackson North Ridgeland | Ridgeland | MS |
| 7201 | Chapel Hill | Durham | NC |

HOU:2732434.1

CONFIDENTIAL

RRI_GW_0000055

| Property ID | Property Name | City | State |
|---|---|---|---|
| 7069 | Charlotte Airport | Charlotte | NC |
| 7164 | Durham Duke Univ. Medical Center | Durham | NC |
| 7155 | Durham Research Triangle Park | Durham | NC |
| 7113 | Statesville | Statesville | NC |
| 7111 | Princeton | Lawrenceville | NJ |
| 7253 | Boardman | Poland | OH |
| 7080 | Cincinnati East Beechmont | Cincinnati | OH |
| 7262 | Columbus Downtown | Columbus | OH |
| 7205 | Dayton East Fairborn | Fairborn | OH |
| 7058 | Toledo Holland | Holland | OH |
| 7046 | Toledo Maumee | Maumee | OH |
| 7010 | Danville | Danville | PA |
| 7027 | Harrisburg South | Harrisburg | PA |
| 7174 | Pittsburgh East Monroeville | Monroeville | PA |
| 7048 | Washington | Washington | PA |
| 7242 | Charleston Mount Pleasant | Mount Pleasant | SC |
| 7085 | Columbia West | Columbia | SC |
| 7178 | Florence | Florence | SC |
| 7148 | Hilton Head Island | Hilton Head Island | SC |
| 7162 | Chattanooga Airport | Chattanooga | TN |
| 7056 | Memphis East | Memphis | TN |

3

HOU:2732434.1

CONFIDENTIAL

RRI_GW_0000056

| Property ID | Property Name | City | State |
|---|---|---|---|
| 7264 | Nashville Brentwood | Brentwood | TN |
| 7115 | Nashville North | Goodlettsville | TN |
| 7210 | Austin North | Austin | TX |
| 7234 | Dallas De Soto | De Soto | TX |
| 7082 | Dallas Market Center | Dallas | TX |
| 7236 | Dallas Plano | Plano | TX |
| 7219 | Houston Hobby Airport | Houston | TX |
| 7231 | Houston Northwest | Houston | TX |
| 7229 | Houston Westchase | Houston | TX |
| 7223 | San Antonio Airport | San Antonio | TX |
| 7240 | San Antonio NW Sea World | San Antonio | TX |
| 7154 | Chesapeake | Chesapeake | VA |
| 7108 | Hampton | Hampton | VA |
| 7093 | Virginia Beach | Virginia Beach | VA |
| 7304 | Seattle Airport | Seattle | WA |
| 7052 | Madison | Madison | WI |
| 7031 | Milwaukee | Oak Creek | WI |
| 7064 | Fairmont | Fairmont | WV |

4

HOU:2732434.1

CONFIDENTIAL

RRI_GW_0000057

## EXHIBIT B

### NUMBER OF GUEST ROOMS

**[Attached]**

CONFIDENTIAL

**R-Roof VI, LLC – Pool 6 Borrower**

| | ID | Prop Name | City | State | Units | Built | Own/LH |
|---|---|---|---|---|---|---|---|
| 1 | 7227 | Red Roof Inn West Palm Beach | West Palm Beach | FL | 129 | 1996 | Owned |
| 2 | 7154 | Red Roof Inn Chesapeake | Chesapeake | VA | 108 | 1986 | Owned |
| 3 | 7174 | Red Roof Inn Pittsburgh East Monroeville | Monroeville | PA | 116 | 1987 | Owned |
| 4 | 7262 | Red Roof Inn Columbus Downtown | Columbus | OH | 149 | 1999 | Leased |
| 5 | 7117 | Red Roof Inn Mobile South | Mobile | AL | 108 | 1984 | Owned |
| 6 | 7261 | Red Roof Inn Phoenix West | Phoenix | AZ | 133 | 1997 | Owned |
| 7 | 7242 | Red Roof Inn Charleston Mount Pleasant | Mount Pleasant | SC | 124 | 1985 | Owned |
| 8 | 7223 | Red Roof Inn San Antonio Airport | San Antonio | TX | 135 | 1996 | Owned |
| 9 | 7304 | Red Roof Inn Seattle Airport | Seattle | WA | 152 | 1979 | Owned |
| 10 | 7093 | Red Roof Inn Virginia Beach | Virginia Beach | VA | 108 | 1983 | Owned |
| 11 | 7083 | Red Roof Inn Pensacola University Mall | Pensacola | FL | 108 | 1982 | Owned |
| 12 | 7111 | Red Roof Inn Princeton | Lawrenceville | NJ | 149 | 1984 | Owned |
| 13 | 7027 | Red Roof Inn Harrisburg South | Harrisburg | PA | 110 | 1977 | Owned |
| 14 | 7201 | Red Roof Inn Chapel Hill | Durham | NC | 114 | 1988 | Owned |
| 15 | 7108 | Red Roof Inn Hampton | Hampton | VA | 103 | 1984 | Owned |
| 16 | 7113 | Red Roof Inn Statesville | Statesville | NC | 115 | 1984 | Owned |
| 17 | 7048 | Red Roof Inn Washington | Washington | PA | 110 | 1980 | Owned |
| 18 | 7253 | Red Roof Inn Boardman | Poland | OH | 117 | 1997 | Owned |
| 19 | 7015 | Red Roof Inn Merrillville | Merrillville | IN | 108 | 1975 | Owned |
| 20 | 7076 | Red Roof Inn Jacksonville Orange Park | Jacksonville | FL | 108 | 1982 | Owned |
| 21 | 7143 | Red Roof Inn St Louis St Charles | St Charles | MO | 108 | 1986 | Owned |
| 22 | 7178 | Red Roof Inn Florence | Florence | SC | 112 | 1987 | Owned |
| 23 | 7240 | Red Roof Inn San Antonio NW Sea World | San Antonio | TX | 123 | 1996 | Owned |
| 24 | 7074 | Red Roof Inn Indianapolis Speedway | Indianapolis | IN | 108 | 1982 | Owned |
| 25 | 7057 | Red Roof Inn Peoria | Peoria | IL | 108 | 1981 | Owned |
| 26 | 7010 | Red Roof Inn Danville | Danville | PA | 107 | 1975 | Owned |
| 27 | 7205 | Red Roof Inn Dayton East Fairborn | Fairborn | OH | 109 | 1990 | Owned |
| 28 | 7264 | Red Roof Inn Nashville Brentwood | Brentwood | TN | 122 | 1999 | Owned |
| 29 | 7210 | Red Roof Inn Austin North | Austin | TX | 143 | 1982 | Owned |
| 30 | 7202 | Red Roof Inn Minneapolis Plymouth | Plymouth | MN | 119 | 1989 | Owned |
| 31 | 7155 | Red Roof Inn Durham Research Triangle Park | Durham | NC | 115 | 1986 | Owned |
| 32 | 7064 | Red Roof Inn Fairmont | Fairmont | WV | 108 | 1981 | Owned |
| 33 | 7131 | Red Roof Inn Jackson Fairgrounds | Jackson | MS | 116 | 1985 | Owned |
| 34 | 7025 | Red Roof Inn Kalamazoo West University | Kalamazoo | MI | 108 | 1976 | Owned |

HOU:2732154.4

| | ID | Prop Name | City | State | Units | Built | Own/LH |
|---|---|---|---|---|---|---|---|
| 35 | 7069 | Red Roof Inn Charlotte Airport | Charlotte | NC | 84 | 1982 | Owned |
| 36 | 7088 | Red Roof Inn Atlanta North | Smyrna | GA | 136 | 1983 | Owned |
| 37 | 7004 | Red Roof Inn Flint | Flint | MI | 107 | 1974 | Owned |
| 38 | 7251 | Red Roof Inn Jacksonville Southpoint | Jacksonville | FL | 127 | 1997 | Owned |
| 39 | 7148 | Red Roof Inn Hilton Head Island | Hilton Head Island | SC | 111 | 1986 | Owned |
| 40 | 7085 | Red Roof Inn Columbia West | Columbia | SC | 108 | 1982 | Owned |
| 41 | 7040 | Red Roof Inn Springfield | Springfield | IL | 108 | 1979 | Owned |
| 42 | 7164 | Red Roof Inn Durham Duke Univ Medical Ctr | Durham | NC | 117 | 1987 | Owned |
| 43 | 7116 | Red Roof Inn Columbia | Columbia | MO | 108 | 1984 | Owned |
| 44 | 7031 | Red Roof Inn Milwaukee | Oak Creek | WI | 108 | 1978 | Owned |
| 45 | 7020 | Red Roof Inn Lansing West | Lansing | MI | 81 | 1975 | Owned |
| 46 | 7046 | Red Roof Inn Toledo Maumee | Maumee | OH | 108 | 1980 | Owned |
| 47 | 7166 | Red Roof Inn Atlanta Indian Trail | Norcross | GA | 115 | 1987 | Owned |
| 48 | 7029 | Red Roof Inn Lansing East University | Lansing | MI | 80 | 1977 | Owned |
| 49 | 7115 | Red Roof Inn Nashville North | Goodlettsville | TN | 108 | 1984 | Owned |
| 50 | 7008 | Red Roof Inn Fort Wayne | Fort Wayne | IN | 79 | 1974 | Owned |
| 51 | 7080 | Red Roof Inn Cincinnati East Beechmont | Cincinnati | OH | 108 | 1982 | Owned |
| 52 | 7052 | Red Roof Inn Madison | Madison | WI | 108 | 1980 | Owned |
| 53 | 7133 | Red Roof Inn Detroit Southfield | Southfield | MI | 113 | 1986 | Owned |
| 54 | 7063 | Red Roof Inn St Paul Woodbury | Woodbury | MN | 108 | 1981 | Owned |
| 55 | 7003 | Red Roof Inn Kalamazoo East | Kalamazoo | MI | 79 | 1973 | Owned |
| 56 | 7114 | Red Roof Inn Atlanta South | Morrow | GA | 108 | 1984 | Owned |
| 57 | 7051 | Red Roof Inn Kansas City North | Kansas City | MO | 108 | 1980 | Owned |
| 58 | 7012 | Red Roof Inn Detroit Roseville | Roseville | MI | 109 | 1974 | Leased |
| 59 | 7032 | Red Roof Inn Kansas City Independence | Independence | MO | 108 | 1978 | Owned |
| 60 | 7120 | Red Roof Inn Tallahassee | Tallahassee | FL | 108 | 1985 | Owned |
| 61 | 7128 | Red Roof Inn Jackson North Ridgeland | Ridgeland | MS | 108 | 1985 | Owned |
| 62 | 7058 | Red Roof Inn Toledo Holland | Holland | OH | 108 | 1981 | Owned |
| 63 | 7011 | Red Roof Inn Grand Rapids | Grand Rapids | MI | 107 | 1974 | Owned |
| 64 | 7056 | Red Roof Inn Memphis East | Memphis | TN | 108 | 1980 | Owned |
| 65 | 7065 | Red Roof Inn Minneapolis Burnsville | Burnsville | MN | 84 | 1981 | Owned |
| 66 | 7162 | Red Roof Inn Chattanooga Airport | Chattanooga | TN | 112 | 1987 | Owned |
| 67 | 7126 | Red Roof Inn St Louis Westport | St Louis | MO | 158 | 1986 | Owned |
| 68 | 7082 | Red Roof Inn Dallas Market Center | Dallas | TX | 111 | 1986 | Owned |
| 69 | 7260 | Red Roof Inn Macon | Macon | GA | 132 | 1998 | Owned |
| 70 | 7144 | Red Roof Inn Tampa Busch | Tampa | FL | 108 | 1986 | Owned |
| 71 | 7062 | Red Roof Inn LaFayette | LaFayette | IN | 80 | 1981 | Owned |

IIOU:2732154.4

CONFIDENTIAL

RRI_GW_0000060

| | ID | Prop Name | City | State | Units | Built | Own/LH |
|---|---|---|---|---|---|---|---|
| 72 | 7234 | Red Roof Inn Dallas De Soto | De Soto | TX | 108 | 1996 | Owned |
| 73 | 7231 | Red Roof Inn Houston Northwest | Houston | TX | 122 | 1996 | Owned |
| 74 | 7043 | Red Roof Inn Benton Harbor St. Joseph | Benton Harbor | MI | 108 | 1980 | Owned |
| 75 | 7078 | Red Roof Inn Chicago Lansing | Lansing | IL | 108 | 1982 | Owned |
| 76 | 7229 | Red Roof Inn Houston Westchase | Houston | TX | 134 | 1996 | Owned |
| 77 | 7219 | Red Roof Inn Houston Hobby Airport | Houston | TX | 150 | 1983 | Owned |
| 78 | 7236 | Red Roof Inn Dallas Plano | Plano | TX | 122 | 1996 | Owned |
| 79 | 7228 | Red Roof Inn San Francisco Airport | Burlingame | CA | 213 | 1982 | Owned |
| 80 | 7289 | Red Roof Inn Deerfield | Deerfield | MA | 122 | 1986 | Owned |
| | | **Total / Wtd Avg of Fee Properties** | | | **9,155** | | |

HOU:2732154.4

RRI_GW_0000061

**EXHIBIT B**
**RED ROOF INN FRANCHISE AGREEMENT**

**FIDELIO PROPERTY MANAGEMENT SOFTWARE LICENSE AGREEMENT**

[attached]

## EXHIBIT B

## FIDELIO PROPERTY MANAGEMENT SOFTWARE LICENSE AGREEMENT

THIS FIDELIO PROPERTY MANAGEMENT SOFTWARE LICENSE AGREEMENT (the "Software Agreement") is made and entered into by and between Red Roof Inns, Inc. ("RRI") and Franchisee with respect to the Franchise Agreement between Franchisee and RRI's Affiliate, Red Roof Franchising LLC ("Franchisor"), of even date herewith. Initially capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Franchise Agreement.

### RECITALS:

A.     RRI is the licensee of certain proprietary property management computer software entitled "Fidelio," "EIS" and "Reveal" and certain related interfaces (collectively, the "Software") and has the right to license or sublicense the Software for use in inns owned, leased, or managed by RRI or franchised by Red Roof Franchising LLC.

B.     The Software is designed to enhance the management of the Inn in automation of multiple functions, including check-in and payment, messages, wake-up calls, reservations, rooms control and housekeeping scheduling.

C.     Franchisee is required to use the Software at the Approved Location by Franchisor.

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

1.     **GRANT**

    **1.1     License Grant.**  RRI hereby grants to Franchisee, and Franchisee hereby accepts, subject to the terms and conditions provided below, a non-exclusive, non-transferable license to use the Software solely in conjunction with the operation of the Inn, and solely on the computer hardware specified in Section 1.3 hereof.

    **1.2     Assignment of Use.**  The Software is furnished to Franchisee under this Software Agreement solely for use as specified herein. RRI shall retain all title in and to the copy of the Software provided to Franchisee.

    **1.3     Hardware.**  Franchisee shall use the Software solely: (a) on the computer and related equipment (including, without limitation, a modem and telephone line) located at the Inn which meet the specifications designated by Franchisor from time to time in the operators manual for the System (the "Hardware") and (b) in conjunction with the operating system(s) designated by Franchisor in the operations manual for the Inn (the "Operating System").

    **1.4     No Modifications.**  Franchisee shall not make any modifications or alterations to the Software.

2.     **SOFTWARE LICENSE, SUPPORT, MAINTENANCE AND OTHER FEES**

    **2.1     Software License Fee.**  Upon execution of this Software Agreement, Franchisee agrees to pay RRI the charge listed in Exhibit A to this Software Agreement for the use of the Software at least 90 days before the Opening Date.

    **2.2     Annual Support and Maintenance Fee.**  Upon the first anniversary of the Opening Date and annually on the same date thereafter, Franchisee agrees to pay RRI or its designee the annual fee listed in Exhibit A to this Software Agreement for annual support and maintenance, as further described below.

    **2.3     Other Fees.**  Franchisee will obtain the other software, data circuits and communication line monitoring systems as specified by RRI or the Franchisor, and pay all associated fees.

HOU:2727916.3

3.   **INSTALLATION, SUPPORT AND MAINTENANCE**

    **3.1**   **Installation**.  RRI shall arrange for installation of the Software.  Franchisor shall provide training in the operation of the Software.  Franchisee shall pay Franchisor or its designee for this installation and training at the rate specified in Exhibit A hereto.

    **3.2**   **Support and Maintenance**.  Provided that Franchisee pays the fee for annual support and maintenance, as applicable under Paragraph 2.2 and Exhibit A, and Franchisee is not in default under the Franchise Agreement, RRI will provide to Franchisee all corrective releases, enhancements and updates to the functions initially included in the Software which are made available to RRI.  RRI shall provide and make available to Franchisee a telephone number for assistance on problems or questions relating to the use and operation of the Software.

    **3.3**   **Replacement of the Software**.  RRI shall replace the Software if it becomes inoperable due to no fault of the Franchisee.  THE FOREGOING STATES THE SOLE WARRANTY AND THE EXCLUSIVE REMEDY OF FRANCHISEE WITH RESPECT TO ANY ALLEGED DEFECT IN THE SOFTWARE.

4.   **TERM AND TERMINATION**

    **4.1**   **Term**.  The term of this Software Agreement shall commence upon execution of this Software Agreement and shall remain in force until the earlier to occur of:  (i) the termination of this Software Agreement as earlier as provided herein; (ii) the termination or expiration of the Franchise Agreement; or (iii) the implementation of replacement Software.

    **4.2**   **Obligations upon Termination or Expiration; Remedies Upon Breach**.  Upon termination or expiration of this Software Agreement, Franchisee shall immediately: (a) discontinue use of the Software; (b) deliver to RRI all the Software then in Franchisee's possession or control and any copies made of the Software (whether or not such copies were permitted under this Software Agreement); (c) erase or destroy any of the Software contained in the computers or data storage devices under the control of Franchisee; (d) remove the Software from any other computer programs or software in Franchisee's possession or control that incorporates or uses the Software in whole or in part; and (e) certify in writing to Franchisor not later than five (5) business days after termination or expiration of this Software Agreement that all such actions have been taken by Franchisee.  In the event that Franchisee breaches the terms of this Software Agreement, Franchisor may, without terminating this Software Agreement, exercise all remedies available to it at law or in equity (including injunctive relief) to protect its intellectual property and other rights in the Software.

    **4.3**   **Survival**.  All provisions of this Software Agreement intended to survive the expiration or termination of this Software Agreement shall so survive, including, without limitation, the terms of Section 8 hereof.

5.   **DELIVERY AND INSTALLATION**

    The Software will be scheduled for delivery to Franchisee or Franchisee's designee within ninety (90) days before the opening of Franchisee's Inn provided that this Software Agreement has been signed by Franchisee, and the fee required under Section 2 hereof has been paid.  Neither RRI nor Franchisor shall be liable for any damages or penalty for delay in delivery or for failure to give notice of delay when such delay is due to factors reasonably beyond their control, including, but not limited to, delays in transportation.

6.   **DISCLAIMERS**

    **6.1**   **NO WARRANTY.  THE SOFTWARE IS PROVIDED BY RRI "AS IS."  EXCEPT AS OTHERWISE PROVIDED IN SECTION 7.1, RRI DISCLAIMS ALL WARRANTIES AND REPRESENTATIONS OF ANY KIND WITH RESPECT TO THE SOFTWARE, INCLUDING THE IMPLIED WARRANTIES OF PERFORMANCE, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

HOU:2727916.3

CONFIDENTIAL                                                                        RRI_GW_0000064

**6.2    LIMITATION ON LIABILITY.   IN NO EVENT SHALL RRI OR FRANCHISOR BE LIABLE TO FRANCHISEE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, LOST PROFITS OR LOST DATA ARISING OUT OF OR RELATED TO THIS SOFTWARE AGREEMENT, THE LICENSE GRANTED HEREUNDER, THE PERFORMANCE OR BREACH THEREOF, ANY FAILURE IN THE SOFTWARE, OR ANY CLAIM MADE AGAINST FRANCHISEE BY ANY OTHER PARTY, EVEN IF RRI OR FRANCHISOR HAS BEEN MADE AWARE OF THE POSSIBILITY OF SUCH CLAIM.   SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.**

7.    <u>**COPYRIGHT**</u>

**7.1    Claims**.  RRI (or RRI's licensors, who have licensed the software to RRI) shall have the sole right and obligation to defend any suit or proceeding brought against Franchisee to the extent that it is based on a claim that the Software or a part thereof, used in the manner specified in this Software Agreement, constitutes an infringement of any U.S. patent or copyright, or misappropriation of a trade secret; and Franchisee shall afford prompt written notification to RRI of any such claim and shall provide to RRI the authority, information and assistance from Franchisee which, in RRI's judgment, is needed for defense of any such claim.  RRI (or RRI's licensors, who have licensed the software to RRI) shall have the right, in its sole discretion and at its own expense, and without payment to Franchisee, to (a) defend and/or settle any such claim; (b) procure for Franchisee the right to continue using the Software or part thereof; (c) modify the Software so that it is non-infringing and require Franchisee to use the Software as so modified; and (d) terminate this Software Agreement and the license granted hereunder.  RRI may assign its rights under this Section 7.1 to Franchisor or another Affiliate.  **THE FOREGOING STATES THE SOLE WARRANTY AND THE EXCLUSIVE REMEDY OF FRANCHISEE WITH RESPECT TO ANY ALLEGED PATENT OR COPYRIGHT INFRINGEMENT OR TRADE SECRET MISAPPROPRIATION.**

**7.2    Copyright Notice**.  Franchisee shall not alter or delete the copyright notices or any other proprietary legends as may be specified on the Software.  The existence of a copyright notice shall not cause, or be construed as causing, the Software to be in the public domain or to be a published copyright work.

8.    <u>**PROPRIETARY INFORMATION**</u>

**8.1    Confidentiality**.  Franchisee acknowledges that the Software constitutes proprietary and trade secret material.  All copyright, patent, trade secret and other intellectual and proprietary rights in the Software, and any modification or alteration thereto, whether or not authorized by this Software Agreement or RRI, are and shall remain the property of RRI (or RRI's licensors, who have licensed the software to RRI).  Franchisee will protect the confidential nature of the Software by complying with written guidelines with respect to those permitted access to the Software and to prevent it from being acquired by unauthorized persons and employees.  Franchisee covenants and agrees: (a) to ensure that the Software is not disclosed, demonstrated, duplicated, misappropriated or used in any manner not expressly permitted by the terms of this Software Agreement by its employees or agents; (b) not to copy (except as permitted under Section 8.2 hereof), reverse engineer or decompile, bypass, decrypt or otherwise disassemble the Software or any portion thereof; (c) to restrict access to the Software to only those employees of Franchisee with a need to know; and (d) not to permit any person or entity to take any action prohibited under the forgoing (a), (b) and (c).

**8.2    Permitted Copying**.  Notwithstanding the provisions of Section 8.1 hereof, Franchisee shall be permitted to make one (1) copy of the Software solely for: (a) archival purposes; or (b) to the extent that such copy is created as an essential step in the utilization of the Software in conjunction with the Hardware, and for no other use.  Copies made under this Section 8.2 shall be deemed to be included within the term "Software" for the purposes of this Software Agreement and shall not be transferred except in accordance with Section 10 hereof.  If such copies are not maintained at the Inn, Franchisee shall provide written notice to RRI of the number of copies and location thereof.

**8.3    Individual Covenants**.  At RRI's or Franchisor's request, Franchisee shall obtain and furnish to RRI or Franchisor executed covenants similar in substance to those set forth in Section 8.1 hereof, from all

3

HOU:2727916.3

employees, agents, officers, directors and/or partners of Franchisee with access to the Software.  All such covenants shall be in a form approved by RRI or Franchisor and shall include, among other things, a provision designating RRI and/or Franchisor as a third-party beneficiary of such covenants with an independent right to enforce them.

**8.4    Injunctive Relief.**  If Franchisee fails to comply with the terms of this Section 8, Franchisee hereby acknowledges that such action or inaction will cause irreparable harm to RRI and Franchisor, and that there will be no adequate remedy at law, thereby necessitating injunctive relief against Franchisee.  In such event, RRI and Franchisor shall be entitled to recover from Franchisee the expenses, including, without limitation, reasonable attorneys' fees and costs of obtaining such injunctive relief.

## 9.    INDEMNIFICATION BY FRANCHISEE

Franchisee hereby expressly agrees to indemnify and hold harmless RRI, Franchisor, their Affiliates and successors, and any of RRI's licensors of the Software in its sole discretion and their respective officers, directors, agents, employees, past and present, from and against any claims, losses, costs, expenses (including, without limitation, reasonable attorneys' fees), liabilities and damages, other than claims specified in Section 7.1 hereof, arising out of or related to this Software Agreement and/or Franchisee's use of the Software.

## 10.    ASSIGNMENT

**10.1**    Without the express prior written consent of RRI, which may be arbitrarily withheld, Franchisee shall not directly or indirectly; sublicense; transfer; sell; donate; rent; lease; loan; convey; translate; demonstrate; convert to another programming, spoken or written language; encumber; distribute or otherwise assign this Software Agreement, the license granted hereunder, the Software or any interest therein.

**10.2**    Notwithstanding the provisions of Section 10.1 above, RRI shall approve the transfer of this Software Agreement in conjunction with a transfer of the Franchise Agreement, which has been approved by Franchisor pursuant to Section 12 of the Franchise Agreement.  RRI may require transferee to execute a new Software Agreement.

**10.3.**    RRI may transfer or assign this Software Agreement or any part of its rights or obligations under this Software Agreement to any person or legal entity, provided that the Transferee is an entity to which Software Licensor transfers all or substantially all of the Software Agreements for Red Roof Inn locations and the Transferee or assignee accepts the Transferor's assignment.

## 11.    GENERAL PROVISIONS

**11.1    Compliance with all Laws; Partial Invalidity.**  Each party hereto agrees that it will perform its obligations hereunder in accordance with all applicable laws, rules and regulations now or hereafter in effect.  If any term or provision of this Agreement shall be found to be illegal or unenforceable, then such provision notwithstanding, this Agreement shall remain in full force and effect and such term or provision shall be deemed stricken.

**11.2    Amendments.**  No amendment to this Agreement shall be effective unless it is in writing and signed by duly authorized representatives of both parties.

**11.3    Waiver.**  No term or provision hereof shall be deemed waived and no breach excused unless such waiver or consent shall be in writing and signed by the party claimed to have waived or consented.  Any consent by any party to, or waiver of, any breach by the other, whether express or implied, shall not constitute a consent to, waiver of or excuse for any other different or subsequent breach of any term or provision.

**11.4    Authority.**  Each party represents and warrants to the other that it has full power and authority to enter into and perform this Agreement, and the person signing this Agreement on behalf of each has been properly authorized and empowered to enter into this Agreement.

4

HOU:2727916.3

**11.5    Notices**.  All notices pursuant to this Software Agreement shall be in writing and shall be personally delivered; sent by facsimile (if confirmed by regular mail within three (3) days); mailed by registered or certified mail, return receipt requested; or dispatched by overnight delivery to the respective parties at the following addresses, unless and until a different address has been designated by written notice to the other party:

| | |
|---|---|
| Notices to RRI or Franchisor: | Joseph Wheeling<br>Red Roof Franchising LLC<br>San Felipe Plaza<br>5847 San Felipe, Suite 4650<br>Houston, Texas 77057<br>Facsimile No.: (713) 782-9600 |
| With a copy to: | Robert Wallace<br>Red Roof Franchising LLC<br>121 East Nationwide Boulevard<br>Columbus, Ohio  43215<br>Facsimile No.: (614) 224-9724 |
| Notices to Franchisee: | R-Roof VI, LLC<br>San Felipe Plaza<br>5847 San Felipe, Suite 4650<br>Houston, Texas 77057<br>Facsimile No.: (713) 782-9600 |

Notice shall be deemed to have been received as follows: by personal delivery - at the time of delivery; by facsimile (if confirmed by regular mail as set forth above) - at time of faxing; by overnight delivery service - on the next business day following the date on which the notice was given to the overnight delivery service; and by registered or certified mail, return receipt requested - three (3) days after the date of mailing.

**11.6    Governing Law and Forum**.  This Agreement takes effect upon its acceptance and execution by RRI in Texas, and shall be interpreted and construed under the laws of the State of Texas.  In the event of any conflict of laws, the laws of Texas shall prevail, without regard to, and without giving effect to, the application of Texas conflict of law rules.  Any legal action based on this Agreement shall be brought in a court of competent jurisdiction located in Harris County, Texas.

**11.7    Statute of Limitation**.  No action, regardless of form, arising out of this Agreement, may be brought by either party more than one year after the cause of action has accrued.

**11.8    Entire Agreement**.  This Agreement constitutes the entire Agreement between RRI and Franchisee concerning the subject matter hereof, and supersedes all prior agreements concerning the same subject matter, no other representations having induced Franchisee to execute this Agreement.

Except as otherwise expressly set forth herein, all terms and conditions of the Franchise Agreement shall fully apply to this Software Agreement as if set forth herein.

[Signature pages follow]

5

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Software Agreement in duplicate on the date first above written.

**LICENSOR**

Red Roof Inns, Inc.
a Delaware corporation

By: _____

       Name: _____

       Title: _____

[Additional signature pages follow]

HOU:2727916.3

CONFIDENTIAL

RRI_GW_0000068

**FRANCHISEE**

R-Roof VI, LLC

By: _____
     Name: _____
     Title: _____

HOU:2727916.3

**CONFIDENTIAL**

**RRI_GW_0000069**

Acknowledged and agreed to by the undersigned as of the date above first written.

**FRANCHISOR**

Red Roof Franchising LLC

By: _____
    Name: _____
    Title: _____

HOU:2727916.3

CONFIDENTIAL

**Exhibit A to**
*Fidelio Property Management Software License Agreement*

<u>**SCHEDULE OF FEES**</u>

| | | |
|---|---|---|
| 1. | License Fee: | $3,650 |
| 2. | Initial Training Rate: | $3,000 plus expenses |
| 3. | Annual Support & Maintenance Fee: | $1,000 |

HOU:2727916.3

CONFIDENTIAL

RRI_GW_0000071

**EXHIBIT C TO**
**RED ROOF INN FRANCHISE AGREEMENT**

**INSURANCE REQUIREMENTS**

The following is a description of the insurance that Franchisee is required to obtain and maintain in force during the entire term of this Franchise Agreement at Franchisee's sole cost and expense:

(i)     Commercial Property Insurance with coverage on an all risk basis, insuring the Inn, fixtures, equipment and improvements and the betterments for an amount not less than 90% of the replacement cost thereof, as well as full coverage for twelve (12) months of business interruption and an endorsement covering its legal liability for loss or theft of data.  In the event of damage or destruction to the Inn, unless mortgagee requires otherwise, the proceeds of any such insurance shall be used to repair or restore the Inn in accordance with Renovation or Construction Plans and specifications prepared by Franchisee and approved in writing by Franchisor.  Franchisor, its successors, and their respective past and present officers, directors, partners, agents, and employees shall be endorsed as an additional insured under the policy, having, without limitation, all of the same rights as the named insured under the policy.  Such insurance will contain a waiver of subrogation in favor of Franchisor, and successors and their respective past and present officers, directors, partners, agents, and employees.

(ii)     Commercial General and Commercial Umbrella Liability Insurance with independent contractor's coverage and coverage for liability assumed under contract, for libel, slander, defamation, false arrest, detention, or imprisonment, malicious prosecution, wrongful entry, invasion of privacy and for any claim for loss of property of Franchisor or any guest caused by a dishonest or fraudulent act by an employee of Franchisee, with a minimum combined single coverage limit of $5,000,000 each occurrence.  In addition, if alcoholic beverages are sold at the Inn, Dram Shop/Liquor Liability Insurance shall also be provided with limits of not less than $5,000,000 per occurrence..  The policy shall be written on the then-current ISO occurrence form (or a substitute form providing equivalent coverage) and shall also provide Broad Form Blanket contractual liability coverage with minimum coverage limits of $5,000,000 each occurrence. Franchisor, its successors, and their respective past and present officers, directors, partners, agents, employees shall be endorsed as an additional insured under the policy, having, without limitation, all of the same rights as the named insured under the policy. The coverage in this paragraph (ii) shall in every instance be primary and without right to contribution from any coverage maintained by Franchisor. Franchisee shall provide notice to Franchisor of any claim or suit arising out of or in connection with its operation of the Inn within three (3) days of its receipt thereof.

(iii)     Automobile Liability Insurance (and if necessary, Umbrella Liability Insurance) for all owned, non-owned and hired vehicles, covering bodily injury, death and property damage with a minimum combined single coverage limit of $1,000,000.  Franchisor, its successors, and their respective past and present officers, directors, partners, agents, employees shall be endorsed as an additional insured under the policy, having, without limitation, all of the same rights as the named insured under the policy.  The coverage in this paragraph (iii) shall in every instance be primary and without right or contribution from any coverage maintained by Franchisor.

(iv)     Statutory Workers' Compensation Insurance with employers liability and/or commercial umbrella insurance limits not less than $500,000 each accident for bodily injury by accident or $500,000 each employee for bodily injury by disease.  Franchisee agrees to waive all rights of subrogation against Franchisor and successors, their respective past and present officers, directors, partners, agents, and employees for recovery of damages.

The insurance coverage described in paragraphs (i) through (iv), above shall be placed with an insurance company or companies having a Bests Key Rating Guide of AVIII or better and be satisfactory to Franchisor.  Any and all deductibles and/or self insured retentions are the sole responsibility of

Franchisee.  No such required policy may have a deductible that exceeds $5,000, which such deductible shall be the responsibility of Franchisee.

Franchisee agrees to direct its insurance company to furnish to Franchisor at least ten (10) days before the commencement of construction or renovation of the Inn, and again at least ten (10) days before the Opening Date, current certificates of insurance indicating: (a) the name and address of the Inn; that (b) with regard to the coverage in paragraphs (i), (ii) and (iii) above, that Franchisor, and successors, and their respective past and present officers, directors, partners, agents and employees are additional insureds; (c) that, with regard to the coverage in paragraph (iv) above, the insurer has waived subrogation; and (d) evidence showing that the premiums thereof have been paid.  Additionally, evidence of renewal shall be furnished to Franchisor before the expiration date of such insurance.  Such policy or policies shall stipulate that Franchisor shall receive a thirty (30) days written notice of cancellation or reduction in coverage or other alteration of the policy or policies.  All certificates of insurance shall be addressed to:

> Franchise Administration
> Red Roof Franchising LLC
> San Felipe Plaza
> 5847 San Felipe, Suite 4650
> Houston, Texas 77057
> Facsimile Number (713) 782-9600

With a copy to:
> Robert Wallace
> Red Roof Franchising LLC
> 121 East Nationwide Boulevard
> Columbus, Ohio 43215
> Facsimile Number (614) 224-9724

The Certificate Holder and additional insured should be listed on the certificate of insurance as follows:

> Red Roof Franchising LLC

Exhibit C - 2

CONFIDENTIAL

**EXHIBIT D TO**
**RED ROOF INN FRANCHISE AGREEMENT**

**<u>OWNERSHIP SCHEDULE</u>**

N/A

Exhibit D