IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| G.W., | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION FILE NO. |
| v. | : | |
| | : | |
| RED ROOF INNS, INC.; FMW | : | |
| RRI NC, LLC; RRI WEST | : | |
| MANAGEMENT, LLC; RED | : | |
| ROOF FRANCHISING, LLC and | : | |
| R-Roof VI, LLC, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## FIRST AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiff in the above-styled action and hereby files her

Complaint as follows:

## Introduction

1.

This case involves the minor sex trafficking of G.W., who was trafficked for

sex for months at a time from the age of 13 years old to 15 years old at a

corporately owned and operated Red Roof Inn located at 2200 Corporate Plaza,

Smyrna, Georgia, 30080 (the "Smyrna Red Roof"). Given the nature of the case,

Plaintiff is identified in this Complaint only by her initials to prevent public

1

disclosure of her name. G.W.'s counsel has previously disclosed G.W.'s full name to defense counsel.[1]

2.

Plaintiff G.W. was a minor victim of child sex trafficking at Defendants' hotel at all times relevant to this Complaint.

3.

The Smyrna Red Roof was not a true franchised hotel. The four companies involved together owned, controlled, operated, and directly employed the staff at the hotel and are jointly controlled by the same entities and employees themselves.

4.

A person under the age of 18 cannot consent to having sex in exchange for money. Any sale of sex in exchange for money involving a person under eighteen (i.e., "minor sex trafficking") is criminal sex trafficking under federal law. 18 U.S.C. § 1591(a). Minor sex trafficking does not require evidence that the victim was subject to "force, fraud, or coercion." 18 U.S.C. § 1591(a)(1), et seq. Every person who engages in commercial sex with a minor is trafficking that minor under

---

[1] Plaintiff has concurrently filed a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the Complaint, which include the minor sex trafficking of G.W. Plaintiff's anonymity will provide for her own personal safety and will protect Plaintiff from the public disclosure of details which are intimate and personal in nature.

18 U.S.C. § 1591(a)(1). Yet, Plaintiff G.W. was repeatedly and forcibly sold by an older, well-known male trafficker at the Smyrna Red Roof.

5.

Defendants knew of the rampant sex trafficking and prostitution at the Smyrna Red Roof for years, before, during, and after Plaintiff's trafficking. Defendants knew because:

a.  The facts of this specific Plaintiff while she was trafficked for sex as a minor child at the hotel;

b.  Its employees were complicit in assisting Plaintiff's sex trafficker in the sex trafficking of Plaintiff;

c.  Its employees knew of and permitted sex trafficking and prostitution to occur at the hotel;

d.  The frequent and ongoing similar crime occurring at the hotel;

e.  The reports of hotel guests to Defendants regarding sex trafficking and prostitution-related activities;

f.  Defendants' knowledge of sex trafficking generally, in the Atlanta area, and the Smyrna Red Roof specifically.

6.

Defendants' liability to Plaintiff is straightforward:

a) Defendants knew or should have known that their operation of the Smyrna
   Red Roof violated the Trafficking Victims Protection Reauthorization Act,
   18 U.S.C. § 1591, et seq., (the "TVPRA") through its association with
   Plaintiff's sex trafficker, and from which it benefitted financially. As such,
   Defendants are liable to Plaintiff for her damages under § 1595(a) of the
   TVPRA.

7.

Whenever reference is made in this Complaint to any act, deed, or conduct
of Defendants, the allegation is that Defendants engaged in the act, deed, or
conduct by or through one or more of its officers, directors, agents, employees, or
representatives who was actively engaged in the management, direction, control, or
transaction of the ordinary business affairs of the Defendants.

**Parties, Jurisdiction, and Venue**

8.

Plaintiff G.W. is a citizen of the United States of America, is a resident of the
State of Georgia, and consents to the jurisdiction of this Court. G.W. was born in
1997 and was a minor at the time of her sex trafficking alleged herein.

4

9.

At all times relevant hereto, Defendants Red Roof Inns, Inc. ("RRI"), FMW
RRI NC, LCC ("FMW"), RRI West Management, LLC ("RRI West"), Red Roof
Franchising, LLC ("Red Roof Franchising"); and R-Roof VI, LLC ("R-Roof")
owned, operated, maintained, controlled, and managed the Red Roof Inn located at
2200 Corporate Plaza, Smyrna, Georgia 30080.

10.

RRI is a Delaware corporation with its principal place of business in New
Albany, Ohio. It regularly conducts business in the State of Georgia, derives
substantial revenue from services rendered in Georgia, and has committed tortious
acts or omissions both within Georgia and outside of Georgia that have resulted in
injuries in Georgia. RRI may be served with process by serving its registered agent
Corporation Services Company at 40 Technology Parkway South, Suite 300,
Norcross, Georgia, 30092.

11.

Jurisdiction and venue are proper as to RRI and RRI was properly served
with process in this action.

12.

FMW is a Delaware limited liability company with its principal place of business in Houston, Texas. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia that have resulted in injuries in Georgia. FMW may be served with process by serving its registered agent Corporation Services Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

13.

Jurisdiction and venue are proper as to FMW and FMW was properly served with process in this action.

14.

RRI West is a Delaware limited liability company with its principal place of business in Houston, Texas. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia that have resulted in injuries in Georgia. RRI West may be served with process by serving its registered agent Corporation Services Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

15.

Jurisdiction and venue are proper as to RRI West and RRI West was properly served with process in this action.

16.

Red Roof Franchising is a Delaware limited liability company with its principal place of business in New Albany, Ohio. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia that have resulted in injuries in Georgia. Red Roof Franchising may be served with process by serving its registered agent Corporation Services Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

17.

Jurisdiction and venue are proper as to Red Roof Franchising and Red Roof Franchising was properly served with process in this action.

18.

R-Roof is a Delaware limited liability company with its principal place of business in Columbus, Ohio. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia that have

resulted in injuries in Georgia. R-Roof may be served with process by serving its

registered agent Corporation Services Company at 40 Technology Parkway South,

Suite 300, Norcross, Georgia, 30092

19.

Jurisdiction and venue are proper as to R-Roof and R-Roof was properly

served with process in this action.

20.

This Court has subject matter jurisdiction over this lawsuit pursuant to 28

U.S.C. § 1331 because Plaintiff asserts claims arising under 18 U.S.C. 1595(a).

21.

Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the

incidents forming the basis of this complaint occurred in Cobb County, Georgia,

within the Northern District of Georgia, Atlanta Division.

**<u>The Defendant's Roles</u>**

22.

At all times relevant hereto, Defendants owned, operated, maintained,

controlled, and managed the Smyrna Red Roof as a joint venture, sharing valuable

information, data, responsibilities, and financial benefits from the hotel's

operation, and each having rights of mutual control over the hotel and each other.

23.

The operation of the Smyrna Red Roof was on paper a complex business arrangement involving four companies, but in reality, these distinctions existed only on paper and even the companies themselves do not know who did what at the hotel.

24.

On paper, from August 2011 through December 2012, FMW owned the property and entered into a franchise agreement with Red Roof Franchising, then a property management agreement with RRI West to manage the property, even though Red Roof Inns, Inc. actually employed all the employees at the hotel. When asked why as many as five companies were needed to operate a single hotel, RRI and RRI West's corporate representative—the same person—has testified, "I can't answer that . . . I don't know."

25.

Similar to FMW, R-Roof owned the property and entered into a franchise agreement related to the Smyrna Red Roof for the time period prior to August 2011.

26.

From at least 2010 through 2012, Defendants each knowingly received financial benefit, or a benefit of some kind, from the rental or rooms at the Smyrna Red Roof, including renting the room to Plaintiff's trafficker.

27.

Defendants shared assets, money, employees, office locations, board members, entered into contracts with each other without consideration, had employees of one company conduct the business of other companies, and generally ignored the corporate forms that are the hallmark of separate entities.

28.

From at least 2010 through December 2012, FMW and/or R-Roof were the title holders of the property on which the Smyrna Red Roof sits.

29.

FMW and R-Roof entered into agreements with Red Roof Franchising ostensibly as a franchisee and Red Roof Franchising as franchisor. However, the parties never conducted business as a franchisor/franchisee and in reality jointly operated the Smyrna Red Roof together with the other Defendants.

30.

RRI owned and controlled Red Roof Franchising.

31.

From at least 2010 through December 2012, RRI West was the management company at the Smyrna Red Roof. RRI West managed the Smyrna Red Roof during this period.

32.

During the Smyrna Red Roof's corporate ownership, RRI employed the employees working at the Smyrna Red Roof.

33.

For the purposes of owning, operating, and managing the Smyrna Red Roof from at least 2010 through 2012, Defendants functioned as a single entity and exercised control jointly over the hotel and over each other.

34.

From at least 2010 through December 2012, FMW, R-Roof, RRI West, and Red Roof Franchising had no employees at the Smyrna Red Roof and conducted no business at the Smyrna Red Roof independent of RRI.

**Plaintiff G.W.'s Sex Trafficking at the Smyrna Red Roof**

35.

Plaintiff, a minor at the time, was trafficked at the Smyrna Red Roof on two occasions: between September and November 2010, and again between January 2011 and November 2012.

36.

Plaintiff's trafficker trafficked multiple other women, including other minor victims, for sex at the Smyrna Red Roof.

37.

Hotel staff knew Plaintiff's trafficker from his frequent stays at the hotel renting rooms to traffic Plaintiff and other victims at the hotel and were friendly with him, allowing him to rent rooms to sell victims, including Plaintiff, at the hotel for several years.

38.

Employees at the Smyrna Red Roof knew G.W.'s trafficker, knew G.W. was there being sold for sex by him, and regularly saw G.W. being sold for sex at the Smyrna Red Roof over the next few years.

39.

12

When Plaintiff was trafficked at the Smyrna Red Roof, she witnessed multiple other sex traffickers operating openly and brazenly at the hotel.

40.

G.W. was forced to have sex with 10 to 20 men each day she was trafficked at the Smyrna Red Roof.

41.

During Plaintiff's minor sex trafficking at the Smyrna Red Roof, she witnessed more than 10 other women and children being sold for sex at the hotel. At times, entire rows of rooms were rented for the purpose of selling girls and women for sex. Plaintiff estimates that roughly half of the victims she witnessed being trafficked for sex at the Smyrna Red Roof were minors.

42.

Plaintiff and other young sex trafficking victims frequently appeared throughout the hotel and on the hotel premises and approaches wearing very little clothing.

43.

While Plaintiff was trafficked for sex at the Smyrna Red Roof, she exhibited numerous well-known and visible signs of a minor sex trafficking victim, of which Defendants knew or should have known, including her very young age and

inappropriate appearance, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, no control of or possession of money, loitering, soliciting male patrons, and monitoring and control of Plaintiff by her trafficker, an older man.

44.

There was a constant stream of traffic throughout the day of men with no luggage visiting the hotel rooms of these women and children for short periods of time before leaving and being followed by another anonymous man. Defendants knew or should have known that the number of daily, older male visitors to the room was obviously indicative of not only prostitution, but of sex trafficking, including minor sex trafficking.

45.

While trafficked at the Smyrna Red Roof, Plaintiff's room evidenced numerous well-known and visible signs of sex trafficking of which Defendants knew or should have known. Frequently, the trash cans in the rooms in which Plaintiff was trafficked contained an extraordinary number of used condoms, the rooms contained multiple cell phones, and Plaintiff or her trafficker frequently requested an excessive number of towels from housekeeping.

**Defendants' Knowledge of Prostitution, Sex Trafficking, and Other Prior Crime at the Smyrna Red Roof**

14

46.

The Smyrna Red Roof and its approaches were well known for crime, prostitution, and sex trafficking.

47.

Defendants had direct knowledge of sex trafficking and prostitution at the Smyrna Red Roof through their employees. Employees included local hotel employees ("hotel employees") who worked at the hotel itself and corporate employees of RRI, RRI West, or Red Roof Franchising ("corporate employees") who visited the hotels for the purpose of monitoring the revenue, occupancy, online reviews, and physical premises of the hotel.

48.

In the years prior to, and during, Plaintiff's sex trafficking at the Smyrna Red Roof, there were often more than a dozen women and children being sold for sex at the hotel at a time.

49.

Employees, security guards, and other victims have stated that prior to, and during, Plaintiff's minor sex trafficking, prostitution and minor sex trafficking were rampant and frequent occurrences, obvious to employees and guests at the hotel.

50.

Prior to, and during, Plaintiff's sex trafficking at the Smyrna Red Roof, hotel employees knew or should have known that crime, prostitution, and sex trafficking were open and obvious at the Smyrna Red Roof.

51.

Sometime in 2011–2012, Cobb County police notified the then-general manager of the Smyrna Red Roof that sex traffickers had paid a former general manager and hotel employee to act as lookouts. Despite this notice, the employee continued to work at the hotel for six more months.

52.

In addition to the knowledge of the hotel employees, corporate employees of RRI also had direct knowledge of trafficking and prostitution at the Smyrna Red Roof.

53.

Jay Moyer, Vice President of operations for RRI, in addition to various other RRI employees, regularly visited the Smyrna Red Roof to inspect the hotel and discuss the hotel's revenue and performance.

54.

From at least 2010 through December 2012, Mr. Moyer frequently stayed at the Smyrna Red Roof for 2–3 nights at a time, several times a year. During these stays, Mr. Moyer personally and directly observed the conditions at the hotel, including the rampant sex trafficking and prostitution at the Smyrna Red Roof.

55.

It was a common occurrence at the Smyrna Red Roof for girls and women to hang over balconies and stand in open doorways to advertise their availability for commercial sex. These girls and women were often inappropriately dressed in nothing more than their underwear and brassieres.

56.

Hotel employees witnessed traffickers beat sex trafficking victims in the public parking lot, giving hotel employees knowledge of the force and coercion that is a well-known sign of sex trafficking.

57.

Other examples of force and coercion used by traffickers were observed by a Smyrna Red Roof employee. This hotel employee observed that the traffickers operating at the Smyrna Red Roof used force to recruit additional victims while there. For example, if a woman tried to prostitute herself without a trafficker,

traffickers at the Smyrna Red Roof would either chase her off the property or force her to work for them.

58.

Smyrna Red Roof hotel employees acted as lookouts for traffickers, alerting them to the presence of law enforcement. These hotel employees' knowledge, support, assistance and facilitation of trafficking and prostitution constitutes knowledge, support, assistance, and facilitation by their employers.

59.

Smyrna Red Roof security guards, who were supposed to prevent and report illegal activity, instead partied with guests—including traffickers—drinking and using drugs with them.

60.

One security guard told a Smyrna Red Roof hotel manager that other managers were aware of this behavior, but that manager did not discourage the security guards from partying with the guests while the guests were drinking and/or using drugs.

61.

At the time of, and prior to, Plaintiff's sex trafficking at the Smyrna Red Roof, Defendants knew of, condoned, and permitted widespread prostitution and

18

sex trafficking at the Smyrna Red Roof, including Plaintiff G.W.'s minor sex trafficking.

62.

Prior to Plaintiff's sex trafficking at the Smyrna Red Roof, Smyrna Red Roof employees at the hotel knew or should have known that rooms at the Smyrna Red Roof were frequently rented for short term use for commercial sex with guests, usually men, renting a room at the hotel, using it for a short period of time, and then leaving and not returning to the hotel.

63.

A Smyrna Red Roof hotel employee at the time estimated that a significant portion of the location's business—at times a majority—came from renting hotel rooms to sex traffickers and prostitutes.

64.

At any given time, the same hotel employee estimated there were 10 to 12 different traffickers operating at the Smyrna Red Roof, many of whom controlled more than one victim and some of whom controlled 4 to 5 victims at a time.

65.

The same hotel employee also estimated that persons selling drugs and commercial sex at times constituted 50% to 75% of the hotel's occupancy.

66.

So many people came to the Smyrna Red Roof to purchase commercial sex that traffickers took to directing traffic in the parking lot to increase efficiency and to maximize profits. Hotel employees at the Smyrna Red Roof witnessed and permitted this activity.

67.

Defendants provided a busy market and beds for sex traffickers to sell women, boys, and girls—including minors—to buyers of commercial sex. That is why Plaintiff's sex trafficker brought Plaintiff to the Smyrna Red Roof to be sold for sex.

68.

Defendants knew or should have known of at least 5 other victims of sex trafficking who were trafficked at the Smyrna Red Roof in the same time period as G.W. and who have already testified in similar cases against Defendants.

69.

Defendants knew or should have known of other sex crimes at the hotel before, during, and after Plaintiff's minor sex trafficking. Specifically, and based on publicly available information and police reports, Defendants knew or should

have known of the following sex crimes, among others, occurring on their

premises and approaches:

    a.  A December 2010 prostitution sting conducted by the Metro Atlanta
Child Exploitation Task Force and the Marietta Police Department,
during which law enforcement rescued a 16-year-old trafficking victim;

    b.  A March 2011 Cobb County Police arrest report remarking that the
"location is known for problems with drugs and prostitution" and was a
"hotbed of illegal activities;"

    c.  A July 2011 report of theft at the hotel, in which the victim reported that
"a pimp and a prostitute" stole her property "because she refused to work
for [the pimp];"

    d.  Police responding to a dispute between a guest and a Smyrna Red Roof
Inn employee at the hotel in April 2012 that arose because the hotel
refused to refund a guest after he demanded that the hotel return his
money because, among other things, he was "harassed by prostitutes"
while there.

## **Defendants' Knowledge of Sex Trafficking Generally**

70.

Defendants knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' adoption of the Palermo Protocol, to prevent, suppress, and punish trafficking in persons.

71.

Defendants knew or should have known that during the relevant period Atlanta was a hub of sex trafficking and that the crime was prevalent in the city, including at the Smyrna Red Roof. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta had one of, if not the, largest illegal sex trafficking economies in the country.[2] In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000. Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendants have received and retained some of those illicit profits through renting motel rooms used for the trafficking of Plaintiff and other victims.

72.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[3] and as "the number one city for child sex trafficking."

73.

Defendants knew or should have known that the motel and the surrounding area were known to be common locations for prostitution, sex crimes, and sex trafficking to occur.[5] That is why Plaintiff's trafficker sold Plaintiff there.

74.

Defendants knew or should have known that motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking.  Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" City *of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

75.

Defendants knew or should have known the following: The National Human Trafficking Hotline has reported that ninety-two percent of the calls it received

23

involving motels and motels reported sex trafficking, and another two percent reported a combination of sex and labor trafficking.[6] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[7] And the Polaris Project found that "75% of [trafficking] survivors responding to Polaris's survey reported coming into contact with motels at some point during their exploitation . . . . Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from motel staff."

76.

Defendants knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[8]

77.

Defendants knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps motels can take:

a.  establish corporate policy and procedures against sexual exploitation of children;

b.  train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

c.  include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

d.  provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

e.  support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

f.  report annually on the company's implementation of Code-related activities.

78.

Defendants knew or should have known that ECPAT is only one of several high-profile organizations that have for years given motels the tools to address the scourge of sex trafficking at motels.

79.

Defendants knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help motels detect and respond to human trafficking.  DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other motel personnel, to be vigilant in looking for signs of human trafficking at motels and motels, such as:

a.   persons who show signs of malnourishment, poor hygiene, fatigue, sleep

deprivation, untreated illness, injuries, and/or unusual behavior;

b.   persons who lack freedom of movement or are constantly monitored;

c.   persons who have no control over or possession of money or ID;

d.   persons who dress inappropriately for their age or have lower quality

clothing compared to others in their party;

e.   requests for room or housekeeping services (additional towels, new

linens, etc.), but denial of motel staff entry into the room;

f.   the presence of multiple computers, cell phones, pagers, credit card

swipers, or other technology in the room;

g.   extended stay with few or no personal possessions in the room;

h.   excessive amounts of sex paraphernalia in rooms (condoms, lubricant,

lotion, etc.);

i.   the same person reserves multiple rooms;

j.   a room is rented hourly, less than a day, or for an atypical extended

stay;

k.   attempts to sell items to or beg from patrons or staff;

l.   cars in the parking lot regularly parked backward, so the license plates

are not visible;

26

m.  loitering and solicitation of male patrons;

n.  waiting at a table or bar and picked up by a male (trafficker or customer);

o.  persons asking staff or patrons for food or money; and

p.  persons taking cash or receipts left on tables.

80.

Without a market, a place for the buying and selling of humans for sex, sex trafficking would cease to exist. Defendant, for a fee, provided that market, a private and anonymous market for Plaintiff to be sold for sex at its motel.

**<u>Count I – Statutory Liability under 18 U.S.C. § 1595</u>**

81.

Plaintiff incorporates the Paragraphs above, as if fully set forth herein.

82.

In violation of the TVPRA, Defendants knowingly benefitted from participation in a venture that Defendants knew or should have known violated the TVPRA.

83.

Defendants knowingly benefitted from Plaintiff's sex trafficking by receiving revenue and/or profit generated from the motel rooms from which Plaintiff was trafficked.

84.

Defendants knowingly benefitted from Plaintiff's sex trafficking because Plaintiff's sex trafficker continued to use the money gained from Plaintiff's sex trafficking to pay for the motel rooms in which Plaintiff was trafficked, and Defendant, as the owner and operator of the motel, then financially benefitted from such room rentals.

85.

Defendants participated in a venture by knowingly owning and operating a motel that generated revenue through room rentals.

86.

 Defendants participated in a venture by knowingly owning and operating a motel which Defendants knew or should have known was being used by sex traffickers for the purpose of trafficking victims for sex in violation of the TVPRA, including Plaintiff.

87.

Defendants knew or should have known that renting its rooms to sex traffickers violated the TVPRA.

88.

Defendants participated in a venture by operating the Smyrna Red Roof in such a manner that the motel allowed sex trafficking to occur so that it could profit from the room revenue the illegal activity generated.

89.

Defendants knew or should have known that its operation of the motel harbored victims of sex trafficking, including the minor Plaintiff, in violation of the TVPRA.

90.

Defendants participated in a venture by associating with, and renting rooms to, Plaintiff's sex trafficker at the Smyrna Red Roof, providing Plaintiff's trafficker with the necessary venue for Plaintiff's sex trafficking, despite the fact that Defendants knew or should have known Plaintiff's sex trafficker was trafficking the minor Plaintiff for sex at their property.

91.

Defendants knew or should have known that its association with, and renting rooms to, Plaintiff's sex trafficker violated the TVPRA.

92.

In the course of these ventures, numerous buyers paid to have sex with the minor Plaintiff in Defendants' motel room.

93.

The ventures in which Defendants participated were in or affecting interstate commerce.

94.

Defendants knew or should have known the ventures violated the TVPRA because Defendants and their agents, employees, and representatives had the opportunity to observe Plaintiff at the motel, with and without her trafficker, the signs of sex trafficking exhibited by Plaintiff, her trafficker, their rooms, and the frequent traffic of adult male buyers into and out of the Plaintiff's motel rooms each day Plaintiff was being trafficked.

95.

Defendants are directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of agents and representatives and other motel employees.

96.

Plaintiff has suffered physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' participation in this venture.

97.

Defendants are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

98.

Defendants are jointly and severally liable for damages arising from the indivisible injuries caused to Plaintiff, whose damages were proximately caused by the acts discussed in this count.

**Damages**

99.

Plaintiff incorporates the Paragraphs above, as if fully set forth herein.

100.

As a proximate and foreseeable result of Defendants' acts described herein, Plaintiff sustained personal injuries, physical abuses, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven

at trial. Plaintiff bring each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incidents at issue, and to recover for all statutory damages, general damages, special damages, compensatory damages, consequential damages, pain and suffering, and all other damages permissible under Georgia and federal law, including, but not limited to:

     a.     Personal injuries;

     b.     Past, present and future conscious pain and suffering;

     c.     Loss of enjoyment of life;

     d.     Medical expenses;

     e.     Mental anguish and emotional distress;

     f.     Loss of past, present, and future wages;

     g.     Incidental expenses;

     h.     All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

     i.     Consequential damages to be proven at trial.

101.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendants and its employees were willful and wanton and

32

showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

102.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (18 U.S.C. § 1595(a)).

*      *      *

WHEREFORE, Plaintiff prays for a judgment to be awarded to them and against Defendant, and for the following:

a.     Process issue as provided by law;

b.     Plaintiff be awarded actual damages in amounts to be shown at trial from Defendant;

c.     Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

d.     Plaintiff be awarded a trial by jury; and

     e.    Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

This 5th day of October, 2023.

**ANDERSEN, TATE & CARR, P.C.**

*/s/ Patrick J. McDonough*
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
*Attorneys for Plaintiff*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
Phone: (770) 822-0900
Facsimile: (770) 822-9680