UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

H.B.,

        Plaintiff,

    v.

RED ROOF INNS, INC., et al.,

        Defendants.

CIVIL ACTION NO.
1:22-cv-01181-JPB

## ORDER

Before the Court are motions for summary judgment filed by Defendants

Red Roof Inns, Inc. ("RRI Inc."), RRI West Management, LLC ("RRI West")

and FMW RRI I, LLC ("FMW") (collectively "Defendants").  ECF Nos. 94, 95,

96.  Having reviewed and fully considered the papers filed therewith, the Court

finds as follows:

I.    **BACKGROUND**[1]

Plaintiff H.B. ("Plaintiff") alleges that Defendants are liable for damages she suffered when she was trafficked for commercial sex at a corporate-owned Red Roof Inn hotel located in Norcross, Georgia ("Red Roof Inn" or the "Hotel").  The Amended Complaint asserts claims for damages under the Trafficking Victims Protection Reauthorization Act ("TVPRA") and the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO").

Plaintiff was trafficked by three people, "Lucky," "Pizza" and "Skii," at Red Roof Inn for 10-15 days between December 26, 2011, and January 19, 2012.

Plaintiff met Lucky on Tagged, an online dating website.  Plaintiff was 16 years old at the time.  Lucky picked Plaintiff up and took her to meet a local hip hop group and run errands.  Lucky refused to take Plaintiff home when she asked him to do so.  He checked into the Red Roof Inn with Plaintiff the next day.  On the third day of their stay at the Hotel, Lucky forced Plaintiff to have

---

[1] The Court has reviewed the evidence presented by the parties in the light most favorable to Plaintiff as the non-moving party, *see* Section II(A), *infra*, and unless otherwise indicated, the facts set forth herein are deemed relevant and established for the limited purpose of evaluating Defendants' motions for summary judgment.

sex with him and threatened to kill her.  Lucky had a gun.  Lucky thereafter took Plaintiff to another hotel.

Lucky eventually returned to the Red Roof Inn with Plaintiff, where he sold her for sex over the next few weeks.  Lucky would take Plaintiff to other hotels for a day or two but always returned to the Red Roof Inn because the Hotel did not "bother[]" them.  Plaintiff testified that Lucky paid a front desk clerk and a housekeeping employee to serve as lookouts at the Hotel while he sold Plaintiff.[2]  During the time Plaintiff spent at Red Roof Inn, she had commercial sex with up to 10-15 men per day.

On January 19, 2012, the police conducted a prostitution sting at the Red Roof Inn and found Plaintiff in a room rented in Skii's name.  The police called Plaintiff's parents, and her mother came to the Red Roof Inn to pick her up.

The Red Roof Inn was known for having high crime, prostitution and sex trafficking.  The executive director of the county's Community Improvement District made multiple verbal and written reports to the Red Roof Inn regarding extensive illicit activities he observed at the Hotel.  The Hotel did not respond.

---

[2] Defendants contend that this testimony constitutes inadmissible hearsay. However, as set forth in Section II(B)(1), *infra*, the Court finds that the testimony is admissible and will consider it for the purpose of ruling on Defendants' motions for summary judgment.

The police and Red Roof Inn's own security guard made similar reports to no avail.  For example, the Hotel's security guard would report prostitution and drug activity to the night clerk but was told that nothing could be done to address the issues.

The Hotel's night auditor testified that the Hotel had a "heads in beds" policy that instructed employees to prioritize renting rooms and not turn anyone away.  She sometimes called the police to the Hotel but would receive threatening calls to the front desk when she did so.

## II.    DISCUSSION

### A.    Legal Standard

"Summary judgment is appropriate when the record evidence, including depositions, sworn declarations, and other materials, shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting Fed. R. Civ. P. 56) (quotation marks omitted).  A material fact is any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case."  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Ultimately, "[t]he basic issue before the court . . . is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen*, 121 F.3d at 646 (citation omitted).

The party moving for summary judgment bears the initial burden of showing that no genuine issue exists as to any material fact. *See id.* "[I]n deciding whether the movant has met this burden[,] the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." *Id.*

After the movant satisfies this initial burden, the nonmovant bears the burden of showing specific facts indicating summary judgment is improper because a material issue of fact does exist. *Id.* "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). In the same vein, "'some metaphysical doubt as to the material facts'" is not sufficient to create a genuine dispute. *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th

Cir. 2009) (stating that "the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment") (citation omitted).

In sum, if the record, taken as a whole, cannot lead "a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

### B.    Analysis

Plaintiff states in her response to Defendants' motions for summary judgment that she is relinquishing her Georgia RICO claims.  Therefore, the only remaining claim relates to civil liability under the TVPRA.[3]

The Court will first address the hearsay question (related to Plaintiff's testimony that Red Roof Inn employees served as lookouts for her traffickers) since its resolution is important to the viability of Plaintiff's TVPRA claim.

### 1.    Hearsay

Plaintiff testified that she saw Lucky pay a front desk clerk and a housekeeping employee to serve as lookouts while she was being trafficked. Her testimony on this issue is as follows:

---

[3] Plaintiff also contends that each defendant is liable for the acts of the others under alter ego and agency theories.

Q What did they look like?
A There was a dark-skinned guy.  That was the main person that Lucky always gave money to.  It was short, dark-skinned guy.
Q He gave money to for what?  For the room?
A And to keep a lookout.
Q Okay.  So your testimony is that Lucky gave an employee money to keep a lookout for what?
A For prostitution.
Q To keep a lookout for prostitution, what does that mean?
A To make sure we didn't get in trouble.
Q With who?
A The police.

H.B. Dep. Tr. at 243:3-16, ECF No. 113

Q How do you know Lucky was giving him money to be a lookout?
A Because I seen him.
Q Seen what?
A I seen Lucky hand him money.
Q Okay.  Well, how do you know what the money was for?
A Because Lucky told me.
Q So Lucky told you that he was giving him money to be a lookout?
A Yes.
Q And you believed him?
A Yes.
Q Okay.  Did you ever speak to the employee?
A No.

*Id*. at 244:5-19

Q Who else?
A There was also the towel ladies.
Q So he was paying the towel ladies to also serve as lookout?
A Yes.
Q Who told you that?
A Lucky did.
Q Okay. And how many towel ladies was he paying?

A I'm not sure.
Q Okay.
A We -- I only seen the same one all the time.
Q So you know of one towel lady he was paying?
A Yes.

*Id.* at 245:25-246:15

If accepted, this evidence would support Plaintiff's claim that the Hotel's

employees and Plaintiff's traffickers acted in concert with respect to Plaintiff's

trafficking.

Defendants object to the admissibility of these statements.  They contend

that the statements constitute inadmissible hearsay because they were made out

of court, and Plaintiff is offering them to prove the truth of the matter asserted

therein.  Defendants argue that these statements cannot be used to create a

genuine issue of material fact.

Plaintiff responds that (i) she may appropriately infer that the payment to

an employee away from the front desk was to further her traffickers' illicit

activity; (ii) such evidence is admissible because it goes to the "direct

involvement" of Defendants' agents in Plaintiff's trafficking; and (iii)

Defendants' employees were co-conspirators with Plaintiff's traffickers, and

statements made in furtherance of a conspiracy are not hearsay.

Federal Rule of Evidence 801(d)(2)(E) authorizes a court to admit a statement that would otherwise be hearsay if the statement was made by a co-conspirator during the course and in furtherance of the conspiracy. The party offering the statement must show "by a preponderance of the evidence: (1) that a conspiracy existed, (2) that the defendant and the declarant were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy." *United States v. Van Hemelryck*, 945 F.2d 1493, 1497–98 (11th Cir. 1991).

The existence of the conspiracy and a party's participation in it are preliminary questions of fact that the district judge must resolve. *See Doe v. Lee*, 220 F. Supp. 2d 1307, 1312 (M.D. Ala. 2002). In this regard, the subject statement "must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it." Fed. R. Evid. 801(d)(2). This means that the party offering the statement must present independent, external evidence of the conspiracy's existence and cannot rely solely on the conspiratorial statement itself. *See Doe*, 220 F. Supp. 2d at 1312.

In *Bourjaily v. United States*, 483 U.S. 171, 180–81 (1987), the United States Supreme Court found that the government offered sufficient independent evidence to corroborate hearsay statements regarding the logistics of an illegal

9

drug transaction where separate evidence showed that the person engaged in the transaction showed up at the prearranged spot and time; he picked up the drugs; and a significant sum of money was found in his car.

Here, Plaintiff testified that Lucky told her that he paid Hotel employees to serve as his lookouts.  There is also separate testimony from Plaintiff that she personally observed Lucky make payments to Hotel employees.  Plaintiff's personal observations constitute corroborating evidence of the lookout agreement, and the payments and related conversation furthered the objective of the agreement.  As such, Lucky's out of court statement regarding the lookout agreement is admissible, and the Court will consider it for the purpose of ruling on Defendants' motions for summary judgment.[4]

---

[4] Defendants argue that even if the Court admits the hearsay statements, the statements should not be imputed to them because the employees were acting outside the scope of their employment.  However, there is disputed material evidence regarding the Hotel's tolerance of criminal activity to further its financial goals.  For example, the Hotel's night auditor testified that the hotel had a "heads in beds" policy that instructed employees to prioritize renting rooms in the face of illicit activities.  Therefore, the jury must resolve the question of whether the Hotel's employees were acting within the scope of their employment.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998) (stating that "the law . . . imposes liability where the employee's 'purpose, however misguided, is wholly or in part to further the master's business'") (citation omitted).

## 2. TVPRA Claim (Count I)

The TVPRA is a criminal statute that provides a civil remedy to victims of sex trafficking.  Under 18 U.S.C. § 1595(a), "[a]n individual who is a victim of a violation of [the criminal provisions of the TVPRA] may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the] chapter)."  The elements of a § 1595(a) beneficiary claim have been the source of much debate among the courts.

The Eleventh Circuit Court of Appeals first set forth a test for a § 1595(a) beneficiary claim in *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021).  It held that:

> to state a beneficiary claim under Section 1595(a), a plaintiff must plausibly allege that the defendant (1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff.

*Id*. at 726.  In developing this test, the court recognized that "[t]he district courts [were] all over the map on the meaning of the[] terms" of such a claim and that

11

the Eleventh Circuit's definition of the elements "depart[ed] from some courts and agree[d] with others."  *Id*. at 725.

The Court will begin its analysis with the participation element of the test (prong two) in light of the arguments advanced by the parties.  The Court will next consider Plaintiff's argument that Defendants knew that the enterprise violated the TVPRA as to Plaintiff and knowingly benefitted from their role in the enterprise (prongs one and four).[5]

### a.    Whether Defendants took part in a common enterprise relating to Plaintiff's trafficking[6]

The Eleventh Circuit has stated that "to participate in a venture under Section 1595(a), a defendant must take part in a common undertaking involving

---

[5] Defendants' briefs are silent as to prong three of the test and have therefore waived their argument as to that prong.  *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) (noting that the "failure to make arguments and cite authorities in support of an issue waives it"); *Jones v. Bank of America, N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) (agreeing with the district court's conclusion that "when a party fails to . . . address a claim, the [c]ourt deems such argument or claim abandoned").

[6] Although each defendant filed a separate motion for summary judgment, Plaintiff's opposition brief does not distinguish which defendant is liable for which of the alleged acts or omissions at issue here.  Instead, Plaintiff argues that each defendant is liable for the acts and omissions of the other defendants under various agency theories.  For simplicity purposes, the Court will refer to "Defendants" when generally discussing Plaintiff's TVPRA claim and will parse through Plaintiff's agency theories after the discussion of the TVPRA claim.

risk or profit." *Id*. at 727. To "participate" means "to take part in or *share with others in common* or in an association." *Id*. (Emphasis added).

In *Doe #1*, the court found that the plaintiff's allegations were not sufficient to show a common venture or the franchisor's participation in it where she claimed only that the hotel franchisor "investigated the individual hotels, took remedial action when revenue was down, read online reviews mentioning prostitution and crime occurring generally at the hotels, and controlled the training of managers and employees who were allegedly involved in facilitating sex trafficking at the hotels." *Id*. The court emphasized that "observing something [was] not the same as participating in it." *Id*. In short, the plaintiff was required to show that the defendant took some action in common with the traffickers or others at the hotel who violated the statute to further the object of the traffickers. *See id*.

The *Doe #1* court cited with approval the First Circuit Court of Appeals' opinion in *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017). As the *Doe #1* court explained, the *Ricchio* court found that the plaintiff had plausibly alleged that the hotel operators participated in a common venture with plaintiff's sex trafficker. *Id*. at 725-26. The trafficker had prior commercial dealings with the operators, which they agreed to reinstate, and the hotel operators were aware that

13

the plaintiff was being used as a sex slave.  *See K.H. v. Riti, Inc.*, No. 23-11682, 2024 WL 505063, at *3 (11th Cir. Feb. 9, 2024) (discussing the facts of *Ricchio* in the context of the participation prong).  The operators also "nonchalantly" ignored the plaintiff's plea for help and her visibly battered and bruised condition, and they likely saw the trafficker kick and physically force the plaintiff back to the room when she tried to escape.  *Id*.  The *Doe #1* court concluded that those were the "kinds of allegations [that] would establish a hotel operator's participation in a venture with a sex trafficker."  21 F.4th at 726.

In *K.H.*, the Eleventh Circuit recently had another occasion to consider what facts are necessary to demonstrate participation in a common venture for the purposes of a § 1595(a) claim.  The plaintiff in that case alleged that the operator knew or should have known that sex trafficking was occurring at its hotel based on online reviews, police reports and other visible indicators.  *K.H.*, 2024 WL 505063, at *3.  The plaintiff contended that the operator nevertheless engaged in a business relationship with her trafficker, pursuant to which the operator rented rooms to and collected fees from the trafficker over a period of approximately four years.

In its opinion affirming the lower court's dismissal of the case, the *K.H.* court referred to its prior approval of *Ricchio* and reiterated that facts indicating

14

prior commercial dealings between the hotel operators and the trafficker coupled with the operators' acquiescence in the plaintiff's specific predicament supported the First Circuit's finding that the hotel operators in that case participated in a common venture with the plaintiff's trafficker.  *See K.H.*, 2024 WL 505063, at *3.[7]  The court reasoned that K.H.'s allegations, by contrast, "amount[ed] to contentions that [the hotel operator] financially benefitted from renting hotel rooms to [the] trafficker and that [the operator] observed signs of sex trafficking at the hotel." *Id*. at *3-4.  The court repeated its view (previously articulated in *Doe #1*) that "allegations of financial benefit alone are not sufficient to establish that the defendant participated in a sex trafficking venture[,] and observing signs of sex trafficking 'is not the same as participating in it.'"  *Id*. at 4 (citation omitted).

The Eleventh Circuit's conclusion in *K.H.* echoed the district court's opinion that to sufficiently allege a § 1595(a) beneficiary claim, the plaintiff had to allege that "[the hotel operator], the beneficiary, engaged in a common undertaking with . . . the trafficker." *K.H. v. Riti, Inc.*, No. 1:22-CV-3404-MHC, 2023 WL 3644224, at *3 (N.D. Ga. Apr. 17, 2023).  The district court expressed

---

[7] *K.H.* is an unpublished, per curiam opinion.  However, it has persuasive value as it relates to the facts of this case.

15

that a description of common behaviors associated with sex trafficking, which the hotel's employees are alleged to have observed, was not sufficient to find that the hotel operator or its employees took part in a common venture with the trafficker regarding the plaintiff. *See id.* at *4.

The common thread in the Eleventh Circuit's opinions is a requirement that the plaintiff (i) show at least some connection between the hotel operator's and the trafficker's actions (the *common* venture) and (ii) identify what actions the operator took to advance the object of the joint undertaking (*participation* in the common venture). The district court in *Doe (S.M.A.) v. Salesforce, Inc.* described the Eleventh Circuit's formulation of the test as a "require[ment] that the alleged participant have an ongoing interest in the success of a specific venture and elect to further the ends of the venture beyond what would reasonably be expected in an ordinary commercial transaction." No. 3:23-CV-0915-B, 2024 WL 1337370, at *13 (N.D. Tex. Mar. 28, 2024).

District courts in this Circuit have followed this mode of analysis. *Compare C.C. v. H.K. Grp. of Co.*, No. 1:21-CV-1345-TCB, 2022 WL 467813, at *4 (N.D. Ga. Feb. 9, 2022) (finding that the allegation that the defendants knew about and observed sex trafficking at their hotel was insufficient to establish the participation element of the TVPRA claim and dismissing the

complaint because the plaintiff "fail[ed] to allege a common undertaking—between [the] [d]efendants and the alleged traffickers—involving risk and or profit"); *A.D. v. Holistic Health Healing Inc.*, No. 2:22-CV-641-JES-NPM, 2023 WL 2242507, at *3 (M.D. Fla. Feb. 27, 2023) (dismissing the complaint where "no allegations [were] made that [the] defendant [provided lodging] with, or [in] association with, the traffickers for a common goal of sex trafficking or to profit from sex trafficking"); *with Does 1-4 v. Red Roof Inns, Inc.*, 688 F. Supp. 3d 1247, 1254 (N.D. Ga. 2023) (deciding that a reasonable jury could find that the participation element was satisfied where, among other things, some employees played the role of lookout and notified traffickers when police were nearby or on the premises, and the hotel's management, upon receiving complaints of prostitution, instructed employees to book suspected sex workers in rooms located in the back of the hotel where they would be less visible to guests); *I.R. v. I Shri Khodiyar, LLC*, No. 1:22-CV-00844-SEG, 2024 WL 1928755, at *6–7 (N.D. Ga. Mar. 18, 2024) (concluding that "a reasonable jury could find that [the] [d]efendant did much more than just rent rooms to sex traffickers and observe signs of trafficking," where managerial employees took steps to facilitate trafficking at the hotel, including by visiting trafficking rooms while sex buyers were present to ask whether the buyers needed anything; permitting

17

victims to solicit sex in the front desk area of the hotel; bartering with victims for sex and providing free lodging in exchange; maintaining a relationship with traffickers; and failing to act when they saw the plaintiff chained to a bed and the trafficker's name scrawled on the wall in blood).[8]

Applying the reasoning of the foregoing cases here, the Court is persuaded that a reasonable jury could find that the Red Roof Inn participated in a common venture with Plaintiff's traffickers. As in the *Does 1-4* and *I.R.* cases, there is evidence here that the Red Roof Inn did *more* than just rent rooms to sex traffickers and observe signs of trafficking on its premises. Plaintiff has offered evidence that Red Roof Inn employees directly facilitated the illicit activities of Plaintiff's traffickers by providing lookout services. These actions go beyond what would be expected in the normal course of operating a hotel business. *See K.H.*, 2024 WL 505063, at *3 (stating that the hotel operators in *Ricchio* did more than provide guest services where the trafficker explicitly discussed an agreement to continue prior commercial dealings with the hotel operators, and the hotel operators ignored the trafficker's abuse of the plaintiff). Accordingly,

---

[8] The *I.R.* case was decided after the Eleventh Circuit rendered its February 2024 opinion in *K.H.*, and, as the Court has done here, the district court in *I.R.* looked at whether the plaintiff had demonstrated that the defendants did "more" than rent rooms to traffickers and observe trafficking at their property.

18

the Court finds that there is a genuine dispute of material fact regarding

Defendants' participation in the venture and denies summary judgment on that

basis.

> **b.**    **Whether Defendants knew that the enterprise violated the TVPRA as to Plaintiff and whether they knowingly benefitted from their role in the enterprise**

Defendants argue that there is no evidence that they had "specific actual"

knowledge that any of their revenue came from Plaintiff's trafficking or that

Plaintiff was trafficked at their property.  They contend that prior instances of

prostitution at the Hotel do not equate to actual or constructive knowledge that

Plaintiff would be or was trafficked at the Hotel.

As set forth above, however, there is evidence in the record that

Defendants' employees coordinated with Plaintiff's traffickers and facilitated

Plaintiff's trafficking by serving as compensated lookouts for the traffickers.

This evidence, among other facts in the record, creates a jury question regarding

the Hotel's knowledge of the TVPRA violation as to Plaintiff and whether the

Hotel knowingly benefitted from the enterprise.  *See Does 1-4*, 688 F. Supp. 3d

at 1254 (stating that the "'knowledge element' 'can be proved by demonstrating

either actual knowledge or deliberate ignorance'" and that "to prove either actual

knowledge or deliberate ignorance, [a] [p]laintiff may rely on both direct

evidence and circumstantial evidence based on the 'totality' of circumstances")
(citations omitted).  Therefore, summary judgment is improper for the additional
reason that there are disputed issues of fact regarding prongs one and four of the
test.

For the reasons described above, the Court **DENIES** Defendants' motions
for summary judgment as to Plaintiff's TVPRA claim.

### 3.    Vicarious Liability

The facts of the three defendants' relationship are complex and disputed.
Defendant RRI Inc. states that the Hotel is a Red Roof Inn franchisee, but RRI
Inc. is not the franchisor.  RRI Inc. explains that it licenses its name, logo and
brand to third parties through another company, Red Roof Inn Franchising, LLC
("RRF"), which is not part of this lawsuit.

At the relevant times, Defendant FMW owned the Hotel property.  FMW
leased the Hotel property to FMW RRI Opco ("Opco"), which is also not a party
to this lawsuit.  Opco entered into a franchise agreement with RRF to operate the
Hotel property as a Red Roof Inn hotel.  The franchise agreement between RRF
and Opco states that the agreement shall not be "construed to create the
relationship of employer and employee, partnership, principal and agent or joint
venture between [the] Franchisor (or its Affiliates) and [the] Franchisee."

Opco hired Defendant RRI West to manage the Hotel.  Under the management agreement, RRI West determined operating policies for the Hotel and handled the day-to-day operations of the Hotel, including staffing and guest relations.  However, RRI Inc. also established policies for the Hotel.  Only RRI Inc. was registered to do business in Georgia.

There is evidence in the record that FMW did not have any employees and that RRI West made decisions for FMW.  It also appears that an RRI West employee signed FMW's lease with Opco.

RRF, FMW and Opco received a portion of the Hotel's gross revenues under the relevant agreements.  RRI Inc. did not directly receive revenue from the Hotel's operations but indirectly received such revenues through RRF.

The parties dispute which of these entities employed the Hotel's employees.  Plaintiff points to some evidence that identifies RRI Inc. as the employer and other evidence that indicates RRI West was the employer.  There is also evidence that the president of RRI Inc. worked for RRI West at the same time he was employed by RRI Inc.

Based on Defendants' interconnected relationships, Plaintiff asserts that all three defendants are liable for the acts of the others under the theories of corporate veil piercing/alter ego doctrine and agency.

21

As an initial matter, Defendants challenge whether vicarious liability is available for a TVPRA claim.  They argue that § 1595(a) evinces a "'clear and explicit' choice to forgo common law indirect liability principles" given its focus on "'knowing participation.'"  ECF No. 94-1 at 17.  They also argue that the Eleventh Circuit has interpreted the participation requirement to mean that the party must play a specific role in the endeavor.

Although the TVPRA is silent on the issue of vicarious liability, numerous district courts have found that the TVPRA does not preclude vicarious liability claims.  *See, e.g.*, *Treminio v. Crowley Mar. Corp.*, 649 F. Supp. 3d 1223, 1232 (M.D. Fla. 2023) (collecting cases).  This makes sense because the Supreme Court has noted that "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules."  *Meyer v. Holley*, 537 U.S. 280, 285 (2003).

Moreover, a key allegation here is that the Hotel's employees actively participated in the trafficking of Plaintiff.  Defendants have not shown why the "well established . . . traditional vicarious liability rules[, which] ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment[,]" should not apply here.  *Id*.  The

Court will therefore consider whether Plaintiff's vicarious liability theories are viable grounds for relief.

**Alter Ego Doctrine**

Defendants argue that Plaintiff did not plead a veil piercing theory of relief in the Amended Complaint and cannot make this argument for the first time at the summary judgment stage. Defendants additionally argue that Plaintiff cannot satisfy the elements of such a claim, including the requirement that Plaintiff show that the corporate form was used to commit fraud or some other wrong.

Under federal common law, courts look at the totality of the circumstances to determine whether an alter ego relationship exists. *See Eitzen Chem. (Singapore) PTE, Ltd. v. Carib Petroleum*, 749 F. App'x 765, 770 (11th Cir. 2018).

> "[A] finding of control or domination of a corporation by an individual or a corporate entity and the use of the corporate fiction are necessary prerequisites to the application of the alter ego theory of liability." Once that is established, "it is appropriate to brush aside the corporate veil when it appears a corporation was organized for fraudulent purposes, illegality, or wrongdoing." The focus is not on an individual's personal misconduct, but on whether the corporate form itself was abused and whether the misuse of the corporate form constituted the fraud or injustice complained of in the underlying suit.

*Id*. (citations omitted; alteration in original).

23

Here, setting aside the issue of whether Plaintiff properly pleaded the alter ego theory of liability, Plaintiff has not offered evidence that demonstrates that any of the corporate defendants was organized for a fraudulent purpose, illegality or wrongdoing. Plaintiff instead argues that the Court should disregard Defendants' corporate form in the interests of justice because allowing Defendants to escape liability due to their complex corporate structure would contravene the important public policy underlying the TVPRA.

However, none of the cases Plaintiff cites in support of her argument have applied the alter ego doctrine to disregard the corporate form where, as here, there is no evidence that the corporate form was abused to perpetrate the injury. Consequently, the Court finds that Plaintiff's alter ego theory of liability is not viable under the circumstances of this case.

**Agency Doctrine**

RRI Inc. contends that Plaintiff cannot show that it exerted the type of control over RRI West required to establish an agency relationship. RRI West disputes that it was FMW's agent and argues that FMW's only involvement here was that it owned the Hotel property. FMW similarly argues that RRI West was not its agent and asserts that it did not have "any" control over RRI West, let alone sufficient control to establish an agency relationship.

An agency relationship requires "(1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent." *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003). In the employment context, an employer may be liable for actions its employees take within the scope or authority of their employment. *See Meyer*, 537 U.S. at 285.

Here, the Court has already explained that a jury could reasonably find that the front desk clerk and the housekeeping staff who were allegedly paid to serve as lookouts for Lucky acted within the scope of their employment when they accepted those payments. Thus, the employer(s) of those staff members could be held vicariously liable for their actions. The factual dispute regarding whether RRI Inc. or RRI West employed the Hotel's employees means that summary judgment in favor of either entity is inappropriate.

Additionally, there is conflicting (and disputed) evidence regarding the relationship between the Defendants. For example, the record contains evidence that certain entities took actions on behalf of others, which could demonstrate an agency relationship. The parties, however, disagree on the facts and meaning of those interactions. Because a jury must decide the disputed facts of the

defendants' relationships, summary judgment on the agency question is not appropriate.

### III.   <u>CONCLUSION</u>

For the reasons set forth herein, Defendants' motions for summary judgment, ECF Nos. 94, 95, 96, are **DENIED**.

The parties are hereby **ORDERED** to file the Consolidated Pretrial Order required by Local Rule 16.4 within fourteen days of the entry of this Order. Failure to comply with this Order may result in sanctions, including dismissal of the case or entry of default judgment.  In the event a Consolidated Pretrial Order is not filed at the expiration of the fourteen-day period, the Clerk is **DIRECTED** to submit the case to the Court.

**SO ORDERED** this 14th day of June, 2024.

_____
**J. P. BOULEE**
United States District Judge